1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - -

CURTIS TVRDOVSKY, on behalf       )
of himself and all others        )
similarly situated,              )
                                 )
                    Plaintiff,   )
                                 )   Civil Action
        vs.                      )   No. 2:13-1463 JFC
                                 )
RENEGADE WIRELINE SERVICES       )
(RWLS),                          )
                                 )
                   Defendant.    )

- - -

THURSDAY, JULY 31, 2014

- - -

The 30(b)(6) deposition of RANDY CASSADY, called
as a witness by the Plaintiff, pursuant to notice and
the Federal Rules of Civil Procedure pertaining to the
taking of depositions, taken before me, the
undersigned, Rebecca L. Schnur, Notary Public in and
for the Commonwealth of Pennsylvania, at the offices of
The Employment Rights Group, 100 First Avenue, First &
Market Building, Suite 1010, Pittsburgh, Pennsylvania
15222, commencing at 9:07 o'clock a.m., the day and
date above set forth.

- - -

NETWORK DEPOSITION SERVICES
1101 GULF TOWER
707 GRANT STREET
PITTSBURGH, PENNSYLVANIA 15219

- - -

**Page 2**

APPEARANCES:
On behalf of the Plaintiff:

Joseph Chivers, Esquire
The Employment Rights Group
100 First Avenue
First & Market Building
Pittsburgh, PA  15222
John Linkosky, Esquire
John Linkosky & Associates
715 Washington Avenue
Carnegie, PA  15106

On behalf of the Defendant:

Christian C. Antkowiak, Esquire
Buchanan Ingersoll & Rooney, P.C.
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219

---

I-N-D-E-X
EXAMINATION BY:                    PAGE:
Mr. Chivers                           4
---

**Page 3**

EXHIBIT INDEX
Deposition Exhibit                                    MARKED
Exhibit 1  Objections to 30(b)(6)                      50
         Notice of Deposition
Exhibit 2  Notice of 30(b)(6)                          51
         Deposition
Exhibit 3  Responses to Interrogatories                51
         and Requests for Production of
         Documents
Exhibit 4  Supplemental Responses to                   85
         Interrogatories and Requests
         for Production of Documents
Exhibit 5  Invoice Information for                     145
         Shell Energy
Exhibit 6  Invoice Information for                     145
         Double Play Oil & Gas
Exhibit 7  Driver's Daily Log for L.                  145
         Pospisil
Exhibit 8  Truck Equipment List                       145
Exhibit 9  Employee Leased Vehicle                    145
         Allowances
Exhibit 10  Current Employees                         145
Exhibit 11  Former Employees                          145
Exhibit 12  Driver's Daily Log for                    145
         Jalomo
Exhibit 13  Invoice Information for                   145
         Chesapeake
Exhibit 14  Spreadsheet                               194
Exhibit 15  Invoice Information for                   209
         Heritage Standard
Exhibit 16  Driver's Daily Log for Smith              209
Exhibit 17  Invoice Information for                   212
         Scientific Drilling
Exhibit 18  Tvrdovsky Personnel File                  217
---

**Page 4**

RANDY CASSADY,
called as a witness by the Plaintiff, having been first
duly sworn, as hereinafter certified, was deposed and
testified as follows:
            EXAMINATION
BY MR. CHIVERS:
     Q.  Would you state and spell your name for the
record?
     A.  Randy Cassady, C-a-s-s-a-d-y.
     Q.  And, Mr. Cassady, for the record, have you
ever given a deposition before?
     A.  Yes.
     Q.  All right.  I'll cover the ground rules
quickly, and if you have any questions, you make sure
you just ask me.
          First, you understand that you're under oath?
     A.  Yes.
     Q.  And you understand that, if you were to
deceive, if you were to lie, if you were to
misrepresent or knowingly deceive during this
deposition, that you could be subject to the penalties
of perjury?
     A.  Yes.
     Q.  Okay.  I don't want you guessing today, but
to the extent that you have knowledge, if I ask you a

**Page 5**

question and you can't say with certainty, a hundred
percent certainty, the answer to this, well, then, at
least tell me within some reasonable basis or grounds
what you do know.  All right.  So even if it's not a
hundred percent certainty, say:  Look.  I can't say
with a hundred percent certainty, but I can tell you,
based on my experience, this is what I understand.
Okay?
     A.  All right.
     Q.  If I ask you a question and you don't
understand it in whole or in part, you've got to tell
me.  All right?
     A.  Okay.
     Q.  And I say that because what happens
otherwise:  I'll ask you a question.  You'll give an
answer.  And then, all we have in the future to go on
is what's in the transcript.  Okay?
     A.  All right.
     Q.  The other thing, too, is make sure that --
and you're doing a good job so far -- make sure you're
verbal in your answers.  The nodding and the shaking of
the head doesn't get transcribed.
     A.  Okay.
     Q.  And lastly -- and then we'll start -- you're
not ill; you're not on prescription medication, nothing

**6**

1    that would impair your ability to hear and understand?
2        A.  No.
3        Q.  I'm going to start with the simple stuff,
4    which is your background.  How is it that you got
5    started?
6        You're in the business.  I guess it's called
7    Renegade Wireline?
8        A.  How is it that I got started with Renegade,
9    or how is it that I got started in the business?
10       Q.  In the business.  That's what I'd like to
11   know.
12       A.  My dad was in this business.  And when I got
13   out of high school, I needed a job, and he suggested
14   that I get started in this business.
15       Q.  And this business, describe to me, what is
16   it?
17       A.  It's a cased hole wireline service business
18   in the oil and gas industry.
19       Q.  What was that first word you used?
20       A.  Cased hole.
21       Q.  Spell that.
22       A.  C-a-s-e-d.
23       Q.  C-a-s-
24       A.  -e-d, yeah.
25       Q.  And what's the next word?

**7**

1        A.  Wireline.  Cased hole wireline.
2        Q.  Cased hole?
3        A.  Right.
4        Q.  Thank you.
5        And the cased hole refers to drilling a hole
6    in the ground, whether it's for gas or oil, and leaving
7    a casing in it?
8        A.  Correct.
9        Q.  Is that fair?
10       A.  Yes.
11       Q.  Okay.  When you got started —
12       If you could, give me your age.  I don't want
13   your date of birth, but what's your age?
14       A.  When I got started?
15       Q.  No.  Right now.
16       A.  Today's my birthday, so probably —
17       Q.  Happy birthday, I guess.
18       A.  No, it's not.
19       I'm 58.
20       Q.  Thanks.
21       (Discussion off the record.)
22       Q.  All right.  So 58, so you've been doing this
23   for 40 years.  Right?
24       A.  Yes.
25       Q.  Okay.

**8**

1        A.  Actually longer.  My dad was in it.  He grew
2    up in the business.
3        Q.  Alrighty.  In Texas?  Oklahoma?
4        A.  Wherever there's oil wells.  Texas, Oklahoma,
5    New Mexico, Mississippi, Pennsylvania, all over.
6        Q.  Now, did your dad actually have a business,
7    or did he —
8        A.  He worked for somebody.
9        Q.  Thank you.  All right.
10       Okay.  So you've been doing this cased
11   hole — you started out in the oil industry more than
12   the gas or —
13       A.  Same.  It's the same difference.
14       Q.  Same thing?
15       A.  Yeah.
16       Q.  Okay.  And you've been doing this for 40-some
17   years.
18       How is it that eventually you got into
19   this — into Renegade Wireline Services, RWLS?
20       A.  About five years ago, I decided that I no
21   longer wanted to work for the people I was working for,
22   so I had a couple of choices, go back to work for
23   somebody else or try to do something myself, and I
24   thought the opportunity — the timing was right to
25   start my own business.

**9**

1        Q.  Did you start this business, Renegade?
2        A.  Yes, I am one of the founders.
3        Q.  Thank you.
4        Congratulations, by the way.  Starting a
5    business is tough.
6        A.  Uh-huh.
7        Q.  I know that.
8        So give me an approximate date when you
9    started Renegade Wireline Services, RWLS?
10       A.  In October will be five years.
11       Q.  Okay.  All right.  So 2009?
12       A.  Right.
13       Q.  Correct?
14       A.  Uh-huh.
15       Q.  2009.  You're headquartered where?
16       A.  In Levelland, Texas.
17       Q.  How do you spell that?
18       A.  L-e-v-e-l-l-a-n-d, Levelland.
19       Q.  Levelland?
20       A.  Yeah.
21       Q.  Levelland, Texas.
22       A.  Not a tree in sight, and it's flat.
23       Q.  Level?
24       A.  Level, yeah.
25       Q.  That's how it got its name, I'd imagine.

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

4 (Pages 10 to 13)

10

1    A.  I would imagine.
2    Q.  What part of Texas is that?
3    A.  West.
4    Q.  How far west?
5    A.  Just 30 miles from New Mexico, about as far
6  west as you can go.
7    Q.  Panhandle?
8    A.  Panhandle -- right below the panhandle.
9    Q.  I gotcha.
10   A.  What's, in the oil and gas business, called
11 the Permian Basin.
12   Q.  Is that right?
13   A.  Yeah.
14   Q.  Okay.  All right.  Does the Permian Basin
15 also include New Mexico, part of it?
16   A.  The Permian Basin does extend into
17 New Mexico, yes.
18   Q.  Now, is that where you got the business
19 going?
20   A.  No.
21   Q.  Where did you get it going?
22   A.  In Mansfield, Pennsylvania.
23   Q.  Yeah.  Up near Scranton/Wilkes Barre?
24   A.  North of Williamsport.
25   Q.  North of Williamsport.

11

1    A.  Almost New York.
2    Q.  Yeah.  Yeah.  Tioga, that area?
3    A.  Yes.
4    Q.  Well, Mansfield, because of the Marcellus
5  Shale?
6    A.  Yes.
7    Q.  Any other reason up in Mansfield?
8    A.  That's where my customer relations were.
9    Q.  In other words, your customers?
10   A.  Right.
11   Q.  And when you started out, who were your
12 primary customers?
13   A.  East Resources.
14   Q.  Okay.  I may as well ask you right now, since
15 you brought it up, the actual services that you perform
16 in Wireline Renegade -- or Renegade Wireline, is it
17 restricted to wireline, in other words, where you're
18 performing those services with explosives in the cased
19 holes?
20     Describe to me:  What do you do in your
21 business?
22   A.  We have a very specialized truck that has a
23 winch with an electric cable on it, and we deploy
24 various mechanical, electrical, and ballistic devices
25 into the well bore to do various services.

12

1    Q.  Thank you.
2      Is this typically the five- to
3  five-and-a-half-inch well?
4    A.  It can go -- whatever.  It can go all the way
5  from 2 inch to 20 inch.
6    Q.  I didn't know it got that big.
7    A.  Yeah.
8    Q.  Does it matter whether it's oil or gas?  Are
9  they bigger, typically, for the gas?
10   A.  Just about all oil wells produce both gas and
11 oil, so there is not much distinction between the two.
12   Q.  I gotcha.  I gotcha.
13     Even the Marcellus Shale?
14   A.  The more profitable section of the Marcellus
15 Shale does produce the liquids.  There are sections of
16 the Marcellus Shale that produces gas.  And that --
17 with gas prices the way they are right now, you prefer
18 to be in the section of the Marcellus that produces the
19 liquids also.
20   Q.  Now, is that, for example, why, like, Shell
21 is talking about putting in a cracking plant?
22   A.  No, nothing to do with it.
23   Q.  Okay.  That's fine.
24     All right.  So, anyway, your business, you
25 have a specialized truck that provides mechanical,

13

1  electrical, and ballistic, you called it -- Right?
2    A.  Uh-huh.
3    Q.  Give me an example, a typical kind of job
4  that Wireline does.  You go out to one of these well
5  sites?
6    A.  Yes.  Probably the majority of our work
7  involves ballistic services, which we lower a ballistic
8  device, in a shaped charge, into the hole and detonate
9  it at certain depths to open the casing to the
10 formation, to put a hole in it.
11   Q.  Yeah.  Are these almost like little BBs in
12 a --
13   A.  No.
14   Q.  No?  Okay.
15   A.  They're a shaped perforating charge.  They're
16 like a bazooka shell.
17   Q.  Yeah.  You run them down the casing, right,
18 at a certain depth or certain distance?
19   A.  Yes.
20   Q.  Detonate them?
21   A.  Yes.
22   Q.  Does that actually blow out the entire
23 casing?
24   A.  No.  It puts a hole in it.
25   Q.  Just a hole.  That's my point.  So it's got

14

```
1    to be a directed charge?
2        A.  It's shaped.
3        Q.  Shaped?
4        A.  That's the definition of shaped charge.
5        Q.  And by being shaped, it obviously, then, is
6    designed to just explode out or blow a hole in a
7    certain place?
8        A.  Yes.
9        Q.  Not the whole damn casing?
10       A.  We have ballistic devices that will take care
11   of the whole casing also.  So it's an extremely -- very
12   specialized services that we do.
13       Q.  Yeah.
14       A.  But we can do numerous things with our
15   ballistic devices.
16       Q.  Yeah.  Among the three techniques you just
17   described to me, mechanical, electrical, and ballistic,
18   approximately what percentage of your work and your
19   revenues come from ballistic?
20       A.  Probably 60 percent.
21       Q.  Okay.
22       A.  That's just a guess.
23       Q.  It's probably -- it's an educated guess.  I
24   mean, I wouldn't be able to guess anything.  You at
25   least have knowledge, obviously, in the business.
```

15

```
1        The majority of your business -- without
2    having to put a figure or percentage on it, the
3    majority of your business is from the ballistic
4    charges?
5        A.  You know, that would be a real hard number to
6    determine, because a lot of times we're doing both.
7    Typically, on an oil well, from start to finish, we'll
8    have done all of those types of services at various
9    points in time during the life of the well.
10       Q.  You currently then -- this is what you've
11   been doing for going on five years.  Right?
12       A.  Yes.
13       Q.  You're one of the owners?
14       A.  Yes.
15       Q.  Who are the other owners?
16       A.  Everybody that works for Renegade Services is
17   an owner.
18       Q.  Okay.
19       A.  So we're all owners.
20       Q.  And so is that an ESOP, or how do you do
21   that?
22       A.  We've set apart 10 percent of the company for
23   all the employees.
24       Q.  Okay.  And then, the other 90 percent is
25   divided how?
```

16

```
1        A.  There is -- I do not know the exact
2    percentages, but there are numerous people involved in
3    that other 90 percent.
4        Q.  Is there any majority owner?
5        A.  There's five of us that sit on the board that
6    are the majority owners, and we all own equal shares
7    and majority shares.
8        Q.  Combined?  The five of you combined, it's a
9    majority?
10       A.  We all own equal amounts of shares.
11       Q.  Right.
12       A.  And the five of us own the majority of the
13   company.
14       Q.  Fair enough.
15           I mean, you just told me then that, at a
16   minimum, each of you has 10 percent plus?
17       A.  Yes.  And I don't remember the exact
18   percentage.
19       Q.  That's fine.
20           Okay.  I looked -- I did -- before you came
21   in, I looked at your profile, not that there is a whole
22   lot there.  I mean, like LinkedIn, you're about --
23   you're right next to me.  I have nothing.  All right.
24       A.  Yeah.
25       Q.  You have next to nothing.
```

17

```
1        A.  Yeah.
2        Q.  And it said, no activity for, you know, like
3    however long.
4        A.  Everybody wants to be my friend.
5        Q.  I figured.  What the heck?
6            My question to you is this:  What's your
7    current title?
8        A.  Vice president of operations.
9        Q.  Thanks.
10           Do you report to anybody, or is it all
11   shared?
12           As the vice president, you're on the board.
13   Correct?
14       A.  Correct.
15       Q.  There are five of you on the board?
16       A.  Yes.
17       Q.  And all of you --
18       A.  I loosely term it as a board.  It's probably
19   not structured like most boards are.
20       Q.  Are you the guy that actually founded this,
21   that really got it going?  You had the idea.  You're
22   the one that decided, this is something that can be
23   done; I'm tired of working for other people?
24       A.  Yes.
25       Q.  That's fair.  Okay.  Good.
```

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

6 (Pages 18 to 21)

18

1  So you don't really report to anybody. It's
2  not like you report to the president or the CEO?
3  A. No.
4  Q. Fair enough. Okay. Thanks.
5  Now, as VP of operations, do the people who
6  are involved in this business, the wireline business --
7  do you call it the wireline business?
8  A. Yes.
9  Q. Because I've heard it in other companies,
10  they've referred to wireline, wireline. And they're
11  not talking about Renegade necessarily?
12  A. Right.
13  Q. Other companies, Superior and people like
14  that, will run a so-called wireline business?
15  A. Yes.
16  Q. Fair enough.
17  Do the people who are doing the wireline work
18  all report to you?
19  A. No.
20  Q. Okay. You have people reporting to you?
21  A. Yes.
22  Q. Okay. Who reports to you, at least by title?
23  A. The district manager for Northeast
24  Pennsylvania, the district manager for Southwest
25  Pennsylvania, the district manager for Refugio, Texas.

19

1  Q. For where?
2  A. Refugio, R-e-f-u-g-i-o.
3  Q. Okay.
4  A. And then, the district manager for Devine,
5  Texas.
6  Q. And do the people who are doing the wireline
7  services, themselves, report to these different
8  district managers?
9  A. Yes.
10  Q. Okay.
11  A. For those districts.
12  Q. Okay. That's fair.
13  A. We have numerous other districts.
14  Q. Fair enough. Yeah.
15  Tell me -- if you can remember, tell me what
16  districts you have. Maybe the easiest way to do it,
17  though -- the way you described it just now, are there
18  other VPs of operations?
19  A. The title VP of operations is pretty -- we
20  don't go -- we have a title because that gets you into
21  the door with some of our customers that a salesman
22  couldn't get into with a salesman title.
23  Q. Yeah.
24  A. The titles really don't mean anything.
25  Q. That's fair.

20

1  What I'm interested in is knowing what other
2  districts you have. You're in charge of a bunch of
3  these different districts?
4  A. Four. Four of them.
5  Q. You're right. One, two, three, four.
6  How many other districts are there?
7  A. There's Woodward, Oklahoma.
8  Q. Yeah.
9  A. There's a shop in Mississippi. I'm not sure
10  of the town. Hobbs, New Mexico; Levelland, Texas;
11  Andrews, Texas; Midland, Texas; Snyder, Texas. I think
12  that that's all of them.
13  Q. Levelland, Andrews -- then there was one more
14  before Snyder.
15  A. Levelland, Andrews, Snyder, Midland.
16  Q. Midland.
17  A. And Denver City, Texas.
18  Q. Okay.
19  A. I think we're up to about 13 districts, 12 or
20  13.
21  Q. Are these districts fairly autonomous in the
22  way they are all set up so they can operate and do
23  whatever you guys provide in the way of services?
24  A. Yes.
25  Q. Okay. Are you performing work -- I mean, do

21

1  you expect people to do things the same no matter what
2  district they're in?
3  A. Some of those percentages between different
4  services may be different between districts, but,
5  basically, we all do those three services.
6  Q. Fair enough.
7  No matter where you are, in what districts,
8  you, I would assume -- with all your years of
9  experience, you have learned how you want things done,
10  and you expect things to be done that way no matter
11  where?
12  A. I don't have anything to do with the
13  operational part of the other districts, so they have a
14  division manager in charge of that.
15  Q. Now, do you have -- you've described these
16  districts. Does each of these districts have a shop,
17  some facility of some kind?
18  A. Yes.
19  Q. And then, that shop is typically the locale
20  for the well sites, where your people are in that area?
21  A. Yes.
22  Q. Okay. Why don't we do this? And you can
23  tell I've got to ask you a lot of questions because I'm

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 7 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

7 (Pages 22 to 25)

Page 22

1  not as -- obviously, I don't know the business like you
2  do.
3      A.  Okay.
4      Q.  Why don't you tell me, at the shops --
5  typically, what do you have in one of your shops,
6  because, you know, you told me, I think, you have,
7  what, 13 shops now?
8      A.  Twelve, 13, something like that.
9      Q.  Fair enough.
10     A.  What do you mean?
11     Q.  Well, describe it to me.  What is it that
12  goes on at the shops?  You have -- I understand from my
13  client -- do you make the charges?  Do you shape the
14  charges or assemble them?
15     A.  No.  We assemble perforating guns.
16     Q.  Assemble perforating guns.
17     A.  Basically, the shops are a staging area.
18  Most of the work is done in remote locations.
19     Q.  Thank you.
20     A.  The shops are primarily staging areas.
21     Q.  And when you say "staging areas," describe
22  what that means.
23     A.  Getting prepared to go out and do various
24  services.
25     Q.  Let's talk about your typical job.  All

Page 23

1  right?
2      A.  All right.
3      Q.  Do you have your guys -- your guys, the
4  people who are doing this wireline service, do they
5  report to the shop before they go to the sites
6  typically?
7      A.  Not necessarily.
8      Q.  Not necessarily.
9          Let's just say that the job hasn't started at
10  the well site yet.  All right?  We'll take an example
11  like that.
12          Do the wireline employees report to the shop?
13     A.  Jobs are very complex, and they're very
14  different, so the type -- we all kind of do the same
15  three basic types of services.  But if you actually got
16  in and drilled down into each of those services, there
17  are a tremendous amount of services that fall under
18  those three categories.  And it involves different
19  types -- it's very -- one of the pleasing things about
20  this occupation is, you typically are not doing the
21  same -- exact same thing every single day.  One day
22  you're doing one thing, and the next day you're doing
23  something else.
24     Q.  Let's do this.  I'm going to need this for my
25  understanding.  You defined three basic types of

Page 24

1  services that you perform from your specialized trucks,
2  mechanical, electrical, ballistic.  Right?
3      A.  Yes.
4      Q.  Give me an example -- Be descriptive.  Give
5  me an example of the mechanical services that you
6  perform.
7      A.  Very basic service, to lower the cable into
8  the hole, measure the cable, and tell how deep the hole
9  is.
10     Q.  You do more than that.  What other mechanical
11  things do you do?
12     A.  We run gauges in the hole to tell what size
13  the hole is.  We run --
14     Q.  Now, when you say -- let me interrupt there
15  because -- run gauges in the hole to see how big the
16  hole is, do you mean the hole where the oil is or the
17  gas is?
18     A.  The hole, yes.
19     Q.  That's what you're referring to?
20     A.  Yes.
21     Q.  You're not referring to the casing?
22     A.  The cased hole, yes.  You got a hole in the
23  ground.
24     Q.  Right.
25     A.  That's where we do our work, is in that hole

Page 25

1  in the ground.  And, yes, that's where -- they
2  hopefully get oil or gas out of it.  Sometimes they put
3  stuff into it also.  So there is various things you can
4  do with an oil and gas well.
5      Q.  Here's what I meant by that:  You run gauges
6  in the hole to see how deep the hole is, right, or how
7  big the hole is?
8      A.  Yes.
9      Q.  When you say "how big the hole is," are you
10  referring to the hole where the oil is, and the gas, or
11  are you referring to the casing itself?
12     A.  The casing.
13     Q.  Okay.  I'm a little confused by that because
14  I'm not as familiar as you are.
15          Don't you know how far you've drilled this
16  hole and how much casing you've laid?
17     A.  You do at the beginning.
18     Q.  Right.
19     A.  But 30 or 40 or 50 years from now, you don't
20  know what the condition of that hole is in.  These
21  wells are -- the wells that they're drilling in the
22  Marcellus right now will be active for 30 to 40 to 50
23  years from now.
24     Q.  Thanks.  See, I didn't know that.
25     A.  Yeah.

26

1      Q.  I know they have some life to them.
2           So what you're saying is, you'll also be
3   called in, and you run gauges in holes that have been
4   there for 20, 30 years?
5      A.  And sometimes brand-new ones, that you're in
6   there fracking with tremendous amounts of pressure and
7   sand, and you don't know what's going on down in the
8   well, and we have tools and devices that will let us
9   know.
10     Q.  And I assume that's important for the owners
11  then to be able to estimate -- well, first, to
12  determine if the oil or the gas is going to flow
13  freely?  What's the primary purpose of figuring out --
14  running those gauges in the hole?
15     A.  We have other tools and devices that we may
16  want to lower in to do various work.  We set plugs,
17  isolating certain parts of the well off.  We might want
18  to run in and dump some cement.  We may want to run in
19  and cut the casing and it's a dry well.  They want to
20  try to recover some of the casing.
21          So most of the time we need to know what the
22  hole -- what condition the hole is before we run other
23  devices in the hole.
24     Q.  Thanks.  That's very helpful to me.  Okay.
25  That's good.

27

1           So those are some of the mechanical services.
2   Right?
3      A.  You know, we could probably go on for days on
4   the amount of stuff that we can do on the end of that
5   cable.
6      Q.  Yeah.  Yeah.
7           Is the cable that you're talking about -- is
8   there a standard size?  Do you have different sized
9   cables, diameter?
10     A.  There are several sizes, all the way from
11  .092 cable to 7/16.
12     Q.  You told me a lot, though, about your
13  business, because those are relatively small cables?
14     A.  Yes.
15     Q.  I mean, because, if you're doing something,
16  for example, like coil tubing, you got a
17  two-and-a-half, two-and-three-quarter-inch cable?
18     A.  Yeah.
19     Q.  Right?
20     A.  Right.
21     Q.  And so you guys -- I begin to understand.  If
22  that's the size of your cable then, you really are
23  going down and, for example, monitoring or measuring
24  things or clearing things?  Do you also clear things
25  out of the lines?

28

1      A.  Yeah, we can.
2      Q.  Okay.  You mentioned plugs.  Do you guys
3   actually put plugs in the cased holes sometimes?
4      A.  Yes.
5      Q.  All right.  But you're not doing the
6   fracking; are you?
7      A.  No.  We don't -- we don't have the pumps.
8      Q.  Yeah.  Okay.  All right.  So that's some of
9   the mechanical stuff.
10          What's some of the electrical services you
11  provide?
12     A.  We run a tool in that can identify where the
13  couplers are, which we use for depth control in the
14  well.
15     Q.  What are the couplers?
16     A.  Where they're screwed together.
17     Q.  Thank you.
18          Okay.  Where the casing is screwed together?
19     A.  Right.
20     Q.  Thanks.  Okay.
21     A.  We run caliper tools in the hole, where we
22  can tell exactly how big the hole is, and get a 3-D
23  image of what the hole looks like.  We run -- we have
24  one tool that's a pulsed neutron tool.  It pulses a
25  neutron cloud.  And we watch -- the neutrons collide

29

1   with the formation --
2      Q.  Yeah.
3      A.  -- and give off gamma rays at different
4   levels and energy levels.  And we watch what comes
5   back, and, from that, by how much comes back, by what
6   energy levels come back, we can get a pretty good idea
7   of what it's made -- what the formation is made out of.
8      Q.  Because each of these substances, whether
9   it's just shale or whether it's some other rock or
10  whether there is gas embedded in that rock, will give a
11  different signature when you --
12     A.  Yes.
13     Q.  -- the readings?
14     A.  Right.
15     Q.  Okay.
16     A.  It's pretty complex.  I mean, it's --
17     Q.  Yeah.  Yeah.
18          Do you do 3-D seismic at all?
19     A.  No.
20     Q.  That's somebody else that's really going in
21  beforehand, typically, I would think?
22     A.  Yes.
23          We run sonic tools in the hole to determine
24  the quality of the cement bond between the casing and
25  the formation.

---

30

Q. When — I don't know if you call it "laying the casing." What do you call it where the guys are drilling the darn hole and leaving the casing?

A. Drilling. You're drilling. You drill an open hole. And there are a lot of wireline services that are done in the open hole, before you put the casing in the hole.

Q. The casing in?

A. That's the open hole company.

Q. I'll be darned.

A. And we traditionally do our services after the casing has been in the hole.

Q. After somebody's already placed the casing?

A. You drill the hole. You do various services.

Q. Yep.

A. There's things that you can find out about the formations during the drilling process that you can't find out after the casing has been placed in the hole.

Q. Very good.

A. So then, they put the casing in the hole, and that's, typically, when we'll start our various services. It can take about a month to a year to drill some wells. And after that time, we do services for the next 30 years on that -- or for the rest of the

---

31

life of the well.

Q. In other words, periodically, you're asked to come in and do diagnosis?

A. All kinds of stuff.

Q. Diagnosis, repair —

A. All kinds.

Q. — assessment. Right?

A. Yep.

Q. I mean, obviously, you want to make sure you're getting maximum flow from this well?

A. Not all wells flow. Sometimes you're injecting stuff, so it's --

Q. Injecting stuff in order for another well to produce?

A. Exactly.

Q. I gotcha.

Kind of forcing it from this end?

A. Yeah.

Q. It's almost like driving birds?

A. That's called secondary recovery.

Q. There you go. I'll be darned. Okay.

So the drilling, itself, might take anywhere from what, a month to a year?

A. From a week -- from three days to a year. It just depends on the well.

---

32

Q. That's an individual well, let alone how many are on a well site?

A. Yes. Individual well.

Q. Interesting.

And then, you guys are really — you're there throughout the life of this well to provide the services?

A. Yes.

Q. Okay. All right. Now, you gave me some examples of the electrical services you provide and mechanical and the ballistic.

Give me -- describe to me a little bit more about the ballistic services that you provide.

A. Various shaped charges in the hole to either put a hole in it or to cut it in two or maybe clear debris downward. During the drilling process, we can lower ballistic devices -- they get stuck in the bottom of the well, and they're free at some point. They want to recover all the pipe that they can get out of the hole. And we'll lower a small piece of primer cord in, a string. We call it a string shot. And we'll position it across one of the couplers. And we can manipulate the pipe where, when we shoot that off, it will unscrew at that particular coupling, and then they can bring --

---

33

Q. Then you can haul it out, at least from that point up?

A. Right.

And we have tools that will tell where it's stuck in the hole, electrical tools, that we can figure out where they're stuck in so we can bring out all the pipe that's free. And then, they'll go in, and they'll wash over the part that's stuck, so, hopefully, you bring out -- you get back to the bottom of the well.

Q. The pipe is made typically of what, cast iron, or does it vary?

A. Steel.

Q. It is steel?

A. Yeah.

Q. Normally?

A. I think pretty traditionally. I would be -- there is some fiberglass-type tubing and casing, but that's very -- that's extraordinary.

Q. What you want is something that doesn't corrode?

A. It all corrodes.

Q. It all corrodes?

A. That's one of the things that -- one of the electrical devices, we can tell inside corrosion, outside corrosion.

34

Q. Yep. That's very helpful to me.
Question: Where's the concrete poured? Is it on the outside of the casing?
A. You pump it.
Q. Right.
A. So you pump it down the inside of the casing.
Q. Right.
A. You put up -- after you get -- you pump a certain amount of cement.
Q. Right.
A. And you put a plug on top of it, and then you continue to pump that plug down all the way to the bottom of the well, where it seats. Then the cement will go out of the bottom of the casing --
Q. It oozes up?
A. -- and come back up to the top of the surface.
Q. I gotcha, because, needless to say, the hole is a little bit larger in diameter, right, bigger than the casing?
A. Yes.
Q. Wow! Okay.
So you just -- all the way down to the bottom and it just oozes up. Right?
A. Yes.

35

Q. What do you do, wait until you can see it?
A. You do -- hopefully, you've calculated the right amount of cement that you put in there, and you see returns to the surface. If you do not see returns to the surface, you are required to go in there and figure out --
Q. -- where the heck it went?
A. -- where the top of that cement is. And we do that. That's one of the services that we can do.
Q. That's very good. All right. Thanks.
A. We can run -- the cement gets hot when it cures, and you can run a temperature tool in, a thermometer, and tell where it's getting hot at. That will give us an indication of where the top of the cement is. Or we can use one of our acoustic tools.
Q. Do you ever have problems where you're called in to actually do something with the cement that's around the outside of the casing?
A. Yes. We find the top of that cement. Then we'll lower a shaped charge, put a hole above where the top of that is. Pump more cement in --
Q. Gotcha.
A. -- before it gets to the surface.
Q. Yep. Yep.
And then, just keep moving it up to the

36

surface?
A. Yep.
Q. I'm curious about this. Is the cement around the perimeter of the casing -- is that required because that's what's necessary to keep the casing secure, or is it for environmental reasons?
A. Environmental.
Q. Thank you.
What they're really trying to say is: Okay. We're not just going to rely upon this steel pipe, the casing. We also want it enclosed with concrete?
A. Yes. And they don't even rely on one of those. It's several strings of casing at various depths, that they're -- When you're trying to isolate the oil or gas from a water zone, which is what you're talking about --
Q. Yes.
A. -- there are numerous barriers. It's not just one string. And, plus, most of the time, on most oil wells, you actually go into the casing and set another string of two-inch pipe or two-and-a-half-inch pipe inside of the well bore to isolate it even further.
Q. Multiple barriers?
A. Multiple, you know.

37

Q. So at the end of the day, you might have, out of five-and-a-half-inch casing -- diameter casing, the oil and or gas may only be flowing through, what, an inch or two?
A. Two inch.
Q. Two inch. Thank you. All right.
And then, on the outside of that, it's encased in concrete?
A. On the outside of the two inch, it's encased with the casing, the five-and-a-half casing.
Q. Right.
A. You monitor that -- the pressure on that casing. We call it the annulus, the space between the tubing and the casing. We monitor the pressure so that, while you're producing the gas through the tubing, if you get a tubing leak, you'll start building into the casing.
Q. Sure.
A. And we can identify that before it becomes an environmental issue.
Q. Yeah.
A. We'll go in and repair -- we have various tools that we can lower in and repair.
Q. The two-inch, if you will --
A. Yeah.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 11 of 65
NETWORK DEPOSITION SERVICES
Transcript of Randy Cassady

11 (Pages 38 to 41)

**38**

1  Q.  -- casing?
2  A.  Yeah.
3  Q.  The two-inch line.
4      What do you call it, the line?
5  A.  Tubing.
6  Q.  Thank you.  All right.  Two-inch tubing.
7      And yet, at the same time, what you're
8  saying, ultimately, you still have this outer barrier
9  around the perimeter, the five-and-a-half --
10  A.  Several outer barriers.  That's where you get
11  into the 20-inch pipe.  You go from five and a half to
12  seven inch to ten and three-quarters.  A 20-inch pipe,
13  probably not any more than couple of hundred feet deep.
14  But you just keep putting these barriers.  Where that
15  water sand is, where our first water comes from, there
16  are probably four to five strings of pipe with cement
17  in between every string and then cement between the
18  last string and the formation.
19  Q.  You used the term "string."
20  A.  String of casing.
21  Q.  S-t-r-i-n-g?
22  A.  String of pipe.
23  Q.  That's good.
24      And string literally meaning being it's
25  coiled?  I mean, it's on a spool?

**39**

1  A.  No, it's not -- you're talking about coiled
2  tubing.
3  Q.  I am.
4  A.  And that's a string of pipe.
5      But any tubulars that you put in the hole, we
6  call them --
7  Q.  That's fair.
8  A.  -- strings, strings of pipe.
9  Q.  You call them strings.  Very good.  Thanks.
10  I got a little better sense -- much better sense,
11  actually, of the work that's done.
12      Let's come back, and you tell me about these
13  shops because -- let's just take an example, and you
14  can tell me:  What percentage of your jobs for
15  Wireline -- do you call yourself Wireline or Renegade?
16  I just want to use the right -- do you call yourself
17  Renegade?
18  A.  We do business as Renegade Services.
19  Q.  Okay.  Fine.  If I keep saying Renegade
20  Services, that's how you guys refer to yourself?
21  A.  Renegade, yes.
22  Q.  Renegade.  Good.
23      A typical job that Renegade is performing at
24  one of the well sites, would you say, for the majority
25  of these jobs, people report to the shop first or the

**40**

1  majority of the work they just go right to the site?
2  If you can give me a -- is there any way to approximate
3  that?
4  A.  Not without some research.
5  Q.  Fair enough.
6  A.  There are -- in West Texas, they -- we
7  primarily concentrate on the frack side of the business
8  up here.
9  Q.  Yeah.
10  A.  In the Permian Basin, their services are very
11  varied from what we're doing.  They have frack services
12  also, but, typically, they'll do -- they'll come into
13  the shop sometimes in the morning, load out for maybe
14  one, two, three jobs during the day, and they may be
15  traveling from state to state or county to county,
16  doing jobs, and they may not return with their truck
17  during the day.  They might go back out and meet the
18  truck the next day or leave it on location.
19  Q.  Describe this truck to me.  What do you call
20  your truck?
21  A.  Wireline truck.
22  Q.  Thank you.  All right.
23      And the wireline truck, give me an idea --
24  gross vehicle weight, if you know it?
25  A.  I don't.  I think it's 38,000 pounds.

**41**

1  Q.  All right.
2  A.  A single-axle truck -- we get right on the
3  verge of being overweight on a single-axle truck, so a
4  lot of times we've got to go to the tandem axle, which
5  I think is 48,000.  I don't know the exact weights.
6  Q.  So some of your wireline -- how many wireline
7  trucks do you have?
8  A.  We're getting close to a hundred.
9  Q.  How many employees do you have?
10  A.  I know we're over 400.
11  Q.  And you've got a hundred trucks?
12  A.  Yes.
13  Q.  Wow!  That's a high ratio.
14  A.  Of what, people to trucks?
15  Q.  Yeah.
16  A.  Typical crew is a three-man crew, so --
17  Q.  Thank you.
18  A.  -- 300 supports -- are directly involved with
19  the trucks and probably a hundred supporting it.
20  Q.  There we go.  Yeah.  That's a good way of
21  looking at it.
22      I'm just telling you from -- I don't pretend
23  to know the way you guys do.  But that's a high ratio
24  of vehicles to people.  Okay?
25  A.  Well, that's just one -- you usually have a

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 12 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

12 (Pages 42 to 45)

42

1 pickup that goes with the truck also and crane trucks
2 also, so --
3     Q. There you go. Yeah. I've gotten -- by the
4 way, we'll get into this a little bit later.
5     Your attorney has provided us with an
6 inventory of vehicles.
7     A. Okay.
8     Q. Okay. So do you call it a spread of
9 vehicles, or not?
10     A. No.
11     Q. You don't call it that?
12     A. No.
13     Q. No?
14     A. You're thinking of a frack spread.
15     Q. Yeah. Yeah. I know.
16     What do you guys call this collection --
17 or you don't?
18     A. Huh-uh.
19     Q. Okay. Let's take -- when you send a crew, a
20 three-man crew -- right?
21     A. Typically.
22     Q. I understand.
23     A. You know, it can vary.
24     Q. That's fair.
25     For now, would you say that's your typical

43

1 wireline service crew?
2     A. I would think so, yes.
3     Q. Okay. Your typical three-man crew, tell me
4 who they -- not who they are by name. I don't want to
5 know the names. By titles?
6     A. Engineer and two riggers.
7     Q. Engineer, rigger 1, rigger 2. Okay.
8     A. Any form of rigger and any form of engineer.
9 We have different levels of engineer and different
10 levels of riggers, but, basically, it's one engineer
11 and two hands.
12     Q. There you go. Okay. One engineer, two
13 hands. Okay.
14     A. Those terms can get kind of -- kind of shady,
15 too, because, in different parts of the company, we
16 call -- I call them a rigger. Sometimes they're called
17 operators. And I think that we've actually got them
18 classified as operators, operator 1 and 2. I don't
19 think they're classified as rigger. But you go down to
20 other parts of the company, and they'll call the
21 engineer, the guy running the truck, an operator, and
22 two riggers. So that has been a real foggy point in
23 our industry for 40 years, on what they're called.
24     Q. I didn't ask you before. Let me just ask you
25 this. As the VP of operations -- and you gave me the

44

1 districts that you have or the shops. Do you call them
2 districts?
3     A. Yes.
4     Q. Fair enough.
5     And you've got a mix of Pennsylvania and
6 Texas. Right?
7     A. Yes.
8     Q. Two and two.
9     Do you live down in the Texas area?
10     A. I do now, yes.
11     Q. That's what I thought. I know you had
12 to make -- do you come up here, though, on a fairly
13 regular basis?
14     A. Less than 49 percent of the time.
15     Q. Less than 49 percent of the time.
16     A. I don't want to pay Pennsylvania taxes.
17     Q. I understand. I understand. I knew that's
18 what you meant.
19     (Discussion off the record.)
20     Q. All right. Good.
21     Anyway, at least your residence is in Texas.
22 Right?
23     A. Yes.
24     Q. That's fair.
25     Coming back to your typical three-man crew,

45

1 as I understand what you said -- may I call you Randy?
2     A. Sure.
3     Q. That's all right?
4     A. Yes.
5     Q. And you can call me Joe, if you're
6 comfortable with that, if you have something you need
7 to say to me.
8     Randy, your three-man crew -- I'm not holding
9 you to that as the only size crew. All right?
10     A. Okay.
11     Q. That's your typical crew.
12     You have an engineer and two hands, whether
13 they call them riggers -- and I think -- correct me if
14 I'm wrong -- what you're saying is, regardless of the
15 title that you put on this three-man crew and the
16 people in the three-man crew, this crew needs to be
17 able to perform certain functions when they get out to
18 the sites?
19     A. Right.
20     Q. All right. Who decides who's going to be on
21 a particular crew that goes out to a site?
22     A. District manager.
23     Q. All right.
24     A. It could be a district manager. It could be
25 an assistant manager. It could be -- it's whoever's in

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 13 of 65
NETWORK DEPOSITION SERVICES
**Transcript of Randy Cassady**

13 (Pages 46 to 49)

46

1  charge of dispatching the shop at that point in time.
2    **Q. That's fair.**
3        **So the dispatching and the assignments to**
4  **crews and that sort of thing is done out of the shops?**
5    A. Yes.
6    **Q. All right.**
7    A. It's a very -- that's a very complex part of
8  our job, believe it or not.
9    **Q. No. Actually, I do believe it, particularly**
10 **as you've told us about the nature of the business. It**
11 **seems -- correct me if I'm wrong -- you have to have**
12 **somebody there in charge, at the shop, who has enough**
13 **knowledge of the business and enough knowledge of the**
14 **customers to know what is needed for a particular job?**
15   A. And enough knowledge of the equipment and of
16 the people that you've got working, because not all of
17 those guys do all the kind of services that we do.
18 It's a very complex part.
19   **Q. Fair enough.**
20       **You talked about the vehicles that go out**
21 **with this three-man crew. You've got a wireline truck.**
22 **Right?**
23   A. Yes.
24   **Q. You've got a pickup truck?**
25   A. Yes.

47

1    **Q. Do you know what kind of pickup truck you**
2  **typically have? Is there a typical truck?**
3    A. Three-quarter-ton long-bed double cab pickup
4  is a typical pickup.
5    **Q. Like an F-250?**
6    A. Yes.
7    **Q. By the way, that seems to be vehicle of**
8  **choice in the industry --**
9    A. Right.
10   **Q. -- because it seems to be all purpose. You**
11 **can do a lot with it. Right?**
12   A. Right.
13   **Q. Do you know the gross vehicle weight of**
14 **something like that, an F-250?**
15   A. I do not.
16   **Q. So it is what it is?**
17   A. Yeah. You know, with my managers and the
18 people that have to dispatch this -- because we have to
19 carry trailers and explosives. Basically, any time you
20 put a piece of explosive in even a --
21   **Q. -- a pickup?**
22   A. -- in even a car, it's got to be a DOT'd
23 vehicle at that point.
24   **Q. It's a hazmat?**
25   A. It becomes hazmat. And we haul explosives

48

1  all the time, so all of our -- no matter gross vehicle
2  weight or any of that, they've got to be DOT'd.
3    **Q. Very good.**
4        **These F-250s -- and by the way, let's just**
5  **say -- I'll just use F-250 as an example. You've got a**
6  **wireline truck, an F-250, and what other vehicles that**
7  **would go out with the three-man crew?**
8    A. Sometimes a crane.
9    **Q. Sometimes a crane?**
10   A. Right.
11   **Q. So, normally, you have at least the wireline**
12 **truck and the pickup?**
13   A. That would be the minimum, yes.
14   **Q. And then, sometimes you might need a crane?**
15   A. Yeah.
16   **Q. The crane is for actually positioning the**
17 **lines that you're going to be -- what's the crane for?**
18   A. To do our operation, we have to -- our line
19 runs off the back of our truck to a shiv. The shiv
20 directs the cable up, and we put a shiv at the top of
21 the crane to lower it back into the hole.
22       The tool strings that we put into the hole,
23 the various ballistic and mechanical, they can get
24 fairly long at some times, so we have to be able to get
25 that top shiv high up in the air to do any of our work.

49

1  Sometimes you have a rig on location.
2    **Q. I gotcha.**
3    A. We do not need the cranes at that point.
4    **Q. Sometimes you don't?**
5    A. I would say probably -- probably -- they like
6  to run cranes. The oil companies like to have the rig
7  gone. The rig costs a lot of money. The cranes cost
8  very little. So they try to keep our phase of the work
9  working off cranes instead of off rigs. So I don't
10 know. It's probably a 50/50 mix.
11   **Q. 50 percent of the time you need to take the**
12 **crane with you from the shop to the jobs?**
13   A. Yeah. It may even be higher than that.
14   **Q. Understood.**
15   A. We have some trucks that have their own
16 cranes built into the truck; you don't have to have a
17 separate unit out there, but we've got a way of getting
18 our line up in the air.
19   **Q. Needless to say, if you have a three-man**
20 **crew, you can't take more than three vehicles?**
21   A. Correct.
22       MR. CHIVERS: I figured that one out.
23       All right. I'm going to mark a couple
24 documents. Okay?
25       MR. ANTKOWIAK: Do you want to mark our

50

1    objections as the first exhibit just to get that
2    out of the way?
3          MR. CHIVERS:  Sure.  It doesn't matter.
4          MR. ANTKOWIAK:  I'll just set this out for
5    purposes of the record.  This is a 30(b)(6)
6    noticed deposition by the plaintiffs, and in
7    response to that, the defendant has issued its
8    objections to the notice that is in advance of the
9    deposition this morning.  We have discussed it.
10   We'll place this on the record as Exhibit 1.  And
11   we will, as defendants, reserve the right to mark
12   and object to specific questions and answers under
13   the deposition testimony later on, subject to our
14   stated objections.  That way at least it avoids us
15   having to interject throughout and disrupt the
16   flow of the deposition.
17         MR. CHIVERS:  That's fine.
18         MR. ANTKOWIAK:  We can mark this as Exhibit A
19   or 1, whichever you prefer.
20         MR. CHIVERS:  1.
21         MR. ANTKOWIAK:  Okay.
22         MR. CHIVERS:  For the record, this will be 1.
23         (Whereupon, Deposition Exhibit 1 was marked
24   for identification.)
25         MR. CHIVERS:  Then, for the record, this will

51

1    be 2.  This is the notice itself.
2          (Whereupon, Deposition Exhibit 2 was marked
3    for identification.)
4          MR. ANTKOWIAK:  All right.
5          MR. CHIVERS:  For the record, this will be 3.
6          (Whereupon, Deposition Exhibit 3 was marked
7    for identification.)
8          (Recess taken.)
9          MR. CHIVERS:  Back on the record.
10   BY MR. CHIVERS:
11     Q.  Sir, I've had a chance to put a few documents
12   in front of you.  And I think we've got agreement --
13   Here you go.  You can have this one.
14         Exhibit 1, we have agreed -- your lawyer and
15   I have agreed that Exhibit 1 is the written objections
16   that defendant has made to the 30(b)(6) notice.
17   Exhibit 2 is the 30(b)(6) notice itself.
18         Did you have a chance to review Exhibit 2
19   before you came here today?
20     A.  Yes.
21     Q.  I figured.  Yeah.
22         Exhibit 3 is defendant's responses to the
23   interrogatories and requests for documents.
24         Sir, do you recognize Exhibit 3?
25     A.  Yes.

52

1      Q.  In fact, did you participate in the
2    preparation of Exhibit 3?
3      A.  Yes.
4      Q.  And, sir, have you -- and can you, today,
5    verify the accuracy of the information that's in
6    Exhibit 3?
7      A.  Yes.
8      Q.  All right.  I'll go through.  Obviously,
9    we're going to continue in our questioning, and I'll go
10   back and forth on some of these documents.
11         By the way, I just want to confirm, when you
12   were talking about a shiv, are you referring,
13   basically, to a pulley?
14     A.  Yes.
15     Q.  Yeah.  What you do, this line or string that
16   comes out of the back of your wireline truck has to be
17   guided; it has to go out in such a way that you can get
18   it to a point vertical, directly over the hole?
19     A.  Yes.
20     Q.  All right.  And that's what these two shivs,
21   or pulleys, do?
22     A.  Yes.
23     Q.  You feed it through -- along the one pulley
24   and then it goes straight up to the second pulley?
25     A.  Yes.

53

1      Q.  And it's then positioned.  That second
2    pulley, I would assume, is positioned directly over the
3    hole?
4      A.  Yes.
5      Q.  Fair enough.
6          I want to talk a little bit more about the
7    crews.  You described a typical crew of three men.
8    There are some women, I imagine, too.  We'll call them
9    three-man.  All right.
10         An engineer.  Correct?
11     A.  Yes.
12     Q.  And then two -- whether you call them riggers
13   or hands?
14     A.  Correct.
15     Q.  Fair statement?
16     A.  Uh-huh.
17     Q.  And the engineer -- describe to me, when you
18   say an engineer, is this somebody with an engineering
19   degree; is this somebody with a professional
20   engineering certificate; or is this more just
21   functional?
22     A.  It's just a title.
23     Q.  All right.
24     A.  There are -- it's been in contention.  Real
25   engineers don't want us calling them engineers, so

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

54

1 that's why sometimes they're referred to as operators.
2 That's where the title gets fuzzy.
3     Q. The point is that, to be a so-called engineer
4 or operator, you don't have need to have a college
5 degree?
6     A. No.
7     Q. You don't need to be a professional engineer?
8     A. No.
9     Q. All right. I would assume that the kinds of
10 engineers or operators that you have are people
11 primarily with experience in the field --
12     A. Yes.
13     Q. -- who functionally know what to do, have
14 experience doing these services, and that can be relied
15 upon?
16     A. Yes.
17     Q. Are they functionally in charge of the crew?
18     A. Yes.
19     Q. And do the engineers -- do they have the
20 authority to give order --
21     A. Yes.
22     Q. -- to riggers?
23     A. Yes.
24     Q. Can they hire the riggers?
25     A. No.

55

1     Q. Can they fire the riggers?
2     A. They can recommend that they be fired. No,
3 they cannot fire them.
4     Q. But they have the authority to give them
5 orders?
6     A. Yes.
7     Q. To be an engineer or an operator for
8 Wireline, on a typical three-man crew, are they
9 required to have CDLs?
10     A. Yes.
11     Q. Are they required to have hazmat?
12     A. You know, there may be some circumstances
13 where a particular guy is trained in a particular type
14 service that he doesn't need those types of things,
15 but --
16     Q. Doesn't need a CDL or a hazmat?
17     A. Yes. Possibly, you know.
18     We would prefer that they have CDL as well as
19 hazmat.
20     Q. I have a list -- I'm going to have it here in
21 a little while for you -- that we were provided as part
22 of the documents, because I had asked the question --
23 or I requested that Renegade identify those employees,
24 those Wireline employees, who had CDLs.
25     Some have them. Some don't?

56

1     A. Correct.
2     Q. I don't know -- we could look. I mean
3 records will show whatever they show. My sense was
4 maybe 50 percent of the people have CDLs?
5     A. Possibly.
6     Q. All right.
7     A. I don't -- we hire people without CDLs, and
8 so sometimes we're more lenient than we should be at
9 when they actually get their requirement, get a CDL.
10     Q. Well, you testified that there are
11 normally -- we'll say at least two, if not three
12 vehicles, if you will, that are a part of the group of
13 vehicles that are taken to a well site from a shop, one
14 being the wireline truck, which is 38,000 or possibly
15 48,000 vehicle weight.
16     Do you know enough about how the Department
17 of Transportation classifies vehicles to know that a
18 38,000- or 48,000-pound vehicle is a commercial
19 vehicle?
20     MR. ANTKOWIAK: I'm going to object to the
21 extent you're calling for a legal analysis or
22 conclusion.
23     Q. I'm not looking for legal. I'm just asking
24 if you -- do you know anything about how these
25 vehicles --

57

1     A. We have to have a CDL to drive the trucks.
2 Is that what you're asking?
3     Q. Yeah. That's another way of answering the
4 question.
5     A. Yes.
6     Q. All right. You understand that the wireline
7 truck or trucks -- you have about a hundred of these.
8 Right?
9     A. Yes.
10     Q. You understand that you have to have a CDL in
11 order to drive one of those?
12     A. You have to have a CDL to even drive a pickup
13 if it's got explosives in it, to even drive a car if
14 you have explosives in the car.
15     Q. Do you have designated drivers working for
16 Wireline, for Renegade?
17     A. No.
18     Q. Okay. So the guys who are doing the driving
19 are the same guys who are doing the work out in the
20 field?
21     A. Yes.
22     Q. Okay. And do you understand you have to have
23 hazmat endorsement in order to drive a vehicle with
24 explosives?
25     A. Yes.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 16 of 65
NETWORK DEPOSITION SERVICES
Transcript of Randy Cassady

16 (Pages 58 to 61)

**58**

1  Q. Do you know whether people who don't have
2  CDLs work the three-man crews?
3  A. Yes, they do.
4  Q. Does that create problems sometimes because
5  they don't have a CDL; therefore, they can't drive a
6  vehicle, even a small vehicle, with explosives or they
7  can't drive one of the big vehicles?
8  A. That gets into the complexity of the
9  dispatching that I talked about at the shop. So that's
10  something that you have to identify before you go on
11  location, you know. If you've got a guy that does not
12  have a CDL -- to begin with, it's a three-man crew,
13  and, typically, you're carrying two vehicles out there.
14  So, typically, you can have one guy without a CDL.
15  Q. Okay.
16  A. Secondly, if the second man does not have a
17  CDL --
18  Q. In other words, if two out of three don't
19  have a CDL?
20  A. -- which would be very unlikely, I would
21  suspect, then the second guy, you got to make sure he
22  doesn't have any hazmat on the vehicle that he's
23  driving. So there are ways to stage things where you
24  can have different drivers do different things.
25  Q. Or if it's close enough -- how long -- I'm

**59**

1  just curious. When you send somebody -- and I
2  understand we're only talking right now about those
3  jobs where the crews report to the shop as opposed to
4  reporting directly to the site.
5  A. Okay.
6  Q. Okay. Are there situations where you have to
7  make two runs from the shop to the site because you
8  only have one person with a CDL?
9  A. Typically not. Typically, we'd make a lot of
10  runs to the locations that we're staged on for long
11  periods of time.
12  Q. That was my next question really, which is:
13  How long -- is there an average? Maybe there isn't,
14  the way you've described things.
15  Am I correct, then, that a job at a
16  particular well site can be anywhere from a day to even
17  months at a time?
18  A. It can be from hours to months at a time.
19  Q. Where the equipment, like the wireline truck
20  and the crane will stay at the site?
21  A. Yes.
22  Q. Or more typically, the wireline truck will
23  stay at the site?
24  A. Yes.
25  Q. The way you described this to me -- am I

**60**

1  correct that, even if you take three vehicles out, the
2  one vehicle that's assured of staying there so long as
3  the job is being done is the wireline truck?
4  A. I don't -- that's really hard to say. I
5  guess I'm having a hard time understanding what you're
6  asking.
7  Q. Yeah. I'm trying to get a sense -- the
8  typical three-man crew reports to the shop, takes the
9  vehicles with them to the well site, drives them.
10  A. Okay.
11  Q. Right?
12  Am I correct that the wireline truck is
13  typically the truck that will stay there for the
14  duration of the job?
15  A. Typically.
16  Q. Look. I'm accepting what you're saying,
17  which is, there are going to be variations depending on
18  the work, but the typical situation is to take the
19  wireline truck to the well site, leave it there while
20  the work is being performed?
21  A. The wireline truck is the essential piece of
22  equipment for our business. Everything we do is with
23  the wireline truck.
24  Q. It's equipped with the -- whatever gauges,
25  monitors, equipment necessary to perform the services?

**61**

1  A. Yes.
2  Q. Okay. All right. The pickup truck is driven
3  to the site. Correct?
4  A. (No verbal response.)
5  Q. And suppose that job lasts two weeks. Right?
6  A. Okay.
7  Q. During that period of time, the pickup truck,
8  I would assume, is the one -- is the vehicle that you
9  can use for transportation?
10  A. Correct.
11  Q. And the pickup truck -- let's say the F-250
12  as an example. It's used for transportation both to
13  the well site and then, also, from the well site either
14  back to the shop or from the well site to the hotels,
15  if you guys were remote?
16  A. Yes.
17  Q. Do you put people up in hotels?
18  A. Yes.
19  Q. I would think you'd have to.
20  A. Yes.
21  Q. Are there situations where you're so remote
22  there is not even a hotel within close proximity?
23  A. No, I would say not.
24  Q. Even if you've got to go ten or 20 miles?
25  A. Typically, we try to keep our driving times

**62**

```
 1   to within an hour or two --
 2       Q.  Thank you.
 3       A.  -- to location.
 4       Q.  For obvious reasons, logistics, and also --
 5   Yeah.  Okay.
 6       A.  There are exceptions to that.
 7       Q.  Are there situations where guys just have to
 8   stay at the site?
 9       A.  Yes.  I have seen that, yes.
10       Q.  But that's not the norm?
11       A.  No.
12       Q.  All right.
13       A.  Not the norm -- I wouldn't say that.  I mean,
14   it can be normal to stay on location.  Sometimes
15   there's living quarters and facilities set forth to
16   keep all the crews on your offshore locations, for
17   example.  It takes days to get out there, so you're
18   not -- you're going to stay out there until the job's
19   done, so --
20       Q.  Is Wireline doing -- as we speak, Renegade is
21   doing offshore jobs as well as --
22       A.  No.
23       Q.  No?
24       A.  No.
25       Q.  Because during the period of time that we're
```

**63**

```
 1   talking about here, let's say going back three years --
 2   actually, the full five years, have you done any
 3   offshore work in the past five years?
 4       A.  No.  No.
 5       Q.  Okay.
 6       A.  We have done some inland water work, where
 7   you load the equipment on a barge and they haul you out
 8   with a tugboat and you stay on location for long
 9   periods of time.
10       Q.  Is that a small percentage of your work?
11       A.  Small.
12       Q.  Okay.
13       A.  The percentage of -- it's a significant
14   amount of jobs that we actually stay on location,
15   though.  It can be -- the remote locations that you
16   talk about, if it gets to where there is no facilities,
17   then the customer will set up facilities on location
18   for you to stay in.
19       Q.  Fair enough.
20           So coming back to this three-man crew and the
21   F-250, you drive the F-250 out to the site.  When you
22   drive it out to the site, do you normally have anything
23   that you're hauling behind it?
24       A.  I'd say probably an equal amount of time that
25   you do and don't.
```

**64**

```
 1       Q.  Okay.  So 50 percent of the time you have a
 2   trailer or something behind you?
 3       A.  Sometimes.
 4       Q.  Sometimes?
 5       A.  Yeah.  I wouldn't even put a percentage on
 6   it, you know.
 7       Q.  Okay.
 8       A.  When we need to have a trailer, we'll have a
 9   trailer.
10       Q.  Okay.  I would assume, if you do -- in those
11   situations where you have a trailer that you're taking
12   out to the well site from the shop, once you get to the
13   site, the trailer stays on the site the way the
14   wireline truck stays on the site until the job is done?
15       A.  Sometimes, yes.
16       Q.  I would assume --
17       A.  We have equipment that supports the wireline
18   unit that stays on location the whole time, such as the
19   crane.
20       Q.  Yeah.
21       A.  Sometimes we have a loading trailer out
22   there, that we're actually doing work on location.  We
23   carry our -- we've got a truck -- a trailer that's set
24   up like a shop, and that's why we don't have to come
25   back to the shops.
```

**65**

```
 1       Q.  How do you get that trailer out to the site?
 2       A.  With the pickup.
 3       Q.  Okay.  But I would imagine -- you tell me if
 4   I'm wrong -- for example, for transporting people, the
 5   crew back and forth between the site and the hotel, you
 6   don't have the trailer stuck on the back of the pickup?
 7       A.  Correct.
 8       Q.  Yeah.  What does the wireline truck -- what
 9   does it run on, diesel fuel?
10       A.  I have diesel.  I have gas.  And I have
11   compressed, CNG vehicles.
12       Q.  If it's running -- how often is it running
13   when it's on the site?
14       A.  The pickup?
15       Q.  No.  The wireline truck.
16       A.  The whole time.
17       Q.  Okay.  So the truck is running?
18       A.  For a month at a time.
19       Q.  Okay.  And it uses fuel?
20       A.  Yes.
21       Q.  Okay.  And where does it get the fuel to run?
22       A.  The customer has diesel fuel trucks deliver
23   fuel.
24       Q.  And are there occasions when you have to go
25   out and get your own fuel for the wireline truck?
```

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 18 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

18 (Pages 66 to 69)

66

1    A.  There's occasions, when we're not out there
2  for a month at a time, that we're filling up before we
3  arrive at the location.  It would be very, very unusual
4  to rig down a piece of equipment, have to go in and
5  fuel up, and then come back to the same location to
6  continue the job.  I can't even -- I can't even think
7  of a time in my 40 years that we've had to do that.
8    Q.  When your crews get out to the well sites and
9  need something, like from a shop, I would imagine -- do
10  those occasions arise?
11    A.  Absolutely.
12    Q.  Yeah.  Yeah.
13    Does somebody from the site go back to the
14  shop to get that part or supply and then take it back
15  to the well site?
16    A.  Traditionally, we have people at the shop
17  that go from the shop, because you hope not to
18  interrupt the services that you're doing.  So the
19  people that are on location are required -- there are a
20  required number of people to do the job, so you usually
21  don't have extra people to send back to the shop.  But
22  it happens occasionally.
23    Q.  Do you have any particular term that's used
24  to describe those runs back to the shop or to the site
25  or, for example, from the site to an outside supplier

67

1  to pick things up, parts, supplies, anything like that?
2    A.  Traditionally called a hotshot.
3    Q.  I would assume any one of the crew members --
4  you tell me.  Between the engineer, the operator -- or
5  the operator and the two riggers, can you say that it's
6  more likely that one of the two riggers will make that
7  hotshot or the operator?
8    A.  It's traditionally the low man on the pole.
9    Q.  Meaning seniority?
10    A.  Yes.
11    Q.  You spent your time, I assume, in this
12  business.  You've been a part of those crews
13  yourself --
14    A.  Yes.
15    Q.  -- I would think?
16    A.  Yeah.  I started from the ground up.
17  Everybody that is part of this company started from
18  cleaning out grease out of the back of a wireline
19  truck.
20    Q.  What kinds of supplies are needed when you
21  get to the site, normally?
22    A.  Additional perforating guns.
23    Q.  Is it a one use and you're done?
24    A.  Yes.
25    Q.  I would think.

68

1    A.  Yeah.
2    Q.  Because that's what a shaped charge would
3  normally be?
4    A.  Yeah.
5    Q.  Use it once?
6    A.  We have parts that we reuse or we clean up,
7  reuse and reload perforating guns, but the whole
8  assembly is a one-use deal, and then, you reassemble
9  another.  And there are parts of the assembly that
10  we've reused.
11    Q.  Almost like in fireworks, I mean, the
12  fireworks, themselves, obviously, you shoot them once;
13  they go off; they're beautiful; they're done.  But the
14  launchers themselves you keep using?
15    A.  Right.  Correct.
16    Q.  And in your case, the thing you keep using is
17  the gun?
18    A.  Generally, the couplers or what we call the
19  "subs," that couple these various guns together.  The
20  guns come in different lengths.  They come in different
21  sizes.  We don't just go down and shoot one set of
22  holes in one spot.  We set up -- we'll shoot a gun.
23  We'll reposition the gun to another part of the hole,
24  shoot another gun, and reposition.  So we have various
25  hardware that we use to do that with, and that's

69

1  generally reusable.
2    Q.  The guns, themselves?
3    A.  The guns are the tubes.  You shoot a hole
4  through them, and you throw them away.  So the guns,
5  themselves -- carriers or guns or tubes, they're a
6  one-shot deal.
7    Q.  Am I correct the shaped charges are within
8  those guns?
9    A.  Correct.
10    Q.  I gotcha.
11    You must have a wire -- are these activated
12  or set off by an electrical signal?
13    A.  Yes.
14    Q.  Okay.  An electrical actuator, I guess you'd
15  call it.  Is that right?
16    A.  We send a -- it's a very complex operation.
17  We send a digital command down there and tell it to
18  fire.
19    Q.  But that's sent down by an electrical --
20    A.  From the surface.
21    Q.  By a line?
22    A.  By the engineer.
23    Q.  Is it sent by a line, a hard line?
24    A.  Yes.  Our cables have an electric conductor
25  in the middle of them.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 19 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

19 (Pages 70 to 73)

70

1      Q.   It's not like you guys are sending -- like
2   you have wifi out there where you're sending the
3   signals?
4      A.   Correct.
5      Q.   Okay.  All right.  So the types of things
6   that somebody would pick up on a hotshot, so called,
7   what would those types of things be?  What would you
8   typically have somebody run out and pick up to bring
9   back to the well site?
10      A.   Typically, guns would be the biggest.
11      Q.   Which is really the tubes?
12      A.   Right.  The assembly.
13      Q.   And the assembly includes the charges?
14      A.   Yes.
15      Q.   Okay.  All right.  So when the pickup goes
16   back to the shop, it's not carrying any explosives, but
17   when it goes from the shop to the well site, it has
18   explosives?
19      A.   Correct.
20      Q.   So you've got to send somebody out that has
21   the CDL and the hazmat endorsement?
22      A.   If we're hauling guns.  There are other
23   things that we haul to and from location.
24      Q.   Good.  Let's talk about the things other than
25   the guns.

71

1      A.   That can be anything from, a guy needs some
2   clothes to black tape to -- I mean, it could be a
3   thousand and one things.
4      Q.   Let's run off some of those things.  Go
5   ahead.
6      A.   The supplies that we use on location to do
7   the job.
8      Q.   Give me some examples, because I don't know
9   your business.
10      A.   Black tape, wire.  There are some specialized
11   insulators and equipment that -- downhole tools, collar
12   locators, the deals that locate the couplings, the
13   lubricator.  There's lots of equipment that is
14   associated with the lubricator that could go bad.  It's
15   just -- I mean, we could go on forever on that, you
16   know.
17      Q.   Do you have materials to clean up spills,
18   grease spills, anything like that?
19      A.   We have material on location for
20   containment-type stuff, so, yes.
21      Q.   So if you run out of that stuff, you have to
22   go back and get more?
23      A.   Yes.  Grease.  You know, we run out of
24   grease.  We have to go back and get some.  We might
25   have to have diesel.  Your fuel -- if the customer's

72

1   not supplying fuel, we have fuel containers that we
2   haul fuel out there, ourselves, to fill up.
3      Q.   How big?
4      A.   I don't even know.
5      Q.   Okay.  I'm going to -- does it fit on the
6   back of the F-250?
7      A.   It fits in the pickup truck, yes.
8      Q.   Right.
9           Do you have an L tank, the shape?
10      A.   Is it L?  No, I don't think so.
11      Q.   Like an 80-, 90-gallon tank?
12      A.   That would be a good estimate.
13      Q.   Look.  I'm asking these things because I know
14   a little bit about the business.
15      A.   Uh-huh.
16      Q.   And that's what we've learned from other
17   businesses, that typically, the diesel fuel is hauled
18   in a tank on the back of a pickup.
19      A.   There are certain parts of our business that
20   typically that is done, but that is not typical of our
21   operations.  It's very, very unusual when we have to
22   haul our own fuel on location.
23      Q.   Gotcha.
24           Lubricants, grease, diesel fuel, personal
25   protective equipment?

73

1      A.   Yeah.
2      Q.   Do the guys have to wear personal protective
3   equipment out there at the sites?
4      A.   Yes.
5      Q.   That includes boots, goggles?
6      A.   Ear protection, gloves.
7      Q.   Earplugs, yeah, gloves.
8      A.   FR uniforms, fire retardant.
9      Q.   Fire resistant -- or fire retardant?
10      A.   Yeah.
11      Q.   Tell me the difference between resistant and
12   retardant.  I don't know the difference.
13      A.   Fire retardant -- FR is all I know what it
14   means.
15      Q.   FR.  Yeah.  Okay.
16           Respirators of any kind, do you need that?
17      A.   Not up here.  There are times when we have
18   oxygen or -- we do work in the H2S environment at some
19   points.
20      Q.   In the Permian?
21      A.   In the Permian especially.
22      Q.   Yeah.  Okay.  Do the sites provide the
23   explosive monitors, readers, to see what kind of
24   explosive gases are present, or do you guys take that
25   with you?

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 20 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

20 (Pages 74 to 77)

74

1    A.  We have it with us sometimes.  Sometimes they
2  have it.  We do have personal H2S monitors and required
3  by some customers on some locations.  Our customers
4  base --
5    Q.  Are the meters something that they wear?
6    A.  Yeah.
7    Q.  All right.  Okay.  I'm just curious.  The
8  Permian Basin, is that typically kind of the
9  traditional kind of pools of oil and gas, not embedded
10  in a formation but more actually in a pool form?
11    A.  There is no such thing as a pool of oil in
12  the ground.
13    Q.  Really?
14    A.  It would cave in.
15    Q.  Yeah.  Yeah.  So it's always --
16    A.  -- embedded in rock.
17    Q.  Thank you.
18    And it depends what kind of rock and how easy
19  it is to get out?
20    A.  Yeah.  And the Permian Basin is very hard to
21  get out.  It's high porosity -- very low porosity.
22  Porosity is around 8 percent.  So there is so much --
23  they expected the Permian Basin to be done 50 years
24  ago, but we keep finding different ways of recovering
25  that oil that's still left in there, and, still, the

75

1  amount that we're able to recover is a small amount to
2  what's still left in the ground that we can't get out.
3    Q.  So even the oil in the Middle East isn't
4  sitting there in a pool of oil?
5    A.  I don't know anything about the Middle East.
6    Q.  That was always the impression I had.
7    A.  You could be right on that --
8    Q.  Yeah.
9    A.  -- because they do have vast amounts of -- I
10  mean, their production --
11    Q.  And they're not doing any fracking?
12    A.  No.
13    Q.  All they're doing is poking a hole?
14    A.  Not very many countries outside of the U.S.
15  are up on the technology of fracking.  They're getting
16  there, but --
17    Q.  Yeah.  Well, let me turn now, if you could,
18  to Exhibit 2.  Okay.  Take a look at Exhibit 2.  Let me
19  just direct your attention -- we're going to kind of
20  take this one at a time.  Number 1, item 1, I think
21  you've described here today the corporate structure, I
22  mean, in terms of how you're organized and your
23  position in the organization.
24    Let's talk a little bit about titles and the
25  titles for the people who are, first, on the crews.

76

1  Are those the best -- I mean, that is as complete a
2  listing that you have of what the titles are,
3  typically, an engineer or operator and then the two
4  hands, riggers?
5    A.  Yes.  They can have various stages of
6  qualifications or experience levels.
7    Q.  Such as, somebody can be a rigger 1, a
8  rigger 2, a senior rigger, a junior rigger?
9    A.  Right.
10    Q.  But it's basically rigger or hand, engineer
11  or operator?
12    A.  Yeah.  There is kind of one other
13  classification in there, and that's SSE, or
14  short-service personnel --
15    Q.  Yeah.
16    A.  -- short-service employee.  They've kind of
17  got their own -- they have to be treated very
18  differently.
19    Q.  Well, the short-service employee, as I
20  understand, that's an industry term?
21    A.  Yeah, I guess you'd call it an industry term.
22    Q.  I mean, I've heard it in other businesses.
23    A.  Other industries, yeah, I think.
24    Q.  So is it the customer that defines the
25  short-term or short-service employees?

77

1    A.  Some customers have their own definitions of
2  it, but we also have a definition of short-service
3  employee.
4    Q.  Do the short service employees -- do they get
5  assigned to crews, to three-man crews?
6    A.  They can be assigned to a three-man crew,
7  yes.
8    Q.  And I would assume, if they're assigned to a
9  three-man crew, they tend -- they're going to be the
10  junior member of that crew, normally?
11    A.  We have some customers that they actually --
12  that dictate what percentage of our crew can be
13  short-service personnel, and so at some point, they
14  have to be in addition to the three-man crew, and
15  sometimes they can actually be part of it.  By our
16  regulations, they can be part of the three-man crew,
17  and, yes, they would be the low man on the pole.
18    Q.  By "our regulations," you mean by Renegade
19  regulations?
20    A.  Yes.
21    Q.  And regulations meaning your internal
22  procedures?
23    A.  Our policies and procedures.
24    Q.  Is there any particular length of time that
25  somebody is designated as a short-service employee?

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 21 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

21 (Pages 78 to 81)

78

1    A.  Yes.
2    Q.  How long?
3    A.  I think it's six months at a minimum.
4    Q.  You think.  Is there any hard-and-fast rule
5  about that?
6    A.  I think we have it defined in the answers
7  that we have given to you.
8    Q.  Take a look at the answers.  You tell me.
9  I'll help you.
10   MR. ANTKOWIAK:  Joe, if I'm correct, we also
11  have supplemental responses.  I don't think they
12  were part of Exhibit 3, unless I'm mistaken.
13   MR. CHIVERS:  No, they weren't.
14   MR. ANTKOWIAK:  I think that's where
15  Mr. Cassady is referring to.
16   MR. CHIVERS:  Let me go get those.
17   (Pause in the proceedings.)
18   MR. CHIVERS:  Back on the record.
19   Q.  While we're waiting -- I'm having those
20  copied right now.  I was talking about your statement
21  before about the wireline trucks.  And you've got a
22  hundred of these, about?
23   A.  About.
24   Q.  About.
25   $500,000-or-so per truck?

79

1    A.  They can vary, but that's a good average, I
2  guess.
3    Q.  Yeah.  I mean, it's got all of your equipment
4  on it that you need for the job, a lot of diagnostics?
5    A.  A lot of it's stored at the shop.  We share
6  equipment from truck to truck.  A lot of the
7  specialized tools and all you don't use on a daily
8  basis per truck.
9    Q.  But a reasonable estimate is about a $500,000
10  investment in each of these trucks?
11   A.  I would say it's closer to probably a million
12  dollar investment.
13   Q.  In each truck?
14   A.  In each truck.
15   Q.  Okay.  All right.  Your clients, Chevron,
16  Range, CNX?
17   A.  I don't think we've done any CNX.  We have
18  done Range.
19   Q.  Are they the same players both up in
20  Pennsylvania and down in the Texas area?
21   A.  No.
22   Q.  All right.  Who are the big players down in
23  Texas?
24   A.  Oxy.
25   Q.  O-x-y?

80

1    A.  Apache.
2    Q.  Apache.
3    Up here, it's Iroquois.  I'm just -- Right?
4  I don't know.
5    Oxy, Apache.  Are these the people that
6  actually own the well sites, or they're the ones, at
7  least, that have the leases?
8    A.  The leases, yeah.
9    Q.  Okay.  Oxy, Apache.  Is Chevron down in the
10  Permian?
11   A.  Yes, they are.  I don't know that we're
12  working for them.
13   Q.  I only want to know the ones you've done work
14  for.  Oxy, Apache --
15   A.  I mean, we have done work for Chevron up
16  here.  Shell Oil is one of our large customers.  I
17  really -- our customer base is in the hundreds, so --
18   Q.  Is that right?
19   A.  Yeah.  You know, that's some of the larger
20  ones, the top of the pile.
21   Q.  Yeah.  Yeah.
22   Range Resources?
23   A.  It's been several years since I've worked for
24  them, but I have worked for them.
25   Q.  Does Haliburton run these well services, or

81

1  do they just do services like you guys?
2    A.  They're a service company, but they -- they
3  have services that run the companies -- that run the
4  well sites.  So they could do it, and they could be
5  just performing a service.  They have cased hole
6  wireline service also.
7    Q.  That's what I thought.  Yeah.
8    A.  And they are into all facets of the oil and
9  gas industry, from -- everything except probably -- and
10  they probably own portions of wells.
11   Q.  Yeah.  At any given time -- let's just take
12  the last year -- you're running how many crews at the
13  same time?
14   A.  We've got a crew per --
15   Q.  Per truck?
16   A.  Where are you talking?
17   Q.  Throughout your operation, throughout your
18  business.
19   A.  How many crews?  I wouldn't even know.  I
20  wouldn't even know how to answer that.
21   Q.  You've got a hundred trucks about.  Right?
22   A.  Right.
23   Q.  So you could run up to a hundred jobs at a
24  time?
25   A.  Correct.

82

1    Q.  All right.  What have you been doing in the
2    last year?  Have you been running 75 jobs at a time?  A
3    hundred jobs at a time?
4       A.  I don't know.  I don't know what our
5    activity -- there's a term for it, our activity level
6    or --
7       Q.  Yeah.  Yeah.
8       A.  -- utilization -- equipment utilization.  I
9    do not know what it is.
10      Q.  Okay.  But you indicated that at least --
11   now, is this true of the past year or so, that you've
12   been running about 400 employees, 300 of whom are doing
13   the actual -- working at the well sites?
14      A.  I just guessed at the 300.  It's probably
15   closer to 350.  The majority of our people work at the
16   well site.  We are very --
17      Q.  -- lean?
18      A.  -- lean.  Correct.
19      Q.  That's what it sounds like.  Okay.  Yeah.
20      And the other 50 people would be people
21   assigned to the shops; in other words, administrative
22   people, support people, that sort of thing?
23      A.  Correct.
24      Q.  Do you actually run out of a headquarters
25   someplace, a main office?

83

1       A.  No.
2       Q.  Okay.  So you run -- you, personally, run out
3    of a shop, or where do you actually have your office?
4       A.  My telephone, my laptop, wherever I'm at.  I
5    spend a lot of time on the road.
6       Q.  Yeah.
7       A.  Motel rooms.
8       Q.  You guys are a --
9       A.  I do have an office in Austin.
10      Q.  Thank you.
11      A.  In New Braunfels, Texas.
12      Q.  Texas?
13      A.  But the majority of the time I'm gone.
14      Q.  You're registered as a Texas corporation,
15   LLC?
16      A.  Yes.
17      Q.  Okay.  So you file -- are there corporate
18   taxes in Texas?
19      A.  I'm sure there are.  I'd have to get my
20   accountant to answer that.
21      Q.  Your accountant is out of Texas?
22      A.  Texas, yeah.
23      Q.  You don't have an exact figure, I imagine,
24   based on what you're saying to me right now, but I
25   mean, you run 75, a hundred million a year in revenues?

84

1       MR. ANTKOWIAK:  Just for the record, we'll
2    object on this point.  Mr. Chivers and I spoke
3    beforehand.  I indicated to him that concerning
4    revenue, capitalization -- I believe this is
5    within topic designated as number 3 -- we have
6    objected to providing this information at this
7    stage.  And we agreed that, if Mr. Cassady knew
8    what the revenues were at this time, he would
9    state that, but, otherwise, questions concerning
10   topic 3 we would push off to another phase of this
11   case.
12      MR. CHIVERS:  That's fair.  I agree with
13   that.
14   BY MR. CHIVERS:
15      Q.  I do think it's helpful if you just can give
16   me a reasonable approximation of revenues.
17      A.  You know, I really don't understand why that
18   would be important.  That doesn't reflect -- that's
19   just one part of the revenue number.
20      I mean, if we talk about the upper end of
21   revenue, it doesn't have anything to do with what gets
22   down to the bottom line and all that.
23      Q.  I'm with you on that.  I understand.
24      A.  I don't think it's a -- I think it's not a
25   very good reflection of what we even do.  But I just

85

1    don't see why we need to know that number.
2       MR. ANTKOWIAK:  I'll just say this:  If you
3    know with certainty what the number is, disclose
4    it.  If you don't know with certainty, then don't
5    answer, and we'll move this to a different phase
6    of the case.
7       A.  I can tell you that it exceeds a hundred
8    million dollars a year.
9       Q.  That's the way I was going to ask the
10   question, and that's all I'm going to ask you.
11      A.  Okay.
12      Q.  Okay.  That's it.
13      A.  I just really think that's not --
14      Q.  By the way, sir, I'm sensitive to that, and
15   we've had a good discussion about that.  All right?
16      A.  Okay.
17      Q.  I just think, at the end of the day, it's
18   going to be helpful.  All right.
19      Now, let's get back, because we were talking
20   on this 30(b)(6).  I do need to know, to the best of
21   your ability --
22      MR. CHIVERS:  By the way, I got the
23   supplement responses.  Let's mark that.  Okay?
24      (Whereupon, Deposition Exhibit 4 was marked
25   for identification.)

86

1        (Discussion off the record.)
2    Q.  Anyway, turning back to this question of the
3 titles, okay, I listened to you.  I think I understand
4 where you're coming from in terms of titles not
5 necessarily being all that fixed.  Things are fluid.
6 You're out there, getting the job done.  Fair enough?
7    A.  Correct.
8    Q.  Normally -- you've gone through and told me,
9 normally, you call the guys out there on the three-man
10 crew -- you've got an engineer or operator, and you've
11 got two riggers or hands.  Correct?
12    A.  Correct.
13    Q.  Okay.  What other titles do you have?  Are
14 those the normal titles for people who are out there at
15 the well sites?
16    A.  Normally, they're called engineers and
17 riggers.
18    Q.  That's fair.
19        And then, you started telling me about these
20 SSEs.
21    A.  Right.
22    Q.  I know we'll go back and just make sure that
23 we're finished on that point.
24        Normally, you say it's a six-month period?
25    A.  Correct.

87

1    Q.  Do you make them wear a different hat color
2 or anything like that?
3    A.  Green hat, worm.
4    Q.  Green hat?
5    A.  Uh-huh.
6    Q.  What did you say, "worm"?
7    A.  Worm.  That's what they're referred to as.
8    Q.  They're worms?
9    A.  Right.  Basically, they have to be mentored
10 the whole time that they're out there, so they're not
11 of much value.
12    Q.  Okay.
13    A.  Their value comes from later down the road.
14 That's our OJT training.
15    Q.  Let me ask you something.  Do you bill the
16 customer for a crew member who is an SSE?
17    A.  No.
18    Q.  You don't bill them?
19    A.  We don't bill them by personnel that are out
20 on location.
21    Q.  How do you bill the customer for a crew?
22    A.  By services performed.
23    Q.  And correct me if I'm wrong, but when you
24 send an SSE out as part of the three-man crew, he's
25 assisting in the performance of those services.

88

1    Correct?
2    A.  Possibly, yes.
3    Q.  Okay.
4    A.  There's times that he's not.
5    Q.  Yeah.
6    A.  There's times that he's just watching what's
7 going on, to familiarize himself with what he's going
8 to be expected to do later on.
9    Q.  And there are times that the SSE is
10 participating to the extent of his ability and to the
11 extent that the other two guys trust him?
12    A.  Correct.
13    Q.  Okay.  I would assume some of these SSEs are
14 guys that come from similar kinds of work?
15    A.  No.
16    Q.  So when you're an SSE, it means you don't
17 have any experience in the field?
18    A.  Very -- most likely.
19    Q.  Most likely?
20    A.  That's the people that I prefer to hire.
21    Q.  You prefer to hire people that don't have
22 experience?
23    A.  Correct.
24    Q.  Because you want to train them?
25    A.  It's easier to train than retrain.

89

1    Q.  Interesting.  Okay.
2        So you've got SSEs, and they will sometimes,
3 as you indicated, be out there on the three-man crew.
4 When they're not out on the three-man crew, what are
5 the SSEs doing?
6    A.  Trip -- usually around the shop.
7    Q.  Okay.
8    A.  Sometimes training.  We provide a lot of
9 training for them before they go on location.  There's
10 a lot of required training that they have to do.
11    Q.  When you send your three-man crews out to
12 well sites, do they --
13        By the way, am I understanding, sir, that
14 your people, these employees who are performing these
15 wireline services, are paid salaries?
16        MR. ANTKOWIAK:  I'm sorry.  Could you repeat
17    the question?
18    A.  Right.
19    Q.  I'm just asking now about:  How do you pay
20 these people, the crews?
21    A.  Which people are you talking?  The crews on
22 location?
23    Q.  Yeah.  Yeah.
24    A.  Yes, on salary.  That's the way they were
25 paid.  We have changed that since, but --

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 24 of 65
NETWORK DEPOSITION SERVICES
**Transcript of Randy Cassady**

24  (Pages 90 to 93)

**90**

1  Q.  When did you change?
2  A.  Last month.
3  Q.  Fair enough.
4      You went to hourly?
5  A.  On portions of them, yes.  Some of them are
6  still salaried.
7  Q.  Who did you change to hourly, and who did you
8  keep at salaries?
9  A.  The riggers and below.
10  Q.  The riggers and below are now hourly?
11  A.  Up here.
12  Q.  Up here?
13  A.  Yes.  And still, in other parts of our
14  company, they continue to do it just like it's always
15  been.
16  Q.  Okay.  Correct me if I'm wrong -- whether
17  you're a rigger --
18      (Discussion off the record.)
19  Q.  -- whether you're a rigger up in Pennsylvania
20  or a rigger down in Texas, you are part of a three-man
21  crew typically.  Correct?
22  A.  Typically.
23  Q.  All right.  Whether you're a rigger up here
24  in Pennsylvania or a rigger down in Texas, typically,
25  you have an engineer or, slash, operator?

**91**

1  A.  Correct.
2  Q.  All right.  And am I correct, sir, that
3  wherever you are, on the -- what do you call it? --
4  land based -- you are performing the same basic
5  services of going out to the sites and conducting
6  either mechanical, electrical, or ballistic services.
7  Correct?
8  A.  Correct.
9  Q.  All right.  And whether you're up in
10  Pennsylvania or whether you're down in Texas or any
11  other place where Renegade does business, you have the
12  same wireline trucks?
13  A.  They can vary in design, yes.
14  Q.  But I would assume sometimes you have a
15  wireline truck in Texas; you need one up in
16  Pennsylvania; and somebody drives it up to
17  Pennsylvania?
18  A.  Correct.
19  Q.  And vice versa?
20  A.  We have -- there are some specialized trucks
21  that operate in special -- in different parts of the
22  country that would not be much use up in this part of
23  the country, and we have some here that wouldn't be
24  much use in their part of the country, so --
25  Q.  The majority of your hundred-or-so wireline

**92**

1  trucks are pretty much interchangeable?
2  A.  Yes.
3  Q.  Okay.  So you've got the -- you were telling
4  me that the riggers, at least up in this neck of the
5  woods -- now, would two of those districts be yours,
6  where you've gone to hourly for the riggers?
7  A.  Yes, that's the two that I have changed.
8  Q.  Very good.
9      But you didn't change your two down in Texas?
10  A.  One was already on hours.
11  Q.  Very good.
12      Which one had already been on hours for the
13  riggers?
14  A.  The Refugio.
15  Q.  How do you spell that?
16  A.  R-e-f-u-g-i-o.
17      And the Devine is also changed.  All of my
18  three -- all of my four districts are on hours.
19  Q.  Fair enough.
20      For the riggers?
21  A.  For riggers and below.
22  Q.  Riggers and below?
23  A.  Right.
24  Q.  Not for the operating engineers?
25  A.  Correct.

**93**

1  Q.  Okay.  Is there some reason you distinguish
2  between the operating engineers and the riggers when
3  you went to hourly for the riggers?
4  A.  They're typically in a supervisor position,
5  and that's typically just -- that is our more
6  experienced personnel.  And because of us changing from
7  salary to hourly, we lost a lot of people, and I did
8  not want to take the chance of losing our key personnel
9  because of this change.
10  Q.  The key personnel no doubt would be your
11  engineers/operator?
12  A.  Yes.
13  Q.  He's the guy you depend upon out at the site
14  to get the job done safely, efficiently?
15  A.  He's the supervisor.  He's in charge of that
16  location while we are on location --
17  Q.  Fair enough.  Fair enough.
18  A.  -- on our section of the business.  He
19  doesn't control the whole location for other service
20  companies.
21  Q.  I understood that, by the way.  Yeah.
22      All right.  Refugio, I would assume, is
23  Spanish for refuge, I would think.  But whatever.
24  We'll get somebody in here that speaks Spanish.
25      All right.  So we talked about the

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

94

1  short-service employee. Now let's talk about the
2  riggers. You seem to use the term "riggers" more than
3  "hands"?
4      A.  That's the one that I'm more comfortable
5  with.
6      Q.  That's what we'll go with. All right?
7      A.  Okay.
8      Q.  All right. Are there any other titles of
9  people who go to the sites on a regular basis, to the
10  well sites?
11     A.  You know, I go -- we have crane operators.
12     Q.  Thank you. That's what I meant.
13     A.  Okay.
14     Q.  And the crane operators, are they typically
15  guys who are driving the cranes?
16     A.  Yes.
17     Q.  Yeah, I would think.
18     A.  Yeah.
19     Q.  These are these big cranes that are a
20  combination; it's a crane and a truck?
21     A.  I have some that's strictly cranes.
22     Q.  Hauled on the back of a trailer?
23     A.  No. They're on a truck, but -- I have two
24  types. One's a truck-mounted crane.
25     Q.  Yeah.

95

1      A.  And one is a crane, a mobile crane.
2      Q.  A mobile -- a motorized crane?
3      A.  Right.
4      Q.  You got both?
5      A.  Yes.
6      Q.  When those guys are going out to the sites,
7  are these -- they can be driven either from a shop or
8  even from another job location or another well site to
9  a well site?
10     A.  Yes.
11     Q.  Your crane operators, do you pay them a
12  salary?
13     A.  Our crane operators are typically our
14  experienced operators, so the --
15     Q.  Meaning engineers?
16     A.  No. Meaning riggers, our experienced
17  riggers.
18     Q.  Thanks. Okay.
19     A.  That's kind of a -- it's kind of a middle
20  point between -- when a rigger becomes qualified to run
21  a truck, become an engineer --
22     Q.  Yeah.
23     A.  -- he will fill the crane operator's spot
24  also.
25     Q.  I gotcha.

96

1      A.  When we need a crane, we probably have a
2  four-man crew on location.
3      Q.  That's what I thought, the way you described
4  this.
5      A.  That allows me to have an SSE on location,
6  because, normally, you cannot have, normally,
7  25 percent of your crew as an SSE.
8      Q.  Normally, by customer limits?
9      A.  Yes, by one of my major customers, so we try
10  to follow that.
11     Q.  Which one of those major customers?
12     A.  Shell.
13     Q.  Okay.
14     A.  Chevron. That's pretty much an industry
15  standard.
16     Q.  So the crane operators, when they're assigned
17  and they're at the well sites, what are they doing?
18     A.  They're running the crane and they're
19  rigging.
20     Q.  That's what I thought, the way you described
21  it, because they're experienced riggers, too?
22     A.  Right.
23     Q.  And the rigging is literally -- you referred
24  to that whole activity of getting your shaped charges
25  or your tools, or whatever it is that you're running,

97

1  down the hole, positioned properly, and then, in fact,
2  getting it down to where it needs to be in the hole?
3      A.  Yes.
4      Q.  All right. What do you have the -- whatever
5  line you're running down the hole or string you're
6  running down the hole, that on a spool of some kind?
7      A.  It's on the end of that cable, so the tool
8  string attaches to the end of the cable.
9      Q.  I gotcha.
10         And the cable is on a spool?
11     A.  -- is on a spool.
12     Q.  A big spool that's on the wireline truck?
13     A.  Yes.
14     Q.  All right. Is that in a motorized -- that
15  spool is run by a motor?
16     A.  The truck engine runs it.
17     Q.  Thanks. Okay.
18         Hence, the reason that you've got to run the
19  damn truck -- pardon my French -- but you've got to run
20  the truck so much of the time?
21     A.  Yes.
22     Q.  That's what's giving you the power to do all
23  the work?
24     A.  That's where we control what's on the end of
25  the cable as well as control the cable itself.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 26 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

26 (Pages 98 to 101)

98

1    Q.  Gotcha.
2    A.  It's a winch truck.  It's got a big drum on
3  it with 30,000 feet of cable on the end of it.
4    Q.  Thanks, because I haven't seen a picture of
5  it, but you're giving me a good picture.  All right.
6    A.  If you think of a spaceship, that's what the
7  inside of our trucks look like.
8    Q.  Lots of gauges and pictures, digital
9  readings.  Right?
10    A.  Yes.
11    Q.  Buttons?
12    A.  Buttons and knobs and levers, a very complex
13  piece of equipment.
14    Q.  Yeah.  Is it the engineer or operator who's
15  in charge really of that unit, of the --
16    A.  Engineer.
17    Q.  The engineer?
18    A.  Right.
19    Q.  He's the one who's really running that, the
20  equipment, monitoring it --
21    A.  Yes.  Yes.
22    Q.  -- and giving directions to the riggers?
23    A.  Yes.
24    Q.  All right.  Fair enough.
25      So we have SSEs, riggers, crane operators.

99

1  We know about the engineer.  Right?
2    A.  Yes.
3    Q.  Engineer/operator.
4      Any other title, typically, of people who are
5  going to be assigned to the crews at the well sites?
6    A.  No.
7    Q.  Fair enough.
8      Now let's talk about the titles of the people
9  in the shops.
10    A.  Okay.
11    Q.  Okay.  Tell me what titles those people
12  generally have in your organization.
13    A.  Starting from bottom --
14    Q.  Yeah.
15    A.  -- we have shop hands.
16    Q.  Okay.
17    A.  We have gun loaders.
18    Q.  Yeah.
19    A.  And if there's enough activity, you'll have a
20  shop foreman.
21    Q.  Okay.
22    A.  A district secretary or -- there's another
23  name.
24    Q.  Administrative assistant or some damn thing
25  like that?

100

1    A.  That will work.
2    Q.  Okay.  All right.
3    A.  And a manager.  Some of our larger bases have
4  assistant managers and that type of thing.
5    Q.  Out of your 12 or 13 -- whatever the number
6  is -- shops or districts, which are your bigger ones?
7    A.  In reference to what?  Bigger in what?
8    Q.  In personnel?
9    A.  In personnel.
10    Q.  Yeah.  You made me think of that when you
11  said some have an assistant manager.
12    A.  Andrews and Levelland is a large shop.
13  Snyder is large -- a lot of people.
14    Q.  Yeah.
15    A.  That's probably the three top employeewise.
16    Q.  Am I correct that the 50-or-so people you
17  described as sort of administrative or support people
18  are distributed maybe four or five per shop, to your
19  various shops?
20    A.  Yeah.  At a minimum, it's a secretary and a
21  district manager, which is what Devine is.  At a
22  maximum, you've got -- at a maximum, it can go large.
23    Q.  Like 15 or 20?
24    A.  I'd say probably somewhere between five to
25  ten.  Ten would probably be max.

101

1    Q.  I'm just going to say -- these are
2  approximations -- you've got anywhere from two to ten
3  administrative support people at the shops?
4    A.  Yes.  We do have a few people in accounts
5  payable, accounts receivable, on the accounting side of
6  it.
7    Q.  Are they all located at Levelland?
8    A.  No.  They're --
9    Q.  They're spread around?
10    A.  Yeah, spread around.
11    Q.  Do you guys do your work for your clients on
12  a time-and-material or just on a job?
13    A.  On a service.
14    Q.  Service.  All right.
15      Are you largely the one who does that,
16  figures out what the charge is for a service?
17    A.  I am very involved in what we are making per
18  job.
19    Q.  I would think --
20    A.  Yes.
21    Q.  -- because you've got a lot of experience.
22    A.  Yes.
23    Q.  Do you have cost overruns, anything like
24  that?  Can you go back and bill the client for more
25  because the job is more complicated than you thought?

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 27 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

27 (Pages 102 to 105)

102

1   A. That's a difficult question. That's not
2   typically how we charge things.
3   **Q. You typically try to come up with a firm**
4   **price. Right?**
5   A. Per service.
6   **Q. Correct. Per service.**
7   A. Right.
8   **Q. And you define your services, obviously, not**
9   **just by showing up at the well site but by particular**
10  **things that you're going to do at the well site?**
11  A. Showing up at the well site is one of the
12  services. So we get a certain amount of money when we
13  show up at the well site.
14  **Q. The show-up charge?**
15  A. Call it a service charge.
16  **Q. All right. And then, of course, you've been**
17  **able, over the years, to define how much you're going**
18  **to charge, for example, for -- would it be, for**
19  **example, per charge, per ballistic?**
20  A. It's traditionally charged -- the way our
21  pricing -- it sometimes takes an accountant to figure
22  out the price of a job. It can be very complex, or it
23  can be very simple. I try, since I've been in
24  business, on my section of the business, I keep things
25  simple, and so it's more or less charged for every run

103

1   in the hole, and sometimes there's charges, such as --
2   cranes are charged by the hour. But I try to keep my
3   pricing very simple.
4   **Q. So they know -- so the customer knows, okay,**
5   **if we go to go down this damn hole five times, right --**
6   A. Yeah.
7   **Q. -- you're going to get charged every time --**
8   A. Multiply this times five.
9   **Q. And the way you described it, I think I**
10  **understand what you mean, because every time you run**
11  **that spool -- Right?**
12  A. Yeah.
13  **Q. -- or every time you run a diagnostic tool**
14  **down that well, that's time, material, wear and tear on**
15  **your equipment. Correct?**
16  A. Correct.
17  **Q. Okay.**
18  A. Some of these tools are -- you talked about
19  $500,000 for a truck. Some of these tools are in the
20  hundreds of thousands of dollars per tool. You might
21  have a $500,000 tool string that you're putting into
22  the hole.
23  **Q. Yeah. Some of your more sophisticated --**
24  **like the 3-D or the sonic?**
25  A. Like the pulsed neutron tools.

104

1   **Q. Yeah.**
2   A. And we are able to stack bunches of different
3   tools into a single tool string.
4   **Q. How long can your tool strings be?**
5   A. It's more dependent on how -- what weight the
6   total length is.
7   **Q. There is a limit on how much weight you can**
8   **put down the hole?**
9   A. Suspend off the end of our cable. Our cable
10  has weight limits.
11  **Q. Yeah, because, I mean, certainly, if you're**
12  **going -- Look. If you got a well that's 10,000 feet --**
13  **right?**
14  A. Yeah. That's a very shallow well.
15  **Q. Really?**
16  A. Yeah.
17  **Q. How deep can -- I shouldn't say "deep." How**
18  **long can the well be?**
19  A. How deep, is how we usually refer to it.
20  **Q. Okay.**
21  A. 30,000, 35,000 feet are the deep -- are the
22  maximum, I guess.
23  **Q. Even though a lot of that might be horizontal**
24  **or fairly horizontal?**
25  A. Those are mostly vertical.

105

1   **Q. Really?**
2   A. Uh-huh.
3   **Q. In the Permian more than up here?**
4   A. The wells that I've worked on that deep,
5   there are some out in the Permian and mostly -- the
6   ones I've worked on were in Louisiana, south Louisiana.
7   **Q. Wow! Okay. That is deep. But you're giving**
8   **me a good sense.**
9   That's, hence, the limit, because essentially
10  you have all the gravity, the weight of the cable and
11  the tools, right, going all that distance?
12  A. Yes.
13  **Q. Okay.**
14  A. It gets to a point where you can have so much
15  cable in the hole that it won't even hold itself up.
16  The cable that you got hanging off into the hole weighs
17  as much --
18  **Q. Yeah, as anything else?**
19  A. -- as the limits of the cable.
20  **Q. Limits of the cable, okay, or the limits of**
21  **the spool. Right?**
22  A. Yeah.
23  **Q. Okay. So now we're talking about the shops.**
24  **Your estimate is you've got maybe, 50, 60 people -- I'm**
25  **using that figure. I'm just kind of doing some quick**

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 28 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

28  (Pages 106 to 109)

---

**106**

1  math. Maybe a total of 50 or 60 support people in
2  these shops, in that range?
3      A.  Yeah.  That's a guess.
4      Q.  And you're running a lean, mean operation,
5  meaning you want as many people as possible or as high
6  a percentage of people as possible at the well sites,
7  where you make money?
8      A.  That's how you make money.
9      Q.  That's right.  Yeah.  Okay.
10         Am I correct, of that, let's say, 350, that
11  you cited before as an estimate of the crew, the people
12  who are actually going out on these crews -- is it fair
13  to say that a good two-thirds of them are the riggers,
14  about?
15      A.  There is -- we've been talking about the
16  average is a three-man crew.  We do have two-, we do
17  have four-man crews, so that can vary from 50 percent
18  to 25 percent.
19      Q.  That's fair.
20      A.  And there really is a high percentage of
21  two-man crews as well as four-men crews.
22      Q.  You average out to three?
23      A.  I would say, yes.
24      Q.  Certainly, if you've got a four-man crew, you
25  only have one engineer?

---

**107**

1      A.  Yes, typically.
2      Q.  If you have a three-man crew, you have one
3  engineer?
4      A.  Yes.
5      Q.  If you have a two-man crew, you have one
6  engineer?
7      A.  Correct.
8      Q.  Okay.  All right.  I mean, I think you
9  answered my question, which is, whether the percentage
10  is 50 percent, 66.667 percent or 75 percent, whatever
11  the size of the crew, you have one engineer, and the
12  rest --
13      A.  Typically, you have one guy in charge,
14  running the unit.
15      Q.  Fair enough.  All right.
16         I just wanted to finish our discussion about
17  the people at the shops.  You said you had shop hands.
18  These are guys that do what?  Maintenance on equipment?
19      A.  Sweep the floor, run hotshots, help the gun
20  loaders.
21      Q.  Do whatever?
22      A.  Yeah, just whatever needs to be done.
23      Q.  Have you been paying them salary or hourly,
24  shop hands?
25      A.  There are some shop hands that have been

---

**108**

1  hourly paid.  Typically, in my operations, everybody's
2  been salaried.
3      Q.  Okay.  Have you changed at all, the shop
4  hands -- the method of paying the shop hands?
5      A.  Everybody from rigger down --
6      Q.  That's what you meant?
7      A.  -- and they would fit into that category --
8  have gone --
9      Q.  Have gone hourly?
10      A.  Yes.
11      Q.  All right.  All right.
12      A.  They were the easiest ones, because it didn't
13  matter whether they left or not.  It matters whether
14  the other guys leave.
15      Q.  Yeah.  Yeah.
16         Gun loaders, what do they do?  I assume,
17  based on the term -- are they the ones that are rigging
18  the charges that are --
19      A.  Assembling the guns.
20      Q.  Assembling.  Yeah, assembling the guns.
21      A.  Yeah.
22      Q.  Okay.
23      A.  They maintain explosive -- we're a highly
24  regulated industry.  We have to have a lot of records
25  on our explosives and that type of thing, and they

---

**109**

1  generally are in charge of recordkeeping also.
2      Q.  At least in your districts, all four or just
3  two of the districts, you changed them to hourly?
4      A.  Just one.  One holds a more of a supervisor
5  role, assistant manager role also, so --
6      Q.  And the gun loaders are the guys actually
7  assembling these -- the guns in the tubes, typically?
8  That's where -- the gun itself is the tube --
9      A.  Yes.
10      Q.  -- with the charges in it?
11      A.  Yes.
12      Q.  All right.  Okay.  You don't rig these things
13  up, though.  I mean, in other words, you don't connect
14  them to the wireline truck, obviously, until you get
15  out to the sites?
16      A.  Correct.
17      Q.  So what you're carrying is, you're carrying
18  this gun, this tube.  It's got the charged rig
19  according to whatever the specifications are?
20      A.  Yes.
21      Q.  Do the customers tell you what the specs are,
22  or do they expect you guys to know what they are?
23      A.  No.  They define it.
24      Q.  Oh, really?
25      A.  Yeah.  That's a science in itself.

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

110

1   Q. The customer's giving you a spec sheet?
2   A. Yes.
3   Q. What do you call it when the customer --
4   A. We get a procedure for the operations that
5   are going to go on. And in that procedure, it's
6   described on what kind of perforating guns they want to
7   use or what other services they'll require.
8       Generally, the procedure is, from the whole
9   time they work on the well till they move off of it, so
10  we get to see what everybody's doing.
11  Q. That's fair.
12  A. It can be lengthy.
13  Q. Shop foreman is the shop foreman. He runs
14  the shop?
15  A. Yes.
16  Q. He's a supervisor?
17  A. Generally, he's -- it would be another name
18  for an assistant manager. He's generally the second
19  man in charge.
20  Q. Does he actually fulfill that? Is he doing
21  the managing?
22  A. Yes.
23  Q. Is he telling people what to do?
24  A. Yes.
25  Q. Scheduling them, hiring them, firing them,

111

1   doing stuff like that?
2   A. The hiring and firing goes to the manager.
3   You know, I really don't -- I wouldn't even go in and
4   fire somebody unless it was a district manager. I
5   leave it to the district managers to manage their
6   operations.
7   Q. That's fair.
8       It sounds to me, from what you've described,
9   two to ten -- that you'll have two to ten people you'll
10  have at any given shop.
11      You've got to have a gun loader. Right?
12  A. Not necessarily. A lot of times we will load
13  our own guns.
14  Q. Out at the site?
15  A. At the shop.
16  Q. I see what you're saying. The crew guys
17  will?
18  A. Yeah. I used to go shoot guns all day and
19  then spent half the night loading them to go shoot them
20  again the next day.
21  Q. Do you need any license or anything like
22  that?
23  A. Yes.
24  Q. Thank you.
25      Is that a state licensing?

112

1   A. Both.
2   Q. State and fed?
3   A. Uh-huh.
4   Q. You got to go through a test and you got to
5   get certified?
6   A. It depends. It differs from state to state.
7   The states can be very different from state to state.
8   Federal's pretty much a background check.
9   Q. Okay. What do they give you, a license that
10  you're allowed to load a certain charge, a certain
11  equivalent in force or power?
12  A. No.
13  Q. No?
14  A. Just able to handle explosives of any kind.
15  Once you've got that, you can get anything, from the
16  charges that we use to dynamite to -- the same thing
17  for fireworks, I'm sure, are in it, the mines.
18  Q. And then, you've got an administrative person
19  of some kind?
20  A. Yes.
21  Q. Like a secretary and a scheduler?
22  A. Yes. Well, she doesn't do anything with the
23  schedules, but --
24  Q. So who is it in the shops that's actually
25  doing -- is it the manager that's doing the

113

1   assignments, like telling -- figuring out who's going
2   to be on crews, what jobs they're going to go to?
3   A. The managers or the assistant manager.
4   Q. Either one?
5   A. And sometimes we'll have an engineer in
6   charge, where the guy with the most seniority at the
7   shop will be doing that work.
8   Q. Your administrative person, the scheduler,
9   salary?
10  A. They went on hours now, so --
11  Q. In your two districts?
12  A. In four, in four directs.
13  Q. You did it -- all your four districts?
14  A. Right.
15  Q. What about the rest of the company, the other
16  eight or nine districts?
17  A. They continue on as they've always done.
18  Q. Salary?
19  A. Yes.
20  Q. Which is, everybody's salaried?
21  A. Yes. We're using my districts as a pilot
22  program to determine what effect this is going to have
23  on our people. We could not -- we have lost -- because
24  we have lost people, we can't afford to have that
25  throughout our operations. And if it's any sign of the

114

1  people that I've lost, if we can compare that to the
2  rest of the company, it would be devastating to do that
3  all at one time.
4       MR. CHIVERS: Okay. That's fair. Take a
5  five-minute break.
6       (Recess taken.)
7       Q. Go back to this thing, this 30(b)(6) notice,
8  Exhibit 2. You pretty much define, I think, where you
9  guys do business. The states include Pennsylvania,
10 Texas, Oklahoma, New Mexico?
11      A. Uh-huh.
12      Q. What other states?
13      A. Mississippi, Ohio. We're doing -- we did
14 some work in Wyoming. We've done some work in
15 West Virginia. I think that's it.
16      Q. Yeah.
17      A. Florida. We've done some work over in
18 Florida.
19      Q. Oil?
20      A. Or gas. I don't know.
21      Q. All right. And that means -- that's where
22 all the well sites are?
23      A. Yes.
24      Q. Those are the states in which you have the
25 well sites, your locations that you described to me?

115

1       A. Everything up to Mississippi.
2       Q. Yeah. You have locations, shops, in Texas,
3  New Mexico, Mississippi, Pennsylvania. Yeah, you have
4  shops in four states. Does that sound right?
5       A. New Mexico -- Five. New Mexico, Texas,
6  Mississippi, Oklahoma, and Pennsylvania.
7       Q. Six?
8       A. Six?
9       Q. Yeah. That's okay. I just want to make
10 sure.
11      If you then turn to number 2 -- and by the
12 way, before we leave number 1, we went through and
13 identified the titles -- and, again, I understand
14 these -- it's more a matter of functions than titles --
15 on the well site -- or at the well site and then in the
16 shop.
17      Can you think of any other functions or
18 titles of the people that are working for Renegade?
19      A. Besides -- above manager level?
20      Q. No.
21      A. Okay. No.
22      Q. Okay.
23      A. I do have safety guys.
24      Q. Okay. All right. Fine. Are those safety
25 guys assigned to shops, or do they pretty much just go

116

1  from well site to well site?
2       A. They're assigned to my region, so they're
3  in -- I have two of them currently. They're both --
4  one's in Mansfield; one's in Ruffs Dale. And they also
5  provide services down in my two districts in Texas.
6       Q. What do you call them, just "safety
7  inspectors"?
8       A. Safety guys.
9       Q. Okay. Safety guys.
10      They're salaried?
11      A. Yes.
12      Q. They remain salaried?
13      A. Yes.
14      Q. Do they have to have college degrees to be a
15 safety guy?
16      A. No.
17      Q. Do they have to have any particular licenses
18 to be a safety guy?
19      A. They've acquired them after, but, no, there's
20 no qualifications.
21      Q. Do they manage two or more employees?
22      A. I'm not sure what -- Direct?
23      Q. Yeah.
24      A. They are -- they have -- safety is number one
25 priority, so they have the ability to go in and shut

117

1  down a job during an operation and stop work authority,
2  so they definitely manage -- everybody, including the
3  managers, are responsive to these guys.
4       Q. Having said that, they don't hire or fire
5  people?
6       A. The only people that hire and fire people are
7  managers.
8       Q. Fair enough.
9       A. Now, I say that -- you know, if I were to put
10 a second safety guy in, then it would be his
11 responsibility to hire that -- if I actually had
12 somebody working -- so I do consider him in a
13 management level.
14      Q. Understood.
15      But you'll agree with me that, on a regular
16 basis, he's not managing two or more people, managing
17 in the sense of scheduling them, giving them
18 instructions as to what they're supposed to do?
19      A. No. I don't agree with that at all. He is
20 in control, especially SSEs. He is determining what
21 school they're going to go to, what classes, what time
22 frames, so he is managing SSEs on a direct level.
23      Q. Fair enough.
24      Okay. Number 2 on this list, we've covered a
25 lot of that. What I'd like to do is know a little bit

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 31 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

31 (Pages 118 to 121)

118

1   more about -- we've defined this either two-man,
2   three-man or four-man crew that's at the well sites.
3         Tell me, in the three-man crew, what does a
4   rigger do?
5         A.   Whatever the operator requires him to do.
6         Q.   That's fair.  Be descriptive.  What is it?
7   What activities in this person performing?
8         A.   He puts gun -- tool strings onto the end of
9   the line.  He helps pick up tool strings.  He's
10  required to do whatever is on -- needed to be done on
11  the ground.
12        Q.   Such as?  Because you got to be specific.
13  You know this stuff.  I don't.
14        A.   Assembling tool strings, rigging up the --
15  rigging up and rigging down the equipment.
16        Q.   From your description of it, if you've got --
17  would you say 10,000 feet of cable?
18        A.   30,000.
19        Q.   30,000 feet of cable.  The point is, if
20  you're actually going downhole the full 30,000 feet,
21  that's got to take some time?
22        A.   Yes.  And, basically, they prepare for the
23  next service.  Whatever the next service is we've got,
24  they get ready, so that when we get out of the ground,
25  you do a quick turnaround.  You get other tools

119

1   assembled, put it back into the ground.
2         Q.   Yep.
3         A.   Once they've prepared, though, they're pretty
4   much at their leisure till the tools get back to the
5   surface.
6         Q.   Now, when you send a crew to the well site,
7   there's only one crew.  It's not like it's two crews?
8         A.   Sometimes it's two crews.
9         Q.   Okay.  That's what I was wondering.
10  Sometimes two crews, meaning you have 24-hour coverage?
11        A.   Correct.
12        Q.   Twelve-hour shifts?
13        A.   They can vary from 12- to 18-hour shifts.
14        Q.   The norm is at least 12 and up to 18 hours?
15        A.   I wouldn't know what the norm is.  I'd have
16  to go look at the records of what the norm is.
17        Q.   What records would reflect how long,
18  typically, the riggers are at the well site?
19        A.   We have job reports.
20        Q.   I'm going to show you some examples of those
21  job reports, because I couldn't figure them out.  You
22  can help me understand what they do.
23        Briefly, describe to me what the job report
24  would show.
25        A.   It shows who's on location.  It shows the

120

1   number of hours that we were on location.  It shows the
2   number of lost time hours that we had during a certain
3   job.  It shows the number of operating hours that we
4   had during the job.
5         Q.   Defined as what?
6         A.   As the time we're actually running the
7   unit --
8         Q.   Thanks.
9         A.   -- performing services for the customer.
10        Q.   Anything else you can think of?
11        I'm going to show you the form, an example.
12        A.   It shows what shifts that they were on.  It
13  shows the crews that were on location.  It shows the
14  services that we did.  It shows the times in and out of
15  the hole for the services that we've done.  It is a job
16  diary, is what it is.
17        Q.   That's fair.
18        Who gets the job reports?
19        A.   Customer can get them.  We maintain them.
20        Q.   You guys maintain them.  Right?
21        A.   Right.
22        Q.   So if you had to go back and try to figure
23  out what jobs have been performed over the last three
24  years and the circumstances of those jobs, as you
25  described these categories of information, you could go

121

1   to the job reports?
2         A.   I could.  And there's other places.
3         Q.   Where else could you go other than the job
4   reports?
5         A.   Our accounting program keeps up with
6   services.
7         Q.   The accounting program, is that a paper --
8         A.   QuickBooks.
9         Q.   Thank you.
10        QuickBooks.  Right?
11        A.   Yes.
12        Q.   Who maintains your QuickBooks?
13        A.   Accounting.  Accountant.
14        Q.   Right.
15        A.   Sham.  Sham Myatt is our accountant.
16        Q.   I didn't know that when you said that.
17  S-h-a-m?
18        A.   Yes.  I think that's how he spells it.
19        Q.   H-y-h-e-t?
20        A.   M.
21        Q.   Myatt, m-y-a-t-t?
22        A.   I think that's it.  I can look it up.
23        Q.   That's all right.
24        Is he down at Levelland?
25        A.   Yes, he is.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 32 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

32 (Pages 122 to 125)

122

1  Q. He's his own — he's got his own practice?
2  A. Correct.
3  Q. Okay. What information, though, does he get
4  that allows him to maintain the QuickBooks? Does he
5  get the job reports?
6  A. We enter the information.
7  Q. Thank you.
8      Okay. So your administrative people enter
9  the information?
10  A. Correct. We have people that do the data
11  entry.
12  Q. And they do the data entry from the job
13  reports?
14  A. Or -- and from the tickets. There's a few
15  forms that we use to have that entered.
16  Q. I've got some tickets, too.
17  A. Uh-huh.
18  Q. I'll show you that. And you can just say,
19  okay, those are the tickets.
20  A. Okay.
21  Q. Needless to say, you know you're in a lawsuit
22  having to do with hours and hours worked. Okay?
23  A. Right.
24  Q. Yeah. So what we have to try to do, we have
25  to be able to go back and figure out, to the best of

123

1  our ability, and also determine how you, to the best of
2  your ability, can determine how many hours people
3  worked.
4  A. Okay.
5  Q. All right. And if I were — I'm going to ask
6  you the question: What's the most accurate way to
7  calculate — to determine how many hours, let's say,
8  the riggers worked? Job reports?
9  A. We probably -- no. Probably the driver's
10  logs.
11  Q. Okay. Now, is every one of your
12  riggers required to fill out a driver's log?
13  A. Yes.
14  Q. Are any of your shop people required to fill
15  out driver's logs?
16  A. All DOT drivers are required to fill out
17  driver's logs.
18  Q. Whether they're driving or not?
19  A. Correct.
20  Q. Okay. So even a guy in the shop, if he's got
21  a CDL, even if he's not driving, you still have him
22  fill out a driver's log?
23  A. Right now, everybody is required -- that is
24  on hours is required to fill out a driver's log. And
25  in the past, everybody that goes to the field or that

124

1  will be a DOT driver at some point is required to fill
2  out driver's logs.
3  Q. Fair enough.
4      I think, what you've described to me is that,
5  if you've got the driver's logs, the job reports, and
6  tickets, you would be able to, with some pretty high
7  degree of certainty, identify the hours that have been
8  recorded?
9  A. Absolutely.
10  Q. Okay. All right. And does admin see all of
11  these? They see the job reports? They see the
12  tickets? They see the driver's logs?
13  A. They probably don't see the job reports.
14  That's -- admin at the district level sees it. It
15  doesn't go any higher than that, the job reports.
16  Q. But admin takes those job reports and puts it
17  into QuickBooks?
18  A. No. No. Most of the information that's
19  entered into QuickBooks comes off the service ticket.
20  Q. The tickets?
21  A. Correct.
22  Q. Gotcha.
23  A. The field ticket is what it's actually
24  called.
25  Q. Now, you described the job report to me.

125

1  Describe the field ticket to me.
2  A. It's just a ticket that we fill out that
3  keeps up on -- as far as time goes, it keeps up with
4  when we arrived at location, when we left, so a running
5  total on hours. And it is a breakdown of pricing and
6  services so that we know how to bill our customer.
7  Q. That's good.
8      What, if anything, records travel time, for
9  example?
10  A. Driving logs.
11  Q. Okay. So you could certainly take these
12  field tickets to determine when the crew arrives, when
13  it leaves. You take the job reports to identify who's
14  on location, the hours on location. And then --
15  A. The field tickets also describe who's on
16  location.
17  Q. They do?
18  A. Yes.
19  Q. Okay.
20  A. What equipment is on location, equipment
21  numbers and whatnot.
22  Q. If you took that information together with
23  the driver's logs — the driver's logs would identify
24  travel time?
25  A. Yes.

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

33 (Pages 126 to 129)

126

1    Q.  Okay.  So if you had all three of those
2  documents, job reports, service tickets, driver's logs,
3  you would be able to determine with a high degree of
4  certainty how many hours your crews are working?
5    A.  Yes.
6    Q.  All right.  Similarly, with the shop people,
7  as you indicated, they're all required to fill out the
8  DOT logs?
9    A.  Yes.  The hourly people will fill out an --
10  there have been some cases where they've filled out
11  just a time card-type thing.
12    Q.  What about the salaried people in the shops?
13    A.  They should be filling out driver's logs.
14    Q.  All right.  Gotcha.
15    Now, am I correct that the riggers then can
16  also be called upon at any time to drive one of the
17  small vehicles?
18    A.  Yes.
19    Q.  All right.  And, in fact, they are regularly
20  called upon to drive the small vehicles?
21    A.  Low man on the totem pole gets the call at
22  2:00 o'clock in the morning to run a hotshot, yes.
23    Q.  There you go.
24    The people in the shop, I would assume, can
25  also be called upon to drive the small vehicles?

127

1    A.  Yes.
2    Q.  And the people in the shop, in fact, are
3  called upon to drive the small vehicles?
4    A.  Everybody from my position down is required
5  to run a hotshot if needed or to do whatever is needed,
6  so we're all multitasking people.
7    Q.  Anything else you can think of that the
8  riggers do?  I'm talking about on a regular basis.
9    A.  They clean equipment.
10    Q.  Okay.  Very good.
11    Am I correct, the F-250 -- by the way, I have
12  a list for you as well, but -- at least the inventory
13  that we got of the small vehicles.
14    Do your people maintain those small vehicles?
15  For example, do they do a pretrip, anything like a
16  pretrip on those small vehicles?
17    A.  They're supposed to, yes.
18    Q.  All right.  Do they make a record of that
19  pretrip?
20    A.  Yes.  That's required by DOT.
21    Q.  Okay.  And a record is maintained of those
22  reports?
23    A.  Yes.
24    Q.  You guys have those reports?
25    A.  Yes.  To the extent that we have them -- will

128

1  I say that a pretrip has been done on every hotshot?
2  Probably not.
3    Q.  I'm not even asking --
4    A.  Same thing with the driving records, you
5  know, they are required to maintain their driving logs
6  and turn them in.  But are they very good at it?
7  They're people.
8    Q.  I didn't even ask you that.  Okay.  At this
9  point I'm trying to get a sense of how things are
10  supposed to work, typically, how they work.
11    A.  Right.
12    Q.  What you're telling me is that, assuming that
13  the people who are driving these small vehicles have
14  done the reports, we could ask you or your lawyers for
15  those trip reports and, presumably, we would be able to
16  get them?
17    A.  I think so, yes.
18    Q.  You think so.  Okay.
19    Do you understand -- I guess you've done
20  those pretrip reports, haven't you, as part of your job
21  over the years?
22    A.  Yes.
23    Q.  And if necessary, if the tires have to be
24  inflated, you inflate the tires.  If the windshield
25  fluids have to be filled, you fill the fluids?

129

1    A.  Yes.
2    Q.  If a light is out, you've got to somehow get
3  the darned light replaced?
4    A.  Yes, or take another vehicle or something.
5  Yes.
6    Q.  Or if the tire is flat, you got to change the
7  tire?
8    A.  Yes.
9    Q.  Okay.  And that's true whether you're in the
10  field or whether you're at the shop?
11    A.  Yes.
12    Q.  As you indicated, anybody and everybody could
13  be required to run a hotshot, and then anybody and
14  everybody could be and is expected to do a pretrip
15  report?
16    A.  Yes.
17    Q.  All right.  And to do whatever else is
18  necessary to make sure that they're driving a safe
19  vehicle?
20    A.  Yes.
21    Q.  All right.  Is there any way you can put --
22  well, you were talking, before, about two-man,
23  three-man, four-man crews at the well sites.  Would it
24  be fair to say the majority of those crews are
25  three-man crews?

---

130

1      A.  I wouldn't know, because there's very high
2  percentages of everyone, so -- there's even times when
3  we have five-man crews, so I really do not know that
4  answer.
5      Q.  Am I correct that a two-man crew is not rare?
6  It happens?
7      A.  Yes.
8      Q.  Okay.  Take a look at 4.  We're done with 3.
9  Okay.  We already had that discussion about that.
10         Method of pay.  Am I correct that, by
11  whatever the title -- take a look.  You see these
12  titles that are listed here.
13         We already talked about short-service
14  employee.  Right?
15      A.  Okay.
16      Q.  Is there such a thing as a junior operator?
17      A.  Yes.
18      Q.  Who is that?  Is that part of the crew?
19      A.  Yes.  He's an operator.
20      Q.  Thank you.
21         Okay.  He's the guy -- even if he's called
22  junior, he's still an operator?
23      A.  When you progress from -- the next
24  progression from short-service employee would be junior
25  operator.

---

131

1      Q.  Is that a rigger?
2      A.  Yes, rigger, operator.  And he's usually a
3  guy with a very limited experience level.
4      Q.  That's fair.  I just want to make sure, when
5  we use that term "operator" —
6      A.  It's going to be confusing.
7      Q.  So it's fair to say, though, the guy that you
8  call the engineer, he's the guy that's in charge?
9      A.  Yes.
10      Q.  Okay.  So I think I understand now what a
11  wireline operator is.  It's the next progression.
12         You're not there.  You're a rigger.
13      A.  You go to West Texas, and they're going to
14  call the engineer an operator, so it's a very -- it's
15  very confusing.  We have different terms.  We don't
16  have a standard term, I guess.  But the standard I
17  would use is supervisor, and then you have guys that
18  are working for him.
19      Q.  We've been developing this kind of standard
20  language in this deposition, which you have said you
21  have this supervisor that is the engineer/operator?
22      A.  Yes.
23      Q.  Then you have the two riggers or hands, who
24  report to him?
25      A.  Yes.

---

132

1      Q.  And that's the standard three-man crew, and
2  sometimes you have only a two-man crew with an engineer
3  and one rigger.
4      A.  Yes.  And four —
5      Q.  Sometimes four?
6      A.  And sometimes five.
7      Q.  And sometimes five?
8      A.  Yeah.
9      Q.  Sure.  All right.  Now, let's talk about the
10  method of pay.  There is a – up until very recently —
11  I think you said a month ago – as far as you're aware,
12  all the crew members with these various titles,
13  whatever title might apply, but certainly everybody on
14  the crew who was out at the crew sites was paid a
15  salary?
16      A.  Correct.
17      Q.  And then, if you're at the well site, you get
18  a bonus?
19      A.  Correct.
20      Q.  Is there any particular length of time in a
21  given day – is it a daily bonus?
22      A.  It's a service bonus, a percentage of the job
23  ticket, of the revenue ticket.
24      Q.  Okay.  And the revenue ticket being what, how
25  many lines – how many charges are run that day?  How

---

133

1  do you determine that?
2      A.  Services.  We get paid by services.
3      Q.  All right.  Give me an example.  Suppose you
4  charge the client $1,000 a day at the well site.
5      A.  Okay.
6      Q.  Just suppose.  And you've got three guys, a
7  three-man crew.  Right?
8      A.  Okay.
9      Q.  Tell me how the bonus works.
10      A.  The operators get 2 percent of that $1,000,
11  and the engineer gets 4.
12      Q.  The operator/riggers?
13      A.  Uh-huh.
14      Q.  "Yes"?
15      A.  Yes.
16      Q.  They get 2 percent?
17      A.  Correct.
18      Q.  And the engineer gets 4 percent?
19      A.  Yes.
20      Q.  Correct?
21      A.  And an SSE would typically get half a
22  percent.
23      Q.  Typically?
24      A.  Yes.
25      Q.  And we could look at the records and figure

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 35 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

35 (Pages 134 to 137)

### 134

1 that out? How would you figure that out from the
2 records, whether the SSE is getting a half percent or
3 the 2 percent?
4    A. We keep records on what bonuses we pay, and
5 it references the ticket, so you could go back and look
6 and determine that.
7    Q. So you go from the pay record to the ticket?
8    A. Yes.
9    Q. And that would allow you to determine the
10 percentage bonus that somebody got?
11    A. Yeah. I mean, you could probably get it
12 right off the pay record, because that percentage is
13 usually recorded right on the payroll.
14    Q. Is it recorded as a percentage or a dollar
15 amount?
16    A. Yes, it's recorded as a percentage.
17    Q. It will say, bonus, 2 percent. Right?
18    A. Right.
19    Q. Okay.
20    A. It will say, this job, you got paid 2 percent
21 for.
22    Q. So if you're out there for a day, might you
23 get multiple bonuses in one day?
24    A. No.
25    Q. So it's really based on a day. It's based on

### 135

1 a day's services --
2    A. It's based on a field ticket. You might be
3 out there a month, and you get your bonus at the end of
4 that job. So it's based per job.
5      MR. ANTKOWIAK: If I could just interject
6 possibly to clarify, maybe, some confusion here,
7 the company did provide a typical calculation in
8 the supplement responses.
9      MR. CHIVERS: I know. That's fine.
10      MR. ANTKOWIAK: Okay.
11      MR. CHIVERS: I'm going to go through it.
12      MR. ANTKOWIAK: Okay.
13      MR. CHIVERS: But it helps me when I have
14 somebody describe it. It does.
15    Q. Okay. All right. So the way -- up until
16 very recently, the way you would pay all of the crews
17 would be salary plus this service bonus -- you call it
18 a service bonus?
19    A. Call it a bonus.
20    Q. Bonus. But you paid no overtime. In other
21 words, you didn't actually calculate anybody's rate of
22 pay and take it by time and a half or any such formula
23 to give them so-called overtime?
24    A. No.
25    Q. All right. Let me ask you this. I mean, you

### 136

1 know what's going on here. You do, generally. Did you
2 or anybody else in the organization ever give -- give
3 that consideration, as to whether people should or
4 should not be paid so-called overtime, a premium rate
5 for their extra hours over 40?
6    A. We really considered our salary as hourly
7 rates. We really considered it as -- we based our
8 salary on a 60-hour workweek. So in calculating what
9 our salaries were going to be, we back-calculated what
10 we thought an hourly rate would fall out onto a 60-hour
11 week. So we considered our salaries as all -- as being
12 paid for all hours worked.
13    Q. Okay. Did you have any kind of an agreement
14 with your employees, for example, a written agreement,
15 where that was described to the employees?
16    A. Probably not.
17    Q. When you were paying the bonuses, did you
18 ever give consideration to going in and calculating the
19 effect that those bonuses had on the hourly rate that
20 you were paying people?
21    A. No.
22    Q. Did you ever have any discussions about the
23 terms "exempt" or "nonexempt"?
24    A. No.
25    Q. All right. Fair enough.

### 137

1      Is it fair to say you're kind of the founder
2 of this company?
3    A. Yes.
4    Q. All right. And as the founder of the
5 company, am I correct that you didn't sit down with any
6 lawyers or any advisers to go through the difference
7 between exempt and nonexempt?
8    A. No, I did not.
9    Q. Okay.
10    A. I based my model on what's been done in my
11 industry for 60 years.
12    Q. That's fair. Yeah.
13      I'd asked you one of the questions here a
14 little bit later -- I'll just ask it to you now. Did
15 you ever give any consideration to this law called
16 SAFETEA-LU, S-A-F-E-T-E-A dash LU, Technical
17 Corrections Act?
18    A. I'm not sure what you're talking about, so
19 no.
20    Q. Thank you.
21      So, no. I know. I've got to do this for the
22 sake of the record.
23      I assume that whole idea, that whole notion
24 of that SAFETEA-LU TCA -- it stands for Technical
25 Corrections Act -- that's something that's only become

138

1  an issue once the lawsuit was started?
2      A.  I'm not even sure what it means now, so --
3      Q.  Fair enough.
4          You're aware -- did you read or have you read
5  Exhibit 1, the objections?
6      A.  Yes, I've looked through them.
7      Q.  You understand that your company is taking
8  the position, based upon Exhibit 1, that plaintiff in
9  this case, Mr. Tvrdovsky, was nonexempt?  Do you
10  understand that?
11      A.  Yes.
12      Q.  All right.  You understand that the company
13  is taking the position that no individualized
14  assessment was made of the other employees to determine
15  whether they're exempt or nonexempt?
16          MR. ANTKOWIAK:  Can you refer to the part of
17      the objection where you're characterizing it, so
18      we can --
19          MR. CHIVERS:  Yeah.  I'll make sure I
20      characterize it fairly.
21      Q.  Take a look at Exhibit 1, which is here.
22  Take a look at number 6, topic 6.  Read that to
23  yourself, topic 6.
24          I think you have the wrong --
25          MR. ANTKOWIAK:  Take a look right there.

139

1          THE WITNESS:  Okay.
2      Q.  I already asked the question.  You indicated,
3  yes, you're aware that your company is taking the
4  position that Mr. Tvrdovsky was not exempt; that is,
5  he's nonexempt.
6          In this language having to do with putative
7  class members -- I have a question for you rather than
8  trying to rephrase any of this.  Did you or anybody in
9  your company ever do a case-by-case analysis of your
10  employees who were being paid a salary to determine
11  whether they were or were not exempt from the overtime
12  compensation under the Fair Labor Standards Act?
13      A.  No.  We didn't -- we didn't consider anybody
14  nonexempt.
15      Q.  But the question I asked is:  Did anybody do
16  any kind of an analysis?
17      A.  No.
18          MR. ANTKOWIAK:  Just to be clear, I mean,
19      this paragraph, I think, speaks for itself.  What
20      it says, I think, with respect to Mr. Tvrdovsky,
21      is that Renegade does not assert the plaintiff was
22      exempt from overtime compensation, the FLSA or
23      Pennsylvania Minimum Wage Act.  And I think,
24      between lawyers, we can argue the significance of
25      that.  What we're saying here is that we're not

140

1      asserting that he was exempt.
2          I think your question to Mr. Cassady was a
3      little bit different.  If I understand you
4      correctly, you're stating this as if to say that
5      the plaintiff is, in fact, nonexempt.
6          We're simply stating the company does not
7      assert plaintiff was exempt in this action.  So I
8      think there is a distinction there I just want to
9      make for the record.
10          MR. CHIVERS:  Understood.
11          MR. ANTKOWIAK:  Okay.
12      Q.  Okay.  All right.  Take a look, sir, if you
13  would, at item 7 on the 30(b)(6).  Am I correct, sir,
14  that your company did not require the salaried
15  employees that we've been talking about, that is,
16  the -- we'll just call it the level of rigger and
17  below.  Correct?
18      A.  Okay.
19      Q.  That's the term -- that's the way you've
20  described them.
21          You did not require anybody from the rigger
22  level or below to record individually on so-called time
23  sheets?
24      A.  Correct.
25      Q.  Okay.  Am I correct, sir, that nobody in your

141

1  organization, over the years, has ever instructed the
2  employees at rigger level and below as to what is
3  compensable time; that is, time that is supposed to be
4  paid for, and time that is not?
5      A.  Correct.
6      Q.  All right.
7      A.  We consider the salary to be to pay for all
8  the hours worked.
9      Q.  Understood.
10          You said a moment ago that your expectation
11  was that people would work at least 60 hours a week?
12      A.  No.  What I said was, we based our salary on
13  a 60-hour week, and it was not very -- it was not
14  uncommon that the hours may be actually ten or 20 or
15  over, at 70 or 80 hours.  So 60 has been the --
16  throughout my industry, throughout the years, 60 has
17  been a number that has come up as the average hours
18  worked during a year, is 60 hours a week.
19      Q.  All right.  Sir, if you take a look at
20  item 10, topic 10 on the 30(b)(6), am I correct, sir,
21  that your expectation is also that any member of the
22  crew or, for that matter, any member of your workforce,
23  including people at the shops, can be called upon to
24  load the small vehicles with parts and goods --
25      A.  Yes.

142

1   Q. -- for delivery to the well sites?
2   A. Yes.
3   Q. And those goods, I assume they come from
4   wherever you can get them. You can get them within the
5   state. You can get them from outside the state. You
6   don't care where they come from, just so long as
7   they're there?
8   A. Correct.
9   Q. Am I correct, sir -- taking a look at
10  number 11, based upon your answers to the other
11  questions, neither you nor anyone else in your
12  organization ever made any kind of a determination, sat
13  down and actually determined whether the safe operation
14  of a small vehicle has any effect on an exemption?
15  A. I'm not sure what you mean.
16  Q. Yeah. You already indicated you never had
17  even heard of the SAFETEA-LU. Even to this day you're
18  not even sure what the heck it is.
19  A. Right.
20  Q. You also indicated, nobody sat down, in your
21  organization, at any point over the past five years and
22  did any kind of individualized analysis of whether your
23  employees were or were not exempt from overtime?
24  A. We never considered anybody exempt.
25  Q. Fair enough.

143

1        Wait. You never considered anybody exempt
2   from overtime, or you never considered anybody entitled
3   to overtime?
4   A. Exempt from it. We figure we're paying the
5   overtime within our salary structure.
6   Q. That's what you're figuring?
7   A. Right. With our salary and our bonus, we
8   consider that to compensate for the overtime.
9   Q. Regardless of the hours worked?
10  A. The more hours worked the more bonus you get,
11  so the bonus is tied to however many hours.
12  Q. Fair enough. Okay.
13  A. The bonus has a direct relationship to the
14  hours worked.
15  Q. That's fair. All right.
16       Do you require your employees to fill out any
17  kind of a -- or indicate in any way, on paper, when
18  they make trips in the small vehicles?
19  A. They're required through their driver's logs.
20  Q. You're thinking -- you're saying here, today,
21  if you look at the driver's logs, it will indicate the
22  use of an F-250?
23  A. It should. Yes, it should document all the
24  time that they're off, all the time that they're
25  driving, all the time that they're on duty, not

144

1   driving. There's about four categories that they're
2   required to document.
3   Q. I'll show you some examples here in a few
4   minutes because I'm going to tell you, having looked at
5   these logs not only in this case but in other cases,
6   I've never seen anybody identify a small vehicle like
7   an F-250. Maybe your people were. You'll have to show
8   me that.
9   A. It's part of the driving log, on what vehicle
10  you're driving.
11  Q. Okay. Very good.
12       Has Renegade ever been investigated by the
13  Department of Labor, to your knowledge, either federal
14  or state, relative to the method of payment of your
15  employees?
16  A. We had an inquiry from West Virginia a month
17  or so ago or within the last month, on what we were
18  paying our people. And they needed I-9s also. And we
19  supplied that, and it's been closed as far as I know.
20  Q. So as far as you know, though, nobody came
21  out from West Virginia to examine how you've classified
22  people as exempt or nonexempt?
23  A. No. Correct.
24  Q. All right. To your knowledge, neither has
25  the Department of Labor ever done that over the past

145

1   five years?
2   A. No.
3       MR. CHIVERS: Okay. Let's take a break.
4   I've got some documents. I'm going to go get the
5   documents, and then we'll go from there.
6       (Recess taken.)
7       (Whereupon, Deposition Exhibit 5 was marked
8   for identification.)
9       (Whereupon, Deposition Exhibit 6 was marked
10  for identification.)
11      (Whereupon, Deposition Exhibit 7 was marked
12  for identification.)
13      (Whereupon, Deposition Exhibit 8 was marked
14  for identification.)
15      (Whereupon, Deposition Exhibit 9 was marked
16  for identification.)
17      (Whereupon, Deposition Exhibit 10 was marked
18  for identification.)
19      (Whereupon, Deposition Exhibit 11 was marked
20  for identification.)
21      (Whereupon, Deposition Exhibit 12 was marked
22  for identification.)
23      (Whereupon, Deposition Exhibit 13 was marked
24  for identification.)
25

146

BY MR. CHIVERS:
Q. Sir, I've put a number of documents in front of you. Actually, I'm going to jump around a little bit on these. I'm not just going to stick with one -- I'm not going to stick with the order.
       You have through 12?
       Actually, take a look at Exhibit 10 first. Sir, if you'd take a look at Exhibit 10, this is what was in response to interrogatory number 12, which was Exhibit 3.
       Actually, let's stick with Exhibit 4.
       MR. CHIVERS: And this, Christian, is for you, as much as anything.
BY MR. CHIVERS:
Q. In Exhibit 4, which is the defendant's supplemental response to plaintiff's interrogatories, number 12 asks for an identification of each and every CDL held by plaintiff, the other putative class members in Pennsylvania, and the other putative class members in states other than Pennsylvania where defendant Renegade does business.
       In response to that, this was given to us, Exhibit 10. Do you see that, sir?
A. Yes.
Q. Am I correct, sir, that this identifies all

147

of the employees during the class period, which is defined as since -- actually, October 1, 2010 through the present.
       My understanding -- you correct me if I'm wrong -- is that this list identifies all of your employees who have had CDLs during that time period?
A. To the best of my knowledge, yes.
Q. Where does Renegade maintain the records that would allow them to put together this list?
A. In Levelland.
Q. Okay. You'll agree with me, sir, that certainly doesn't represent all of the employees that Renegade has had performing wireline services since October of 2010?
A. Correct.
Q. All right. I went through and did a quick count. I don't know. It's a little over 200.
       Am I correct, sir, that some of these people would no longer be employed by Renegade?
A. Yes, I would assume that. We've had some people leave, yes.
Q. And you had indicated before, that not all of the employees -- for example, not all the crew members that are out there at the well sites have CDLs?
A. Correct.

148

Q. Am I correct, sir, that it's your company policy that, if you don't have a CDL, you're not permitted to drive a commercial vehicle?
A. Correct.
Q. All right. And certainly, if you don't have not only a CDL but you don't have a hazmat endorsement, you won't permit them to drive any vehicle, commercial or noncommercial vehicle, that has hazardous materials?
A. Correct.
       (Discussion off the record.)
Q. Take a look at Exhibit 10. I see. Yeah, I see what you're saying.
       Take a look at Allen. He's actually a pretty good example of what I wanted to ask you about. Am I correct, sir, that Mr. Allen's date of hire was January 13 of 2012?
A. Yes, that's what it indicates.
Q. Is there any reason to question this?
A. No.
Q. And that his CDL wasn't issued until February 1 of 2013?
A. Okay.
Q. Do you agree with that?
A. That's what the form says, yes.
Q. Not to be too fussy about it, but it's not

149

only the form. Do you have any reason to question the accuracy of this form?
A. No.
Q. Am I correct, sir, then, that if you take a look -- as an example, William Allen, that even though, eventually, he got a CDL, for the first almost year that he was employed he didn't have a CDL?
A. Correct.
Q. So based on what you've said, am I correct that during that first almost year he would never have driven a commercial vehicle?
A. Correct.
Q. Nor could he have been called upon to drive a commercial vehicle because he didn't have a CDL; did he?
A. Right.
Q. Do you know the difference between an A CDL -- a CDL A and a CDL B?
A. Yes.
Q. What is the difference?
A. The type of truck that you're allowed to drive.
Q. What are you allowed to drive if you have a CDL B?
       By the way, I should really ask: Which is

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 39 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

39 (Pages 150 to 153)

150

1  more restrictive, an A or a B?
2      A.  The A -- the B.
3      Q.  The B.  I would have guessed that simply
4  because, if he just got his CDL, I would assume he got
5  the entry-level CDL first.
6      A.  No.  From this point on, they're all
7  receiving As, so it's just -- we didn't require them to
8  have an A, but now we do.
9      Q.  Now you do?
10     A.  Yes.
11     Q.  Fair enough.
12          What was the CDL B, when it was still being
13  issued, if you know?
14     A.  I don't know the exact, but it has something
15  to do with the weight of the truck that they can
16  haul -- that they can drive.  A class B will not let
17  you haul a trailer, a truck and trailer, and the
18  class A will.  And we're going to all class A now.
19     Q.  I assume, sir, the primary function of, let's
20  say -- whether you call him a junior wireline operator
21  or a rigger, the primary function is to go to the well
22  site and perform rigging operations?
23     A.  Yes.
24     Q.  Do you know what a CDL C is?
25     A.  CDL C, it's a lower classification of CDL.  I

151

1  do not know the different classes.
2      Q.  That's fine.  Sir, I think, based on your
3  statement, though, before, it's fair to say that you
4  and your company insisted that drivers abide by
5  whatever the relevant DOT restrictions were?
6      A.  Correct.
7      Q.  All right.  If you take a look at
8  Exhibit 11 -- You might think that the name of this is
9  redacted.
10     A.  Yeah.  It looks like.
11     Q.  But it's not.  I know.
12          Look.  What I see here are -- you see this
13  list.  What we were told was that this is an employee
14  roster or list of your employees redacted so that the
15  only people showing up here really are the junior
16  operators.
17          Do you see that?
18     A.  Okay.  All right.
19     Q.  I mean, that's what I've been told.  I don't
20  see anybody other than the junior operators on here.
21  Do you?
22     A.  No.
23     Q.  And it also doesn't appear -- take a look at
24  the third page.  In the lower right-hand corner, it
25  says "4351."

152

1      A.  Okay.
2      Q.  And do you see Curtis Tvrdovsky's name there?
3      A.  Yes.
4      Q.  What is he identified as?
5      A.  Junior operator.
6      Q.  That's 11.
7          Take a look at Exhibit -- I don't want to do
8  it completely in reverse.  Take a look at Exhibit 5, if
9  you would.
10     A.  Okay.
11          MR. CHIVERS:  What I did, just so you know --
12  and Christian, so you know -- you guys produced
13  this disc with about a quadrillion pages.  Okay.
14     Q.  And I'm just taking things as representative.
15  All right?
16     A.  Okay.
17     Q.  I understand -- you tell me:  What do these
18  pages -- from 00001 to 00010, what are these?
19     A.  These are field tickets.
20     Q.  Okay.  We talked about field tickets before.
21  Right?
22     A.  Correct.
23     Q.  Walk me through here.  I see the customer
24  name is identified?
25     A.  Correct.

153

1      Q.  In the upper right-hand corner, it says,
2  "1/21/11."  Do you see that?
3      A.  Yes.  The date.
4      Q.  It says, "truck."
5      A.  Correct.
6      Q.  Can you decipher that?
7      A.  Hoist unit 2, HU 002.
8      Q.  What's a hoist unit?
9      A.  Our service units, our wireline units.
10     Q.  The wireline truck?
11     A.  Correct.
12     Q.  But you call them a "hoist unit"?
13     A.  It's called the wireline truck.
14     Q.  That's what I thought.
15     A.  The number is HU 002, of the wireline truck.
16     Q.  I gotcha.
17          But that's one of your wireline trucks.
18  Correct?
19     A.  Correct.
20     Q.  All right.  Good.
21          So on that day, January 21 of 2011, that
22  would indicate that wireline truck with that crew,
23  S. Brown; W. Dumas --
24     A.  Dumas.
25     Q.  Dumas.  Couldn't tell?

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 40 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

40 (Pages 154 to 157)

---

154

1    A. Yeah. I know him.
2    Q. Sorry.
3        (Continuing) -- and B. Robinson -- you've got
4    an operator and two riggers identified here?
5    A. Correct.
6    Q. Am I correct, sir, that a rigger would also
7    be either a wireline operator or a junior wireline
8    operator?
9    A. Correct.
10   Q. All right. And the customer was Shell
11   Energy?
12   A. Yes.
13   Q. And it's out of Mansfield, Pennsylvania?
14   A. Yes.
15   Q. Now, the 38 Route 660, is that out in the
16   sticks? That's just the location?
17   A. That's the address of Shell Energy, of their
18   office.
19   Q. Thank you.
20       Okay. But it does say -- their office is in
21   Tioga County? That's where Mansfield is?
22   A. Yes.
23   Q. But then, it also identifies the well name.
24   Right?
25   A. Yes.

---

155

1    Q. Lingle 1102-IV?
2    A. 1V.
3    Q. 1V. Okay.
4        Well name -- I see. So the well name is
5    Lingle with the numbers, and the field is Wildcat?
6    A. Yes.
7    Q. Then it also identifies the type of service?
8    A. Correct.
9    Q. Gyro, CBL, p-e-r-f.
10       Perf is perforation?
11   A. Yes.
12   Q. What is CBL?
13   A. Cement bond log. That's the tool that we use
14   to tell the integrity of the cement job.
15   Q. Is it basically a sound?
16   A. Yes, it's acoustics.
17   Q. I was going to say, yeah. Okay.
18       And "gyro," what does that mean?
19   A. For us, it's a mechanical service. We're
20   hoisting somebody else's tools. A gyro is a tool that
21   they use to tell the direction of the well, where is
22   the bottom of the well.
23   Q. So it's a direction finder?
24   A. Direction survey, yes.
25   Q. Right.

---

156

1    A. After we run that, we know exactly where the
2    well is in relation to the surface.
3    Q. Okay.
4    A. We know if it's on somebody else's property
5    or not.
6    Q. There you go.
7    A. Yeah.
8    Q. I would assume that it's also -- it's based
9    on the whole -- like a GPS; in other words, it's some
10   way of locating?
11   A. It's not GPS.
12   Q. It's not?
13   A. It is survey-type equipment.
14   Q. Okay. Very good.
15       "Remarks." See the "remarks" section?
16   A. Uh-huh.
17   Q. I think I understand. This perforation was
18   done at 5,055 feet to 5,065 feet --
19   A. Correct.
20   Q. -- in the line itself?
21   A. In the well.
22   Q. In the well.
23       Yeah. You guys just call it "the well."
24   Right?
25   A. The hole, the well.

---

157

1    Q. That's where you guys did a perforation --
2    A. Yes.
3    Q. -- which means, that's where you ran your
4    assembly down -- your string. Right?
5    A. Correct.
6    Q. And blew -- and detonated the gun?
7    A. Correct.
8    Q. Okay. What is the LU number?
9    A. That's a Shell number. In order for us to
10   get paid, we have to have this number recorded on
11   our -- when we submit an invoice, we have to have this
12   number. It's like a purchase order number.
13   Q. What about API; what is that?
14   A. That's a number that's given to that well so
15   that -- you can actually reference that -- you can go
16   anywhere in the United States and recognize --
17   reference that well and know where it is.
18   Q. Is that American Petroleum Institute?
19   A. Yes.
20   Q. I thought.
21       Wow! Okay.
22   A. Every well ever drilled, from some point in
23   time, has an API number.
24   Q. Okay. What's this AFE number?
25   A. That's like a purchase order from the

---

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

41 (Pages 158 to 161)

---

**158**

1  customer. He does a cost estimate. And it's of when
2  he starts a project. And it's like a bucket that money
3  is drawn out of as they do services for the well.
4      Q.  Do you know what "AFE" stands for?
5      A.  I do not.
6      Q.  Is that a number that the customer then gives
7  you?
8      A.  Yes. It's like a purchase order number.
9      Q.  "AFE," is that what you find for any
10 customer, Shell or anybody else?
11     A.  It's a typical -- yes, most people track
12 their costs by AFEs. It's like a purchase order. You
13 start out a project, and your boss wants to know what's
14 it going to cost to do this job.
15     Q.  Give me an estimate?
16     A.  And they do an estimate. And it's probably
17 field estimate something -- something field estimate.
18     Q.  Yeah. Okay. Now, it says, arrive, 7:00 a.m.
19 Do you see that?
20     A.  Uh-huh.
21     Q.  Time on well. Arrived, 7:00 a.m. But it
22 doesn't have a departure. Do you know why?
23     A.  He didn't do his job.
24     Q.  Fair enough.
25     Who's the "he"?

---

**159**

1      A.  Scotty Brown, the operator.
2      Q.  Because you expect -- you called him an
3  operator. That's fine.
4      A.  Well, that's what it's called on the top of
5  our ticket.
6      Q.  Yeah. But we know, from our discussion, that
7  operator is equivalent of engineer?
8      A.  Yes.
9      Q.  And you have described him as the
10 supervisor --
11     A.  Yes.
12     Q.  -- on the site?
13     A.  Yes.
14     Q.  Fair enough.
15     Service performed, it has these three
16 services that correspond to the services identified up
17 here in type of service. Right?
18     A.  Yes.
19     Q.  And for each of these, it has a price.
20 Right?
21     A.  Correct.
22     Q.  $500, $3,500, $1,000, total $6,500?
23     A.  Correct.
24     Q.  Then there is some miscellaneous charge for
25 grease. What is that? Do you know?

---

**160**

1      A.  Grease? It's actually 5K grease, and
2  it's the pressure control equipment that we install on
3  top. It's a piece of equipment that we charge for.
4      Q.  Is that right?
5      I see. You have to have the right tool to
6  inject the grease under pressure?
7      A.  The name "grease" is -- we use grease to
8  control the well. It's pretty complicated, but it's
9  just a term we use for a piece of equipment that we use
10 on the well.
11     Basically, a well has pressure on it, and you
12 have valves.
13     Q.  You mean a positive pressure that you put in
14 from the top?
15     A.  That the well is making.
16     Q.  Thank you.
17     A.  The gas.
18     Q.  The gas has a certain pressure?
19     A.  3,500 pounds, let's say. So you've got
20 valves, three or four valves, that keep that pressure
21 in the ground until you're ready to send it somewhere.
22 So we have to get into that well and do services, so we
23 put a specialized piece of equipment on top of the
24 well, and that allows us to get our tools into the
25 well, open them up, send them down, do our service,

---

**161**

1  bring them back out, close the well, the valves, and
2  then we're able to take our equipment off the top and
3  add more tools or whatever we need to do.
4      Q.  Because you're running your tools down
5  through the well casing?
6      A.  Yes.
7      Q.  Right. And that well casing has pressure?
8      A.  Yes.
9      Q.  All right. Okay. Who's this company rep
10 signature? Is that the Shell Energy rep?
11     A.  Correct.
12     Q.  All right. Take a look at the next one. And
13 the next one, similar -- I assume that, basically, the
14 legend, if you will, is the same?
15     A.  Almost identical.
16     Q.  And this time Brown, Scott Brown, identified
17 7:00 a.m. arrived, 3:45 depart, and he even put the
18 total?
19     A.  Yes.
20     Q.  That's on --
21     A.  -- the next day.
22     Q.  -- the next day.
23     And if you take a look at 2/3, February 3,
24 arrive time, depart time is identified on this next
25 one?

---

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 42 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

42  (Pages 162 to 165)

162

1    A.  Correct.
2    Q.  Page 3, at the lower right hand.
3        You've got one operator or engineer, Scott
4   Brown, and you got one rigger?
5    A.  Yes.
6    Q.  And then, the next day -- well, not the next
7   day, but the next ticket we've got, which is -- lower
8   right-hand corner -- 4 -- I see, in some of these --
9   you're right -- sometimes they'll put the arrive time
10  and depart time and total.  Sometimes they'll put none
11  of it.  Right?
12   A.  Correct.
13   Q.  And these are called your "field tickets."
14  Right?
15   A.  Correct.
16   Q.  You and I had talked before about how one
17  could go back and figure out how many hours people were
18  working.  What you told me was, you really -- you could
19  go to the field ticket.  Right?
20   A.  Yes.
21   Q.  This is a field ticket; is it not?
22   A.  Correct.
23   Q.  Suppose you have a situation where the field
24  ticket doesn't do it, I mean, because we've seen
25  already that some of these, you can't -- whoever it is,

163

1   the engineer/operator hasn't identified start time,
2   depart time, or arrive time, depart time.
3    A.  Correct.
4    Q.  So in a situation like that, then, where did
5   you go to try to figure it out?
6    A.  Job report.
7    Q.  I'll show you some job reports here.  I think
8   I have a couple.  Okay?
9    A.  Okay.
10   Q.  You can show me how that works.
11       Now, since I have -- we have here some of
12  these examples of field tickets.  Is it the field
13  ticket that will then be the basis for calculating a
14  bonus?
15   A.  Yes.
16   Q.  Okay.  So, for example, you could go, if you
17  take a look at the lower right-hand corner 4 -- yeah,
18  you have right there -- $6,500.  Right?
19   A.  Correct.
20   Q.  All right.  1 percent of $6,500 is $65.  So
21  you're telling me, for that day, he gets -- Scott Brown
22  made four times that much.  Right?
23   A.  Correct.
24   Q.  Or $260.  Correct?
25   A.  Yes.

164

1    Q.  Okay.  And the rigger got half of that; he
2   got $130?
3    A.  He got 2 percent, yes.
4    Q.  Half of whatever the engineer got?
5    A.  Yes.
6    Q.  Okay.  Where would I track that?  Would I
7   have to look at the pay statements or paystubs for
8   those guys, those individuals?
9    A.  You could find the bonus there.  I mean, we
10  designate it as bonus.  But as broke down to the
11  ticket, to the job?
12   Q.  No.  No.  But for the day -- or could I?
13   A.  We track it per ticket, per field ticket.
14   Q.  Well, you calculate it per field ticket.
15   A.  And we track it that way also.  There is a
16  sheet, a bonus sheet --
17   Q.  Thank you.
18   A.  -- that directly relates all bonuses to these
19  field tickets.  We turn it in once a month to pay our
20  bonus.
21   Q.  All right.  And the bonus sheets are tied
22  indirectly with the field ticket?
23   A.  Yes.
24   Q.  Okay.  So if I asked for the bonus sheets,
25  the bonus sheets would provide information not only as

165

1   to how much people were paid, individuals were paid,
2   for a given period of time, but, also, you'd be able to
3   identify on those bonus sheets which field ticket it's
4   associated with?
5    A.  Correct.
6    Q.  Okay.  If you take a look at 5, lower
7   right-hand corner --
8    A.  Okay.
9    Q.  This is February 10 of 2011.  You see where
10  it's arrive at 6:30 a.m. and depart at 6:00 p.m.?
11   A.  Yes.
12   Q.  And Scott Brown then identified that as 11
13  and a half hours.  Do you see that?
14   A.  Yes.
15   Q.  All right.  And am I correct, sir, that it
16  typically takes time to get to these well sites from
17  wherever you may be, whether it's from the shop or from
18  a hotel?
19   A.  Yes.
20   Q.  All right.  And then, it takes that same
21  amount of time, assuming you're still on the job, to
22  get back to either the hotel or back to the shop?
23   A.  Correct.
24   Q.  And you're saying, I think, before, that in
25  order to track the time that people were traveling,

166

1  you'd have to look at their logs?
2      A.  Correct.
3      Q.  Their DOT logs?
4      A.  Yes.
5          Shell has a 14-hour rule, so no more than 14
6  hours driving to, from location, and on the job.  So on
7  this particular job -- this is a Shell ticket -- I know
8  that he was not driving over 14 hours for this
9  particular job.
10     Q.  You mean --
11     A.  Or on location or total working time over
12 14 hours.
13     Q.  I understand what you're saying.
14         Shell, at least, said whatever you do,
15 maximum 14 hours work a day?
16     A.  Yes.
17         (Discussion off the record.)
18     Q.  Correct me if I'm wrong, sir.  If you take a
19 look at page 2, in the lower right-hand corner,
20 7:00 a.m. is arrive at the well site?
21     A.  Correct.
22     Q.  3:45 is depart the well site?
23     A.  Correct.
24     Q.  The point of this is that it shows, at least
25 when it's filled out, total time spent at the well

167

1  site?
2      A.  Correct.
3      Q.  That's Exhibit 5.
4          In terms of payment of the bonuses, do you
5  get paid -- how soon after the end of the month?
6          I assume it's month by month the bonuses are
7  paid?
8      A.  We turn the bonus sheet in at the end of the
9  month and we pay by the 15th of the following month.
10     Q.  All right.  Does it matter whether the
11 employee is still employed as of the 15th of the
12 following month as to whether that person gets his
13 bonus?
14     A.  No.  He should get his bonus regardless.
15     Q.  Take a look at Exhibit 6.  If you take a look
16 at Exhibit 6, am I correct these are more examples of
17 field tickets?
18     A.  Correct.
19     Q.  If you would, though, take a look in
20 Exhibit 6.  There are a couple of pages that I'm going
21 to ask you about.
22         By the way, if you take a look in the upper
23 right-hand corner, 41455 -- it's interesting.  Now
24 we're back to 41455.
25         See that?

168

1      A.  Yeah.
2      Q.  You see where it says the date.  I guess
3  that's 1/30/2014, January 30 of 2014.  You see where it
4  says, "engineer"; then it has "operator"?
5      A.  Yes.  Yes.
6      Q.  But looking at that again, the engineer
7  sometimes can be referred to as an operator.  Right?
8      A.  Yes.
9      Q.  And the operators sometimes are referred to
10 as riggers?
11     A.  Yes.
12     Q.  So they're interchangeable?
13     A.  Yes.
14     Q.  That's fair.  All right.
15         I assume these, then, are just a little --
16 slightly different form of the same thing as the field
17 tickets?
18     A.  Correct.  It's still a field ticket.  We
19 needed more room so we changed the format.
20     Q.  There you go.  That's 6.
21         Take a look at Exhibit 8.  I told you I was
22 going to bounce around a little bit here.  This was in
23 response to number 11 of the interrogatories for
24 whatever --
25         MR. CHIVERS:  Christian, you may just want to

169

1  look at this.
2      Q.  On page 10 of Exhibit 4, the question was --
3  the request was to identify and describe defendant's
4  inventory of rolling stock.
5          Do you call it "rolling stock"?
6      A.  I've heard it referred to as that.
7      Q.  You just call them your vehicles?
8      A.  Trucks.
9      Q.  Trucks.
10         Okay.  You see where it says, "including
11 vehicles less than 10,001 pounds gross vehicle weight"?
12     A.  Okay.
13     Q.  "Yes"?
14     A.  Yes.
15     Q.  Then you see the answer on the next page, on
16 page 11?
17     A.  Okay.
18     Q.  Now, am I correct, sir, that the way this was
19 answered was -- I mean, the information we got -- the
20 small vehicles, it's a combination of what's in
21 Exhibit 8 and Exhibit 9?
22         Take a look at 8 and 9.
23     A.  9 is a list of people that we're leasing
24 vehicles from, vehicles and -- people that are getting
25 vehicle allowances, people that are using their own

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 44 of 65
NETWORK DEPOSITION SERVICES
Transcript of Randy Cassady

44  (Pages 170 to 173)

170

1    vehicles.
2        Q.  That's correct.  But my questions is:  Am I
3    reading this correctly, that in order to identify the
4    vehicles of less than 10,001 pounds gross vehicle
5    weight that are used in the performance of the wireline
6    services by Renegade, one would have to look at both
7    Exhibit 8 and Exhibit 9?
8        A.  Yes.
9        Q.  All right.  And then, could I, sir, determine
10   from looking -- this is not the complete list, by the
11   way.  Wait.  Yes, it is.  It is a complete list; isn't
12   it?
13       That's all the pages, I think, that we were
14   provided.  Am I correct?
15       Why don't we take a look?  334 --
16       MR. ANTKOWIAK:  It states 4326 through 4333
17   is a list of Renegade vehicles used by employees.
18   Then, in addition, Renegade has a program whereby
19   employees were paid vehicle lease allowance.  I
20   believe that's what you're referring to as
21   Exhibit 9.
22       Q.  Here's my question:  I looked through here,
23   and I only see the small vehicles.  I don't see the big
24   ones like the wireline truck and the crane and the
25   vehicles like that.

171

1        A.  Okay.  I thought your question asked for the
2    small vehicles.
3        Q.  I said, "including."  It was supposed to be
4    inclusive.
5        A.  Okay.  This is not a list of the larger
6    equipment.
7        Q.  Yeah, I figured that.  I did.
8        But I think what you're telling me right now
9    is, you just read it a different way?
10       A.  Yes.
11       Q.  That's all right.
12       A.  We thought you wanted our small vehicle list.
13       Q.  Just the small ones.
14       MR. ANTKOWIAK:  I'll just state for the
15   record that this was -- these are the supplemental
16   responses, as we understood them to come out of
17   discussions with counsel.  And so while the
18   original question had asked for all the
19   vehicles -- because I do see it does say
20   "including vehicles less than 10,001" -- it was
21   our understanding that the supplemental was
22   supposed to just focus on the small vehicles.
23       MR. CHIVERS:  By the way, I'm fine with it.
24   Okay.  Look.  I'm making a request.  I'm not
25   criticizing anybody because, frankly, this is

172

1    probably more difficult to get than the big
2    vehicles, the commercial vehicles.
3        If you would, could you just supplement --
4    send me the list of your commercial vehicles?
5        MR. ANTKOWIAK:  We can do that.
6        MR. CHIVERS:  That's all.  That would be
7    fine.  All right.
8    BY MR. CHIVERS:
9        Q.  Sir, let me ask you this.  If you take a look
10   at Exhibit 8, you'll see that it actually identifies
11   the GVWR for the vehicle?
12       A.  Yes.
13       Q.  Over in the far left, that district, is that
14   a code for the district -- like the districts you
15   identified at the very beginning?
16       A.  Yes.
17       Q.  And so what is DCTY?
18       A.  That would be Denver City, Texas.
19       Q.  What is AND, Andrews?
20       A.  Andrews.
21       Q.  Andrews, Texas?
22       A.  Yes.
23       Q.  SWPA?
24       A.  -- is Southwest PA, which is Ruffs Dale.
25       Q.  That's where your shop is?

173

1        A.  Yes.
2        Q.  What is NEPA?
3        A.  Northeast PA, which is Mansfield.
4        Q.  What is HBBS?
5        A.  Hobbs.
6        Q.  Hobbs?
7        A.  New Mexico.
8        Q.  H-o-b-b-e-s?
9        A.  H-o-b-b-s.
10       Q.  All right.  SNY?
11       A.  Snyder.
12       Q.  Texas?
13       A.  Uh-huh.
14       Q.  What is Levelland, LVL?
15       A.  Uh-huh.
16       Q.  WWD?
17       A.  Woodward.
18       Q.  Texas again?
19       A.  Oklahoma.
20       Q.  Oh, yeah?  Where is that?
21       A.  Northwest part of the state, nearly the
22   panhandle.
23       Q.  Nearly the panhandle?
24       A.  All their work takes place in the panhandle
25   of Texas -- the majority of it.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 45 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

45  (Pages 174 to 177)

174

1    Q. So the work occurs in the Texas panhandle.
2  The shop is located near it, in Northwestern Oklahoma?
3    A. Right. They probably cross the border every
4  day.
5    Q. That was my question. Yeah.
6    A. It's the same thing with New Mexico. And the
7  Permian Basin probably crosses borders on a regular
8  basis.
9    Q. If not daily, regularly?
10    A. Yes.
11    Q. Out of Ruffs Dale, do the crews regularly
12  cross the border to West Virginia and Ohio?
13    A. Yes.
14    Q. Out of -- I guess the ones that wouldn't be
15  as frequent would be the ones stuck in the middle of a
16  state like Texas? Or do they even cross the borders?
17    A. Not near as often. The Devine and Refugio
18  probably cross less than anybody.
19    Q. And the other extreme being a place like
20  Woodward, Oklahoma, where it's basically a daily basis?
21    A. Yes. I would expect probably 80 percent of
22  their work to be performed in Texas, so they cross over
23  daily.
24    Q. There might be another one here. Who's NEPA?
25    A. That's the Ruffs Dale -- Northeast PA.

175

1    Q. Sorry. That's right. We already covered
2  that.
3    Okay. Now, I've got eight.
4    A. We have added some since, since this was
5  asked for, so.
6    Q. Thank you.
7    A. There's two or three more districts.
8    Q. That have these small vehicles?
9    A. Yes.
10    MR. CHIVERS: All right. Same request.
11    MR. ANTKOWIAK: Uh-huh.
12    MR. CHIVERS: Zap them on over. If you
13  could, now that you know I need to know what these
14  districts are, give me at least a little code that
15  says -- because some of the other districts
16  haven't been accounted for yet.
17  BY MR. CHIVERS:
18    Q. Now, if you take a look at Exhibit 9, how can
19  I tell from this list -- maybe I know -- I know the
20  answer.
21    There's no way to tell from this list where
22  these vehicles are assigned, in other words, what
23  districts?
24    A. Other than who they're assigned to. All
25  these people are assigned to certain places. They get

176

1  paid out of a certain cost center.
2    Q. Right.
3    Adam Areliano, do you know what district he's
4  out of?
5    A. Don't know.
6    Q. Okay. Coronado Armando?
7    A. Don't know either.
8    Q. Locklin, Austin?
9    A. I would -- the amount of -- I would not know
10  where most of these people actually are.
11    Q. Well, we know where Dustin Brown is?
12    A. If I had -- you know, the very highest
13  percentage of all these people are in the Permian
14  Basin.
15    Q. Okay.
16    A. I don't think -- out of my four districts, I
17  don't have anybody leasing vehicles back to us, so
18  that's why I wouldn't know where most of these people
19  are. They don't work for me.
20    Q. So what, they purchase these vehicles and
21  they lease them back to the company?
22    A. Correct.
23    Q. You guys give them a certain amount each
24  month to cover their -- do you also pay them mileage?
25    A. Pay them fuel and pay their repair bills

177

1  also.
2    Q. And these vehicles are used in the
3  performance of their duties?
4    A. These are generally management guys or sales
5  guys. And I would say most of these are salesmen,
6  but --
7    Q. Do you know how many of these guys are
8  crew --
9    A. I don't.
10    Q. -- members?
11    A. I don't.
12    Q. Okay. Do you know whether any of them would
13  be crew members, like the engineers?
14    A. Yes, they would be.
15    Q. Okay. You just don't know who?
16    A. I'd have to cross-reference this list to what
17  they're classified as, and then we could determine
18  that. I haven't done that.
19    Q. It's fair to say, certainly, to the extent
20  that these are -- that the people identified here have
21  these vehicles, they own these vehicles and lease them
22  back to Renegade, your understanding would be that
23  these are vehicles used in support of Renegade
24  Wireline's business?
25    A. Yes.

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 46 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

46 (Pages 178 to 181)

178

1    Q. Same as the vehicles that are owned by
2  Renegade?
3    A. Yes.
4    Q. All right.
5    A. We also lease vehicles from Enterprise.
6    Q. Did I get a list of those?
7    A. That's in there. So some of those vehicles
8  are not owned by Renegade.
9    Q. You mean some of the vehicles listed in
10  Exhibit 8?
11    A. Yes.
12      (Discussion off the record.)
13    Q. Do you know, in Exhibit 9, are all of these
14  small vehicles?
15    A. Yes.
16    Q. Every one of them?
17    A. Yes.
18    Q. And you understand "small vehicle" means less
19  than 10,001 pounds gross vehicle weight?
20    A. Yes.
21      MR. CHIVERS: I've got Exhibit 7 and Exhibit
22  12. Okay. Let me take a look, first -- take a
23  look at 12 first.
24      Christian, do you know if 12 -- are these
25  Tvrdovsky's for the job, if you know? Are these

179

1  somebody else's?
2      THE WITNESS: Somebody else's.
3      MR. ANTKOWIAK: They have to be somebody
4  else's because they're from Texas.
5      MR. CHIVERS: Yeah. Yeah.
6      THE WITNESS: They're signed, at the top, who
7  the driver is.
8  BY MR. CHIVERS:
9    Q. Okay. It's got his name written out. It
10  doesn't actually identify -- it's not printed. Right?
11    A. Correct.
12    Q. That's fine.
13      I'm trying to remember where I saw Curtis's.
14      Let's just take Exhibit 7 and Exhibit 12,
15  though. And these are going to be -- my question is
16  whether these are representative of the driver's daily
17  log.
18    A. Yes.
19    Q. Now, remember I asked you the question,
20  before, about, first, who's required to fill these out?
21      Basically, I think what you told me is,
22  everybody who was salaried was filling these out?
23    A. Yes.
24    Q. Okay. I know this is not a complete listing
25  by any stretch, but can you see anywhere in here, on

180

1  these forms, where it would indicate a small vehicle
2  was driven?
3    A. The truck number.
4    Q. Okay. Let's just take Exhibit 12 as an
5  example, because I see where it says, "total miles
6  driven in a day, 138." Right?
7    A. Yes.
8    Q. What does "total mileage today" -- what does
9  that mean? Is that a running -- it must be a running
10  total?
11    A. Yes. You know, I don't know -- it looks like
12  it's improperly filled out at the top. But "total
13  miles driving today" and "total mileage today," I don't
14  know why they -- "total miles driving" -- one is if you
15  have a codriver. So if you're in the sleeper berth,
16  you could actually be driving and off duty, and your
17  total mileage would be higher than what you actually
18  drove. So one is the total miles that you drove. One
19  is the total miles that the vehicle went.
20    Q. "Running total," nobody drives 37,000 miles
21  in a day?
22    A. He improperly -- I don't know what that
23  number means.
24    Q. All right. Okay. Now, what you're telling
25  me, though, is this number 69 will correspond to --

181

1    A. Truck number 69, HU069 probably.
2    Q. Thanks.
3      But what you're saying -- or are you saying
4  that I would be able to look through these documents
5  and identify a small vehicle that the guy was driving?
6    A. Should be, yes. All our pickups have
7  numbers.
8    Q. Okay. If you take a look at the exhibits,
9  like the inventory of the small vehicles -- show me
10  where there's a number.
11    A. Unit number, second column.
12    Q. Yes. I see that.
13    A. "PT." Most of the pickup trucks should be
14  designated PT 1069.
15    Q. That's interesting. Would you understand, if
16  you take a look at this -- and what is that, Denver
17  City? What's the name of the place in Texas?
18    A. Denver City.
19    Q. It is Denver City?
20    A. Yes.
21    Q. So this guy -- just by chance, it looks like
22  he was driving the Ford F-250?
23    A. Now, I would say this is probably hoist unit
24  069.
25    Q. Thank you. Okay. All right. Thanks. I

182

1  appreciate that.
2        And you would expect, if somebody was driving
3  one of the pickup trucks, like the F-250, it would have
4  a like a "PT" in front of it?
5      A. If this form is filled out correctly, it
6  would be --
7      Q. If it's filled out correctly?
8      A. -- the pickup number will be recorded.
9      Q. What is "CRB" -- do you know -- or "CRA"?
10 What would that correspond to?
11     A. Where do you see that?
12     Q. I can't tell if it's an 8. I think it's
13 an 8.
14        If you take a look at Exhibit 12, 5647 in the
15 lower right-hand corner --
16     A. 5647. Crane.
17     Q. That's a crane?
18     A. Crane 8, yes.
19     Q. Do you know how, if at all, one could
20 determine whether the Renegade employees are making
21 interstate trips in the small vehicles?
22     A. It should be recorded on this document. When
23 you cross a state line, you're supposed to record where
24 it is you crossed that line.
25     Q. Where would that be?

183

1      A. It would be down in these -- in the remarks
2  section, down at the bottom.
3      Q. In the remarks, really, with a time --
4  there's a timeline down there and then an arrow,
5  basically, a line leading from a particular time on
6  that timeline?
7      A. Yes.
8      Q. Right?
9      A. Yes.
10     Q. Can you decipher for me, on Exhibit 12, what
11 a P trip is or Apache or a P?
12     A. That's the customer. And then, "P trip" is
13 pretrip. You have to document that you did a pretrip
14 on that truck.
15     Q. Okay. And then there is another pretrip --
16 is that a pretrip or a posttrip?
17     A. Post.
18     Q. Okay. So you're saying that there should be
19 records of pre- and posttrips both on the commercial
20 vehicles and on the small vehicles?
21     A. Yes, if they've done what they're supposed to
22 be doing.
23     Q. If they're doing what they're supposed to be
24 doing.
25        And he's in Snyder, Texas. That's what that

184

1  would say to me. And he drove to Garden City, Texas?
2      A. On which one? Yes.
3      Q. The first page.
4      A. I was on a different one. Yes.
5      Q. And then, he drove from Garden City, Texas to
6  Snyder, Texas?
7      A. Yes.
8      Q. And it sounds to me like the round trip would
9  be 138 miles?
10     A. Correct.
11     Q. That's what you would assume. Right?
12     A. Yes.
13     Q. I see. Can you tell -- if you take a look at
14 5649 of Exhibit 12, lower right-hand corner -- it says,
15 "on duty for 11 hours."
16        Do you see that?
17     A. Yes.
18     Q. Can you tell where this guy is for those
19 11 hours?
20     A. Not off this, no.
21     Q. I mean, would you -- yeah, you can't tell
22 whether he's on site, whether he's at the shop --
23     A. Correct.
24     Q. -- can you?
25     A. No. But I could probably cross-reference his

185

1  name and the dates and find out where he is -- where
2  exactly he was.
3      Q. What would you cross-reference with?
4      A. Job field tickets or the job tickets.
5      Q. Gotcha.
6        "Shipping documents, Renegade Wireline."
7  What does that mean?
8      A. Where do you see this?
9      Q. In that same -- see, in the lower left --
10 lower left?
11     A. Okay.
12     Q. What is that?
13     A. That's a bill of lading. When we're hauling
14 explosives, we have to have a manifest of what we're
15 hauling. There is paperwork documenting that we're
16 hauling explosives.
17     Q. So you would know, from looking at that, that
18 that's explosives?
19     A. No.
20     Q. Okay.
21     A. That doesn't mean anything to me, so --
22     Q. Where do I find out -- where do I -- do you
23 maintain all your bills of lading?
24     A. Yes.
25     Q. Do you call them "bills of lading"?

186

1    A.  Hazmat -- I'm not sure.  I don't remember the
2  exact term we call it.
3    **Q.  Whenever anybody picks up a load, let's say**
4  **at one of the shops, and delivers it to the site, is**
5  **there paperwork that's generated?**
6    A.  Yes.  There should be paperwork.
7    **Q.  What kind of paperwork would be generated?**
8    A.  A material transfer sheet of some kind.  I
9  don't know the exact name of it.
10    **Q.  That's the generic term, material transfer**
11  **sheet?**
12    A.  I don't know the -- I can't remember the
13  exact name of the document, what it's called.  I just
14  know that we have shipping paperwork that documents
15  when we pick it up and where we took it to and --
16    **Q.  And what the items are?**
17    A.  Yes.
18    **Q.  Not just the explosives, but anything else?**
19    A.  No.  Just the explosives.  That's the only
20  thing we document.
21    **Q.  If somebody is picking up a load of personal**
22  **protective equipment or a load of rags or parts for the**
23  **machines --**
24    A.  That wouldn't be documented at all.
25    **Q.  It's not documented.**

187

1    **Take a look at Exhibit 7.  Now, it appears --**
2  **this one I can understand, at least this part, which**
3  **says, "Arrive at shop at 9:00.  Leave shop at 5:00."**
4  **Correct?**
5    A.  Yep.
6    **Q.  What does this column on the right-hand side**
7  **of the document -- what does that mean?**
8    A.  It's keeping track of the total hours.  So
9  total hours for the day, 16 hours of them were off
10  duty.  Zero in sleeper berth.  Zero hours driving.
11  Eight hours on duty, not driving.
12    **Q.  Your understanding would be that driving**
13  **would be whether it's in a commercial vehicle or a**
14  **small vehicle?**
15    A.  Yes.  It wouldn't matter what he was driving
16  in.
17    **Q.  Okay.  And then, along the right-hand side,**
18  **it says, "total hours on duty last" --**
19    A.  -- "eight hours" -- or last 70 -- eight-hour
20  days.
21    The column is a running total for the week.
22  We're allowed to drive so many hours per week.  And
23  this helps you keep track of when you're out of hours
24  to drive.
25    **Q.  Well, isn't 70 hours a combination of driving**

188

1  and working?
2    A.  Yes.  Both of them come into play.
3    It's not -- we do have exemptions for hours
4  on site, not on duty.  So it gets a little tricky on
5  keeping up with it.
6    **Q.  And I see, if you take a look at the next**
7  **document after that, on Exhibit 7, he's up to 16, and**
8  **54 hours available?**
9    A.  Yes.
10    **Q.  Then 24 and 46 available.  This week, at**
11  **least, it appears he worked at the shop?**
12    A.  Yes.
13    **Q.  Can you read this guy's name?  I can't.**
14    A.  Larry something.  You know, I could -- it's
15  spelled out up here at the top.  Pospisil.
16    **Q.  Pospisil or whatever.**
17    **Do you know if he's -- what kind of a worker**
18  **he is?**
19    A.  I do not.  I'd have to reference the --
20    **Q.  I wonder if this guy's a shop guy.**
21    A.  I don't have a clue.
22    **Q.  Okay.  All right.**
23    A.  It's not uncommon to spend a week at the shop
24  and not do anything, no matter what job -- what
25  classification you are.  Generally, you would get even

189

1  sent home at that point.
2    **Q.  Okay.  If you get sent home, what does that**
3  **mean?  You're literally told to just go home?**
4    A.  Yeah, go home.
5    **Q.  Do you still get your salary if you're sent**
6  **home?**
7    A.  Yes.
8    **Q.  Now, Exhibit 13, are these more examples of**
9  **the field tickets?**
10    A.  Yes.
11    **Q.  And I see, in the upper right-hand corner,**
12  **these are three-man crew.  Right?**
13    A.  Correct.
14    **Q.  Some of these get to be more involved.  I'll**
15  **give you an example.  If you turn to 13499, in the**
16  **lower right-hand corner --**
17    A.  Okay.
18    **Q.  -- am I correct that the billing for the day**
19  **is $77,000?**
20    A.  Probably 27.
21    **Q.  Yeah, I think you're right.  Yeah, $27,000.**
22  **Okay.**
23    So there's an example of a day -- if $275 is
24  1 percent of $27,570, this guy's making -- at least
25  Hennish, Henny, whatever his name is, the operator --

Case 2:13-cv-01463-JFC   Document 22-6   Filed 09/05/14   Page 49 of 65
**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

49 (Pages 190 to 193)

190

1    A. Right.
2    Q. — he's making over $1,000 in that day in
3 overtime?
4    A. Yes.
5    Q. And the rigger —
6       MR. ANTKOWIAK: Could you repeat that? Did
7 you say a thousand per day in —
8       MR. CHIVERS: No. Just that day.
9       MR. ANTKOWIAK: Did you say "in overtime"?
10 Is that what you said?
11      MR. CHIVERS: No. In bonus.
12      MR. ANTKOWIAK: I thought you said
13 "overtime."
14      MR. CHIVERS: Did I? Strike that.
15      MR. ANTKOWIAK: Okay.
16      THE WITNESS: Yeah, I'll bet.
17      MR. ANTKOWIAK: I wasn't sure if I heard you
18 correctly.
19   A. You're referencing the day. And this is per
20 job. This is over a day's worth of work, so —
21   Q. Thank you.
22      Okay. And how can you tell — I see. I see
23 what you're saying. Can you tell from looking at this
24 how many days it covers?
25   A. Thirty-six hours, I can tell that.

191

1    Q. How can you tell that?
2    A. Look at the time. Arrived at location.
3 Depart location.
4    Q. I see. Okay. Thanks. Yep.
5       So you're on site for 36 hours. Right?
6    A. That's correct.
7    Q. Well, in that 36 hours, how would you
8 determine how many of those hours the riggers actually
9 worked?
10   A. The best way would be off the job report.
11   Q. Okay. This is the field ticket. And then,
12 we looked at the other examples of the job report.
13 Right?
14   A. I don't think we've looked at that yet.
15   Q. Haven't we looked at the job reports — or
16 have we?
17   A. I don't remember seeing one.
18   Q. All we have looked at thus far are the field
19 tickets?
20   A. Correct.
21   Q. Right?
22   A. And driver's logs.
23   Q. Did you guys produce any job reports, that
24 you remember?
25   A. We produced bunches of them.

192

1       MR. CHIVERS: Okay. Why don't we take a
2 break?
3       (Recess taken.)
4       MR. CHIVERS: Back on the record.
5    Q. If you would, take a look at Exhibit 13, and
6 you see where this is the one we've looked at before,
7 13499. Flip toward the end, 13499.
8       And if you take a look, it says, "arrive at
9 the well July 6 of 2012." Do you see that?
10   A. Uh-huh.
11   Q. And leave on July 7?
12   A. Okay.
13   Q. And it says total, 36. Correct?
14   A. Okay.
15   Q. You would agree with me that means that they
16 were on site, working for 36 hours?
17   A. They were on site for 36 hours. I don't know
18 what they were working.
19   Q. Is on-site time typically work time?
20   A. No. It can be off time, too.
21   Q. And how do you define "off time"?
22   A. They weren't doing any of these services.
23   Q. They were on the site, though. Correct?
24   A. Yes.
25   Q. What are they doing if they're not performing

193

1 these services?
2    A. They could be sleeping or eating or watching
3 TV or —
4    Q. Do the sites have TVs?
5    A. The trucks do.
6    Q. When you say "the trucks," like the wireline
7 truck?
8    A. Yes.
9    Q. Do they have a place to sleep?
10   A. They have — yes, you can sleep in the
11 trucks. You can sleep in the pickups. You can sleep
12 on the bench in the trucks, yes.
13   Q. As a matter of Renegade policy, how long does
14 somebody have to get uninterrupted sleep in order for
15 him not to be considered working? In other words, if
16 you sleep for only two hours —
17   A. I don't think we have a written policy on
18 that.
19   Q. Or a practice?
20   A. Uh-huh.
21   Q. Is that right?
22   A. Right.
23   Q. Correct me if I'm wrong. All these guys were
24 getting paid salaries. Correct?
25   A. Correct.

194

1    Q. So, I mean, look. When you get right down to
2    it, it didn't matter how many hours they spent on the
3    site; did it?
4    A. As far as what?
5    Q. As far as how much you had to pay them?
6    A. Yes, it matters.
7    Q. Because of the bonuses?
8    A. Because of the bonuses, yes.
9    Q. Other than the bonus, certainly in terms of
10   the total number of hours, if you pay him a salary, it
11   doesn't matter whether it's 12 hours or 18 hours; does
12   it?
13   A. Correct.
14   Q. All right. Now, I did find some of these
15   things we were looking for, although I can't -- I don't
16   know how I can read them.
17   A. They're not designed to be on paper, so --
18   Q. These?
19   A. Right.
20       MR. CHIVERS: I gotcha. Okay. We're going
21   to mark this as 14.
22       (Whereupon, Deposition Exhibit 14 was marked
23   for identification.)
24       (Discussion off the record.)
25       THE WITNESS: Are these all in PDF for you

195

1    guys, or are they the Excel --
2    Q. There are some other pages, though, too.
3    Let's work our way through.
4    A. Okay.
5    Q. Let's work our way through. Exhibit 14 is a
6    series of documents from Bates number 14418 to 14427.
7    Do you see that?
8    A. Yes.
9    Q. These might be a mix. I don't know. Start
10   at the top and tell me what these are.
11   A. The first one, 418, is a job report.
12   Q. All right. Now, who completes -- is this a
13   standard form?
14   A. Yes, fairly standard throughout my districts.
15   Q. When you say that, is it -- it's a Renegade
16   document?
17   A. Yes.
18   Q. So we can call this, for lack of a better
19   term, the "Renegade job report"?
20   A. Yes.
21   Q. All right. And it's awfully tough for us to
22   read it. At some point we'll get one, I imagine, we
23   can read.
24       Tell me, basically, what information is on
25   here.

196

1    A. The customer, the well name and number.
2    Q. Yeah. I see that, well pad.
3    A. Yes.
4    Q. Okay.
5    A. There are some API numbers and everything up
6    on the top. There is a total standby hours --
7    Q. Right.
8    A. -- which, on this one, is 118 hours.
9    Q. Right.
10   A. Total operating hours, which I think this is
11   about 51 hours operating. Lost time, which is
12   something that we track for our efficiency ratings.
13   Q. Right.
14   A. Then a total number of hours.
15   Q. These job reports, are they completed -- when
16   you say "a job," is it a day, or is it a job
17   corresponding to like a purchase order for the
18   customer?
19   A. It's for a job, from the time the truck
20   arrives at location to the time it leaves.
21   Q. All right. And what would the total -- what
22   would the standby hours be? What does that mean, the
23   standby hours?
24   A. The time we weren't doing -- performing
25   services.

197

1    Q. Okay. Now, during that time that you're not
2    performing services, are the crew members allowed to
3    leave the site?
4    A. No -- it depends. They can leave the site,
5    yes, but generally, no.
6    Q. And generally no, because they could be
7    called back to operate at any moment?
8    A. Correct.
9    Q. All right. Then the total operating, what
10   does that correspond to, the time that your wireline
11   truck is in service?
12   A. The time we're going in and out of the hole,
13   performing services for our customer.
14   Q. Would it be fair to say that even the time
15   that you're -- let's say before you're actually going
16   into the hole with your cable and with your string,
17   that there are things that need to be done before that
18   starts?
19   A. Yes.
20   Q. Describe the kinds of things that typically
21   need to be done before you can actually start going
22   down the hole.
23   A. Preparing the tool string to go into the
24   hole, picking the tool string up off the ground. There
25   are procedures that we have to do in arming the gun to

**198**

1  put into the hole. And that's all done prior. It
2  generally takes about 30 minutes.
3      Q. Okay. And there are certain activities, I
4  would assume -- typically, you operate -- when you
5  start down a hole, you don't stop until it's out of the
6  hole, until your equipment is out of the hole?
7      A. Not -- I mean, no, not really.
8      Q. Okay.
9      A. There are times that -- we've sat in the hole
10  for hours at a time, waiting for orders, or we didn't
11  get down to where we expected to get down, or we've had
12  issues and somebody needs to make a decision somewhere.
13  We've sat for hours, waiting to do something.
14      Q. And when you finally recommence the
15  operation, it's based on somebody giving you the order
16  to recommence?
17      A. Yes.
18      Q. And you need to be ready to recommence at a
19  moment's notice?
20      A. Yes.
21      Q. All right. And so the total hours -- I see
22  what this means. Total hours on site would be 170 --
23      A. Yes.
24      Q. -- in this situation?
25      A. Uh-huh.

**199**

1      Q. Now, look. I don't pretend we can -- you can
2  just give me a general description, if you can tell
3  from your familiarity with these forms, what is it from
4  left to right?
5      A. All right. You know, I've got to have a
6  little better look at it myself. I can't tell off of
7  this.
8      Q. I see one thing. The second column says,
9  "stage"?
10      A. Yeah.
11      Q. Do you see that?
12      A. I know we track stage. I know we track where
13  we perforated at.
14      Q. Yep.
15      A. That's generally all these shaded colors over
16  here.
17      Q. Yep.
18      A. We track the time that we're going in and out
19  of the hole. We track the crew members. We track the
20  services that we performed. That's over here, in the
21  large column on the right.
22          We track the shift, whatever shift that
23  they're on, the number of shifts that it takes us to do
24  the job.
25      Q. Do the customers get these job reports?

**200**

1      A. Yes, if they request them.
2      Q. If they request them?
3      A. Right.
4      Q. But, certainly, you use these for internal
5  management purposes as well. You need to find out how
6  long it takes to perform certain operations?
7      A. We use these forms to track our incident rate
8  for our safety factor. We use these forms to track our
9  efficiency rates that we maintain. We use these forms
10  to track our bonuses.
11      Q. Describe that to me, when you say you use
12  them to track bonuses?
13      A. Unlike a lot of these tickets that -- field
14  tickets that we've looked at today, where you've had
15  just one crew on a single field ticket, these jobs,
16  pump-down jobs, go on for months. There's lots of
17  different crews, lots of different hours. And we
18  actually pay our bonus based on the number of hours
19  that they're on location.
20      Q. Okay. And that would be reflected in the job
21  reports?
22      A. We arrive -- we get that information from the
23  job report.
24      Q. Okay.
25      A. We use a different form to actually calculate

**201**

1  what the exact bonus is going to be.
2      Q. That would be the bonus sheet?
3      A. Yes. And that's determined by the number of
4  shifts and the number of hours in the shift.
5      Q. Gotcha.
6          All right. Now, on the second page, you see
7  where it says "engineer" at the top?
8      A. Yes.
9      Q. Is the guy's name Lee?
10      A. Yes.
11      Q. And who's Cody Yarborough?
12      A. He's an engineer.
13      Q. And David Noel?
14      A. Engineer.
15      Q. So the point is that this -- does this
16  normally -- this page 14419, is this normally part of
17  the job report?
18      A. No. This is the bonus sheets.
19      Q. Very good.
20      A. This is how Northeast Pennsylvania calculates
21  their bonuses, by the hour.
22      Q. If you take a look at -- on the operator,
23  that's the wireline operators?
24      A. Yes.
25      Q. Now, is there any category here, under the

---

202

1  operators, for SSEs?
2      A.  No.  I'm assuming we didn't have an SSE on
3  location or there would be a column for one.
4      Q.  So you're saying that, where there is an SSE,
5  you'd have a separate column for an SSE?
6      A.  Yes.  They get paid generally a half
7  a percent.
8      Q.  Generally?
9      A.  Generally.
10     Q.  What does "generally" mean?
11     A.  I can't say that every single time that they
12 got a half a percent bonus.  If you saw that -- if you
13 put them out toward their end of their time as an SSE
14 and they were actually filling a position of a full
15 operator, then we would pay them the full bonus.
16     Q.  So, for example, on a field ticket, if you
17 were to see the list of three crew members and one of
18 those crew members or riggers happens to be an SSE,
19 would it say "SSE," or would it just say "rigger"?
20     A.  It would just say "rigger."
21         Generally, you come in as a junior operator
22 even though you're classified as an SSE.
23     Q.  Now, take a look at the total time for the
24 operators.
25     A.  Okay.

203

1      Q.  This is total time on the job?
2      A.  Yes.
3      Q.  And so you see the different amounts?
4      A.  Yes.
5      Q.  Why does it have bonus at 2 percent and bonus
6  at 1 percent?
7      A.  This guy was getting 1 percent, Robert
8  Buffington and Larry Pospisil.
9      Q.  Yeah.
10     A.  I said, generally, a half a percent.  They've
11 awarded -- these are probably SSEs and got 1 percent.
12     Q.  Total ticket amount, what is "total ticket
13 amount"?
14     A.  The total that the ticket was.
15     Q.  Meaning the total charge to the customer?
16     A.  The field ticket, yes.
17     Q.  Then the next page, Renegade 14420 --
18     A.  This is a little -- this is the same job
19 report that's a little easier to see.
20     Q.  Yep.  I see that.
21         When it says -- I can see "well" and "stage."
22 What does "stage" mean?
23     A.  We generally do work in stages.  Whenever
24 you're perforating -- you're fracking a horizontal
25 well, you only frack 300 feet of it at the time.  So

204

1  you frack 300 feet, which is a stage.  Then you come
2  up, and you frack another 300 feet, which is another
3  stage.  So this was stage 2 of that well, stage 3 of
4  that well, so forth.
5      Q.  I gotcha.
6          And these numbers, do these numbers
7  correspond to amounts of money?
8      A.  The plug is the depth -- whenever you --
9      Q.  I see.  Yep.
10     A.  You set a plug in between the stages to
11 isolate the stage that you've already fracked, so this
12 plug is the depth that we set the plug at, and then we
13 came up and we shot three clusters of guns.  So we shot
14 a cluster at 9,728.  We shot a cluster at 9,640 and we
15 shot a cluster at 9,550.
16     Q.  Then it has the charge?
17     A.  We shot a total of 51 holes in that
18 perforating run, in that stage.  The gun was phased at
19 180 degrees, which means we shot -- the charges are
20 180 degrees from each other, so one shot one way, one
21 shot going the other.  We used a 22.6 gram RDX Good
22 Hole Outlaw charge, which is just a manufacturer's
23 name.
24     Q.  The RDX, what does that mean?
25     A.  It's a type of explosive.

205

1      Q.  That's what I thought.
2      A.  Yeah.
3      Q.  Yeah.
4      A.  HMX, RDX, PETN, it's all explosive types.
5      Q.  What kinds of explosives do you use, if you
6  can tick off --
7      A.  High explosives.
8      Q.  They're high explosives?
9      A.  And low explosives.  We use them all.
10 Generally, they're classified in two or three types,
11 igniters and high explosive and low explosives.
12     Q.  You don't use anything like C-4?
13     A.  No.  C-4 is made out of one of these
14 different -- these types of RDX or HMX or something.
15     Q.  That's what I thought.
16         The pressure, that's pounds of pressure, or
17 what is that?
18     A.  Yes, 5,700 pounds of pressure to pump down,
19 when we're pumping our tools down to the bottom.
20 Maximum tension on our cable was 1,800 pounds.
21         This is the exact time that we went in the
22 hole and got out of the hole, was the next one.  And it
23 calculates standby time, operating time, and lost time,
24 in the next three columns.
25         Then it should have -- I know that it's a

206

1  perforating job, so we didn't have any comments. They
2  didn't have anything that they needed to note, such as
3  that they got stuck in the hole at a certain depth. So
4  this would be a place to make some comments.
5        The next one is the crew, and the next one is
6  the shift.
7        Q.  Now, the crew, those are the initials of the
8  guys?
9        A.  Yes.
10       Q.  Then, the next one, it says pre-job tailgate
11  safety meeting report. So anytime before you start
12  this operation -- let's say you're going to be rigging
13  charges, doing perforations or anything else, for that
14  matter --
15       A.  We generally do these at the beginning of the
16  shift.
17       Q.  Okay. Gotcha.
18           No matter what the operations that you're
19  going to be performing?
20       A.  If we deviate and go into a different part of
21  the operation, then we may shut down and do another
22  safety meeting at that time, so it's possible that you
23  can have several of these during a shift.
24       Q.  And I see that this is from March 3 of 2011.
25  Does that say "Rodney Oilfield"?

207

1        A.  Yes.
2        Q.  Where is that, if you know?
3        A.  The meeting facilitator, that's Rodney
4  Offield.
5        Q.  Oh, he's the facilitator?
6        A.  He's the engineer on the job.
7        Q.  You've got NSPA. Is that the Mansfield?
8            No. No. What is NSPA?
9        A.  I don't know.
10       Q.  And then, I see that there are three Renegade
11  employees?
12       A.  I think it's probably Northeast PA.
13       Q.  Yeah, somebody just -- I think you're right.
14           Attendees, the three guys listed here would
15  be the three crew members?
16       A.  The ones that are marked "RWLS," yes. There
17  was a Chevron guy and a WCS, which I'm not -- I don't
18  know exactly what company that is.
19       Q.  And the next page, 14422 -- I see that you've
20  got two crew members. Right?
21       A.  Yes. Well, the engineer and two crew
22  members.
23       Q.  Well, when you say the engineer and two crew
24  members --
25       A.  Yes. This is the -- the meeting facilitator

208

1  was David Noel, who is the engineer.
2        Q.  I gotcha.
3        A.  Then he had two guys on his crew.
4        Q.  So are you telling me that this page before
5  is actually a four-man crew?
6        A.  Yes.
7        Q.  One engineer and three riggers?
8        A.  I'm not sure what classification the other
9  three guys are. Rodney is the manager, so -- but I
10  would expect these are probably operators. I wouldn't
11  know, without looking, who they are.
12           There is a tailgate safety meeting for
13  every -- at the beginning of every shift that we did on
14  this job, and this is the total.
15       Q.  Then, if you turn to 14425, what is this?
16       A.  This is a job we do per stage, a little
17  paperwork that we do per stage. It shows various
18  calculations that we need to do to perforate these
19  holes at the depth that they want to do it. But it
20  also shows -- I thought it showed time, but it
21  doesn't -- yes, it does. In at 5:00 p.m. Out at 6:34.
22  And that should correspond to the same times that are
23  over on the job report.
24       Q.  And that's true of 14427 as well?
25       A.  Yes.

209

1        Q.  Do you know why there is an X on these pages?
2        A.  We finished that stage.
3        Q.  I gotcha.
4        A.  It's very confusing which stage you're on,
5  and you do not want to be in the wrong place.
6        Q.  When you get done with the stage, you put an
7  X on it?
8        A.  Yes.
9        Q.  That's good.
10           (Whereupon, Deposition Exhibit 15 was marked
11  for identification.)
12       Q.  If you take a look at Exhibit 15, are these
13  more of the field tickets?
14       A.  Yes.
15       Q.  Am I correct that, if I were to look at the
16  upper right-hand corner, I would be able to determine
17  if it's a two- or three-man crew?
18       A.  Yes.
19           MR. CHIVERS: I'll show you 16.
20           (Whereupon, Deposition Exhibit 16 was marked
21  for identification.)
22       Q.  If you take a look at 16, are those more of
23  the driver's logs?
24       A.  Yes.
25       Q.  And I asked you before if you would expect to

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

54 (Pages 210 to 213)

---

210

1  see a description of where people are or where people
2  have driven on these daily logs. I think you said,
3  yes?
4      A. Yes.
5      Q. Take a look at the first page of Exhibit 16,
6  which is Bates 18356. Now, it does say three hours
7  driving. Correct?
8      A. Yes.
9      Q. Can you tell where this guy is driving?
10     A. No.
11     Q. I can't either.
12        What you're saying is, this doesn't — you
13  would expect to see —
14     A. If it was filled out properly, he would have
15  noted where he started it, where he did his pretrip.
16  And so it's not filled out properly.
17     Q. Take a look at the next page. This is Rusty
18  Smith. 18357 is the Bates number.
19        And it says that he's got three and a half
20  hours of driving. Correct?
21     A. Correct.
22     Q. Can you tell where he drove?
23     A. I cannot. Once again, it's not filled out
24  correctly.
25     Q. Then, if you take a look at the next page,

---

211

1  18358, it says he drove for an hour, did a pretrip and
2  a post-trip, but I don't see any indication where. Do
3  you?
4      A. Same guy.
5      Q. I know.
6      A. He still doesn't know how to fill one out.
7      Q. Okay. A question for you — And look. I
8  don't pretend to say this is necessarily the way
9  everybody was doing it. But my question is: Is there
10  any way that you have had, over the past five years, of
11  auditing or otherwise examining your employees' daily
12  logs to see if they're being filled out properly?
13     A. I have a guy doing it now, but three years
14  ago, probably not.
15     Q. Two years ago?
16     A. Probably not.
17     Q. One year ago?
18     A. I don't remember when he came onboard, but we
19  regularly audit them now.
20     Q. Now?
21     A. Now.
22     Q. Okay. What you're saying to me is that, if I
23  looked at a record two years or three years old, I
24  shouldn't be surprised to find people who are not
25  filling out their logs properly?

---

212

1      A. Probably, yes.
2        MR. CHIVERS: 17, I think, is more what we
3  were looking at before, but I want to confirm.
4        (Whereupon, Deposition Exhibit 17 was marked
5  for identification.)
6      Q. Take a look at Exhibit 17. Are these more
7  field tickets?
8      A. This is actually a credit for an overcharge,
9  so this is just a form of paperwork. It's a field
10  ticket, but it wasn't generated in the field.
11     Q. All right. Now, if you take a look at 23779,
12  is this a field ticket?
13     A. Yes.
14     Q. It identifies a two-man crew?
15     A. Yes.
16     Q. And similarly, the next one, 23780,
17  identifies a two-man crew?
18     A. Correct.
19     Q. Am I correct, at least on 23779, that that
20  job on site was an eight-hour — they were eight hours
21  on site?
22     A. Yes.
23     Q. All right. Then take a look at 23781, a
24  couple pages further in. Do you see that?
25     A. Yes.

---

213

1      Q. What is that?
2      A. It's an invoice.
3      Q. Now, would there be an invoice — who's Hilda
4  Cassady?
5      A. That's my wife.
6      Q. There you go.
7        Would there be an invoice for every — what?
8  You tell me.
9      A. Every field ticket.
10     Q. Thank you.
11        That was what I was wondering. So every
12  field ticket has an invoice?
13     A. Every field ticket gets input into
14  QuickBooks, and QuickBooks generates an invoice from
15  the field ticket. I'm not going to say that every
16  invoice -- every field ticket becomes an invoice,
17  because if they mess up on one, they X it out, and it
18  won't become an invoice.
19     Q. What you're saying is that the field ticket
20  goes into QuickBooks; QuickBooks generates an invoice?
21     A. Correct.
22     Q. The invoice goes to the customer?
23     A. Correct.
24     Q. And, hopefully, money comes back?
25     A. It generally does.

---

**Johnstown - Erie - Pittsburgh - Greensburg - Harrisburg**
**866-565-1929**

214

1  Q.  Your industry is pretty good about that?
2  A.  Well, I would say so.  I don't know what the
3  other industries are.
4  Q.  Do you get paid in 30 days?  60 days?
5  A.  Generally, 60 days is where we want to see
6  our pay.  We want it immediately.  And I do have
7  customers that pay us before we do the work, so --
8  Q.  Okay.
9  A.  I've had other customers that don't ever want
10  to pay us at all.
11      MR. CHIVERS:  That's number 17.  I'm going to
12  go get the final package of stuff.
13      (Recess taken.)
14  Q.  Sir, I'm going to give you these documents.
15  I'm going to represent to you that these documents from
16  Bates number 26490 to 26559, some 120 pages -- no, some
17  60 pages -- 70, 70 pages, yep, 70 pages -- I'm going to
18  represent to you that these are the documents that were
19  given to us as part of the production of documents by
20  your attorneys.
21  A.  Okay.
22  Q.  And it was represented to us that this was
23  Mr. Tvrdovsky's personnel file.  Okay?
24  A.  Okay.
25  Q.  All right.  Now, I'm going to give you that.

215

1  And I have a question for you -- I'm going to have a
2  number of questions, but I'm going to give you a couple
3  minutes.
4      Find someplace in that personnel file, what
5  we've been told is a personnel file, that says "SSE."
6  Okay?
7  A.  Okay.  I doubt it's in there.
8  Q.  Well, confirm.  I don't want -- I appreciate
9  you're saying you doubt it's in there, but you let me
10  know if you can find anything in there.
11      (Recess taken.)
12  Q.  I'd asked you, sir, to go through the
13  documents that are -- at least we've been told are
14  Mr. Tvrdovsky's personnel file and to identify anyplace
15  you can find short-service employee, anything like
16  that.
17      What page do you have there?
18  A.  26544.
19  Q.  And what's the date on that document, if you
20  can find out?
21  A.  I do not know.  It doesn't have a date.  It
22  has a date that they started filling this form out,
23  which is 10/29/12.
24  Q.  Yeah.  Okay.  Can you find anyplace else that
25  it uses the term "short-service employee"?

216

1  A.  I did not see it, no.
2  Q.  Then, if you would take a look at that page
3  that I have tabbed --
4  A.  Okay.
5  Q.  Just fold it over.  What document number is
6  that?
7  A.  26507.
8  Q.  And 26507, what is that form?
9  A.  That's the personal action form, when he was
10  hired.
11  Q.  And what does it say about his job title?
12  A.  That he's a junior operator.
13  Q.  All right.  So his job title, when he was
14  working for you guys, was junior operator.  Correct?
15  A.  Correct.
16      MR. CHIVERS:  All right.  What I'll do, I'll
17  make -- do we need exhibits -- because we've
18  identified the specific pages?
19      MR. ANTKOWIAK:  I don't think we need them.
20  I mean, the page numbers are in the record.  I
21  don't have an issue with that.  If you just want
22  to mark, generally, his personnel file as whatever
23  next in the order, that's fine, too.
24      MR. CHIVERS:  It's so many pages, although --
25  yes, let's do that.  I'll make some copies, and

217

1  that will be Exhibit 18.
2          - - -
3      (Whereupon, Deposition Exhibit 18 was marked
4  for identification.)
5      MR. ANTKOWIAK:  That's fine.
6      MR. CHIVERS:  I'll make that an exhibit.
7  BY MR. CHIVERS:
8  Q.  Am I correct -- if you want to say this right
9  now -- in the production of documents -- I assume you
10  were involved in the production, because I see you
11  verified, on page 20 of Exhibit 4 -- on page 20 of
12  Exhibit 4, I assume that's your signature?
13  A.  Yes, it is.
14  Q.  All right.  Are you aware of whether any
15  documents were provided, for example, either pay
16  documents or hours, like field tickets, for Randy
17  Tvrdovsky?
18  A.  I would have assumed that we gave you all of
19  the field tickets, so I assume that the ones that he
20  was on would have been in those field tickets.
21  Q.  It's an assumption?
22  A.  It's an assumption.
23  Q.  Yeah, same as mine --
24  A.  Right.
25  Q.  -- because we got thousands and thousands of

218

1  pages of documents. And I haven't been able to find
2  it. All right?
3       A.  Okay.
4       Q.  I have a request, which is if you could find
5  Mr. Tvrdovsky's documents, all right, his specific --
6  like his field tickets and his -- I haven't seen his
7  pay records either. I haven't. I don't know if
8  that's -- because I expected to see his pay --
9           Are they mixed in there?
10          MR. ANTKOWIAK:  What specific request did
11  they fall under?
12          MR. CHIVERS:  I'll tell you in a moment.
13  18. Interrogatory 18 and -- that's where I
14  wanted to see any bonuses that he was paid. Then,
15  in part of our document requests, number 1 --
16  request 27.
17          MR. ANTKOWIAK:  That doesn't seem, at least
18  in my mind, to cover the pay records.
19          MR. CHIVERS:  27?
20          MR. ANTKOWIAK:  27, the number of days and
21  hours or minutes plaintiff and putative class
22  members worked in Pennsylvania.
23          MR. CHIVERS:  That might be the
24  interrogatory. But anyway, here's the request
25  that I sent you back on February 24. Request 27.

219

1           Whatever the reason -- I assume it's an
2  oversight -- you guys went up through the
3  interrogatories, but you didn't pick up on the
4  requests. I specifically asked for the pay
5  information.
6           MR. ANTKOWIAK:  Well, our response directs
7  you to the personnel file that provides that pay
8  information and rates.
9           Are you looking for, specifically, paystubs,
10  or what is it, specifically, that you're looking
11  for?
12          MR. CHIVERS:  I mean, typically, what you're
13  going to look for -- I mean, I assume you guys pay
14  people and give them statements of some kind.
15          THE WITNESS:  Yes.
16      Q.  What do you call those, pay statements?
17      A.  That's a good phrase for it.
18          MR. CHIVERS:  That's what I expected to see.
19  I haven't had a case where I get anything else.
20          MR. ANTKOWIAK:  I mean, because, to be honest
21  with you, my initial thought at least, in the
22  first phase for purposes of class certification or
23  Rule 23, I don't know how that would be relevant
24  at this point.
25          Of course, you know, we'd stipulate that

220

1  folks were paid a salary for all hours worked and
2  we have the bonus calculation -- so for purposes
3  of the similarly situated analysis and Rule 23
4  factors, I don't know why we'd produce that at
5  this juncture. Certainly, I understand and would
6  produce that at a later stage, in merits and
7  damages discovery.
8           MR. CHIVERS:  Here's the reason:  First, it's
9  a 216(b) conditional class. This is not the
10  Rule 23 phase right now.
11          MR. ANTKOWIAK:  Sure.
12          MR. CHIVERS:  Secondly, to the extent,
13  always, that the defendant is going to assert that
14  the plaintiff -- the purported representative
15  plaintiff is able to represent a group of people,
16  then the extent to which he is paid in a manner
17  similar to the other similarly situated employees
18  is highly relevant.
19          I mean, I asked for that information for the
20  specific reason that I wanted to be able to see if
21  Curtis were paid in a manner similar to the other
22  wireline operators. I can't do that unless I have
23  those records.
24          MR. ANTKOWIAK:  What would you need aside
25  from a stipulation that states they're paid a

221

1  salary, bonus, and we give you the bonus
2  calculations?
3           MR. CHIVERS:  What I need is something that
4  allows me -- because I know this is an argument
5  that defendant is making, that somehow Curtis is
6  not representative of anybody other than junior
7  wireline operators.
8           So to the extent -- that's all I got, by the
9  way, on your production. I just got a list.
10  That's why -- in fact, yeah, that was one of our
11  exhibits. Right?
12          In the exhibit -- what was that, 7, John?
13          MR. LINKOSKY:  7 was driver logs, 7 to 12
14  were driver logs.
15          MR. CHIVERS:  Here you go. Exhibit 11. See?
16  That's all I got. You see? We had discussions
17  about this.
18          MR. ANTKOWIAK:  Right. But my point is that,
19  we will stipulate to the individuals who were paid
20  a salary and bonus. And if in stipulating that --
21  I'm not sure what you think you would need the
22  paystubs for at this stage in addition to that
23  stipulation.
24          Perhaps -- we can talk more about this off
25  the record -- but at least at this juncture, I'm not

222

1  sure what else you get from that in light of our
2  offer to stipulate, because that would at least, I
3  believe, show that all of these individuals,
4  regardless whether it's junior operator or
5  operator, were, in fact, paid a salary and a
6  bonus, which is, I think, what you're looking for
7  to, I think, glean from those pay records.
8      MR. CHIVERS:  What I'm also looking to do is
9  to be prepared for what I think is an argument to
10 be made, which is that Curtis Tvrdovsky can only
11 represent junior wireline operators for purposes
12 of conditional notice. I mean, I understand that's
13 your argument.
14     My argument, on the other hand, is that he is
15 representative of all of the riggers, right, not
16 just the junior guys but anybody that has the
17 title of wireline operator or some title similar
18 to that. And the only way I can do that is to be
19 able to establish that, based on his pay, right,
20 he was treated the same as any other wireline
21 operator. But I can't do that without the
22 records. I have to be able to see the records.
23     MR. ANTKOWIAK:  Are you suggesting, then,
24 that you want the pay records for every person
25 that's a potential class member aside from just

223

1  Tvrdovsky?
2      MR. CHIVERS:  No.
3      MR. ANTKOWIAK:  Just Tvrdovsky's?
4      MR. CHIVERS:  At this point, just
5  Tvrdovsky's, yes.
6      Look. I just expected that they would be in
7  there. I did request that, you can see, in
8  request 27.
9      MR. ANTKOWIAK:  Well, you know, look. I
10 mean, that's the way that we responded to it.
11 This is the first time, as I understand it, that
12 we've had pushback on this particular request with
13 respect to his pay records.
14     I mean, my position here today would be that
15 the pay records aren't relevant for purposes of
16 216(b) or Rule 23 certification. And that in
17 light of the fact that we're also willing to
18 stipulate that he and however many other
19 individuals were paid a salary and bonus, I think
20 moots the issue that you would want to otherwise
21 use those pay records to establish similarly
22 situated, you know, under the 216(b) standard,
23 but --
24     MR. CHIVERS:  Why don't we compromise?
25     MR. ANTKOWIAK:  On what basis?

224

1      MR. CHIVERS:  Because -- why don't you get me
2  his pay records?  All right?  Get me his pay
3  records and the extent to which we have -- you
4  have any of his logs, which I would assume --
5  because that's clearly within the scope of what I
6  asked for, both in the interrogatories and the
7  requests.
8      MR. ANTKOWIAK:  I will say this: On the
9  separate issue of the logs, I mean, you have the
10 records. We have the records. We're both capable
11 of doing the same search for the records.
12     I can go back and confirm that we're not
13 aware of any records that we failed to produce,
14 but I'm not going to have somebody go back and
15 comb through thousands of pages just to identify
16 some individual. I mean, you could -- your staff
17 can do the exact same with the documents just as
18 we can. We both have equal access to the
19 documents in that respect, so --
20     MR. CHIVERS:  Here's the difference: We
21 didn't assemble them. All we did was receive
22 them. I mean, I don't know about you but,
23 typically, when I assemble documents, I know what
24 I'm assembling.
25     So all I'm asking is, tell me -- you know,

225

1  send me an e-mail -- send me an e-mail. Tell me
2  that his pay records and his time records are not
3  included in the production, and then, would you
4  get them for me?
5      MR. ANTKOWIAK:  Well, I can tell you that the
6  pay records are not -- as I'm aware, are not
7  included in the production. Again, I don't see
8  how those are relevant. So I'll at least take
9  that issue back, discuss it with Mariah and Kevin
10 and get you an answer to that issue.
11     I can tell you that, at this point in time,
12 I'm not going to go through and look to try to
13 find and identify Tvrdovsky's specific tickets in
14 the documents. I think we both have equal access
15 to these files.
16     MR. CHIVERS:  I didn't say the tickets. I
17 didn't say the tickets. What I want, if you have
18 any of the logs, I have some --
19     MR. ANTKOWIAK:  The driver's logs?
20     MR. CHIVERS:  Yeah, the driver's logs.
21     MR. ANTKOWIAK:  Right.
22     MR. CHIVERS:  And his actual pay statements,
23 because your witness today is saying that the pay
24 statements will identify bonuses, for example.
25 Okay?

226

1      MR. ANTKOWIAK: Uh-huh.
2      MR. CHIVERS: And as I recall, even will
3  identify whether it's a SSE bonus or just a
4  regular bonus.
5
6  BY MR. CHIVERS:
7      Q. Am I correct, sir?
8      A. It will define what the bonus is paid on his
9  pay record, only in an amount. I don't know that it
10  will tell how that was derived.
11      Q. Fair enough.
12      In other words, whether -- it won't
13  necessarily say that he was an SSE or a junior wireline
14  operator or anything like that?
15      A. Right.
16      Q. Okay.
17      A. Or how the bonus was calculated. All it's
18  going to give is a dollar amount that he was paid, or
19  if he was paid any.
20      Q. And for me to determine whether he was paid
21  the same bonus as the other wireline operators on that
22  job, I would then need to be able to identify -- I
23  would need to be able to look at what, the bonus
24  sheets?
25      A. Yeah.

227

1      Q. Is that right?
2      A. Yes.
3      MR. CHIVERS: Maybe that's what I'll do then.
4      MR. ANTKOWIAK: I believe you have bonus
5  sheets.
6      MR. CHIVERS: Okay.
7      MR. ANTKOWIAK: We used one as an exhibit
8  today, so I'm assuming that you have -- it's my
9  understanding that we have produced all of the --
10  I mean, the records we've identified -- we're not
11  holding anything back as far as I'm aware of,
12  so --
13      MR. CHIVERS: That's fair. That's fair.
14      Let's at least -- can we agree, get me his
15  pay statements and his logs, if you have them? I
16  honestly think I'm going to need those for my
17  motion.
18      MR. ANTKOWIAK: Okay. Well, I mean, look.
19  Like I said, just give me a day to consider that
20  because my position is, as I've said a number of
21  times now, I don't see how that information is
22  relevant to certification. If the issue is that
23  he was paid similar to other folks holding
24  different titles, I mean, we're willing to
25  stipulate to, you know, who was paid a salary and

228

1  bonus, so --
2      MR. CHIVERS: Fair enough.
3      MR. ANTKOWIAK: So outside of that, I'm not
4  sure why we need to go back and dig through at
5  this stage, which is not to say that we're
6  rejecting to providing that at a later stage. It
7  just seems burdensome now.
8  BY MR. CHIVERS:
9      Q. Fair to say -- Let me ask the witness. Is it
10  fair to say, sir, that Mr. Tvrdovsky was paid in the
11  same method, the same basic method, which was salary
12  plus bonus, as the other salaried employees?
13      A. Yes, but at a different rate.
14      Q. "At a different rate" meaning at a different
15  bonus rate?
16      A. Different bonus rate, yes.
17      Q. And that, obviously, is what I would want to
18  be able to confirm through the records.
19      A. One thing about the driver's logs, we're not
20  required to keep those logs indefinitely. Now, since
21  the lawsuit started, we have not gotten rid of any
22  driver's logs. But DOT regulations say we only have to
23  hold them for a certain amount of time. And it's
24  possible that that -- I'll have to go back and look at
25  his in particular, but that could be the reason they're

229

1  not -- that he didn't have any driver's logs.
2      MR. CHIVERS: You know, and what, Christian,
3  you're saying to me is that, if the logs --
4  whether they're there or not -- presumably, we
5  would be able to dig through those documents and
6  find field tickets, right, and/or job reports that
7  would identify Mr. Tvrdovsky?
8      MR. ANTKOWIAK: If he filled one out. Do you
9  see what I'm saying? If there is one that exists,
10  it's my understanding that it would be in the
11  production, if we had that in our possession.
12      MR. CHIVERS: Okay.
13      MR. ANTKOWIAK: And if it's not in the
14  documents we've given to you -- I'm saying we
15  haven't held anything back.
16      MR. CHIVERS: That's fair.
17      MR. ANTKOWIAK: So I have no reason to
18  believe that we actually have it.
19      MR. CHIVERS: All right. If you would,
20  confirm that.
21      MR. ANTKOWIAK: Sure.
22      MR. CHIVERS: And you must have his pay
23  statements. You have to have those. I can't
24  believe that --
25      MR. ANTKOWIAK: I'm sure we do.

230

BY MR. CHIVERS:

1  Q.  Okay.  All right.  Now, having said all that,
2  I've identified those pages.  You've identified the two
3  pages for me with the Bates number.
4        Now let me just ask you a couple questions.
5  And I think we're very close to being finished.  I'm
6  going to show you your driver's logs that I just got in
7  myself.  I'm going to be copying these for you guys.
8        I'm going to represent to you, as far as I
9  can, these are Mr. Tvrdovsky's for November of 2012,
10 December of 2012, and February of 2013.  Okay?  Those
11 are the representations I'll make.  I have no reason to
12 question both what my client has told me and what is
13 evident from looking at the logs.
14       Do you recognize those documents generally,
15 what they are?
16     A.  Driver's logs.
17     Q.  All right.  And those are the driver's
18 logs -- an example of driver's logs that we have been
19 talking about today?
20     A.  Yes.
21     Q.  All right.  If you could just take a look --
22 flip through, if you would, because I just have some
23 general questions for you.  As I say, I'm going to
24 represent these are Mr. Tvrdovsky's.

231

1        Sir, from what you can tell you look at
2  these logs, does Mr. Tvrdovsky identify where he was on
3  a particular day?
4     A.  On some of them it does, it looks like.
5     Q.  Like, it says, "Ruffs Dale"?
6     A.  Yes.
7     Q.  Class, it defines what he was doing, or at
8  least generally.
9        Take a look at that page.  It says -- is it
10 "Ruffs Dale" --
11     A.  Uh-huh.
12     Q.  -- shop?
13     A.  Yes.
14     Q.  And then, it says something about, "drive to"
15 wherever?
16     A.  Yes.
17     Q.  Then, if you would, jump ahead and take --
18     MR. ANTKOWIAK:  If you don't mind, before we
19 move on, this is -- because it's not
20 Bates-numbered.  The date, 11/12/12, just for
21 purposes of future reference.
22     MR. CHIVERS:  Correct.
23 BY MR. CHIVERS:
24     Q.  Take a look at December's logbook.
25     MR. CHIVERS:  Christian, I'll get you copies

232

1  of these probably by tomorrow.
2     MR. ANTKOWIAK:  That's fine.
3     Q.  Let me ask you a question, sir, while you're
4  looking at them.  When you bring a new employee in,
5  he's required to attend classes?
6     A.  Correct.
7     Q.  And I believe that you can see some of that
8  was reflected in Mr. Tvrdovsky's personnel file?
9     A.  Correct.
10    Q.  Generally, those classes are completed within
11 the first month?
12    A.  Generally, yes.
13    Q.  And generally, after the first month, the new
14 employee, the junior wireline operator, such as
15 Mr. Tvrdovsky, are then assigned to crews?
16    A.  No.
17    Q.  When do they get assigned to crews?
18    A.  They may not ever be assigned to a certain
19 crew, but once they've -- toward the end of their SSE
20 project, once they've gone through certain check-offs
21 on that SSE check-off list --
22    Q.  Okay.  Now, having said that, is there a set
23 time before they're actually assigned to a site on a
24 crew?
25    A.  No.

233

1     Q.  Okay.  Is it fair to say it's based on the
2  needs of the organization?
3     A.  Yes.
4     Q.  And based on the person's showing that he's
5  capable?
6     A.  It depends on what form that he goes out in.
7  If he's out for a Shell -- for a Shell customer, I
8  can't send him out until six months without a certain
9  amount of other people going with him.  So he has to go
10 out as an extra guy always.
11    Q.  Like the fourth guy?
12    A.  Like the fourth guy.
13    Q.  Okay.  So if you look at the log -- in
14 particular, turn to February, the next logbook.  You
15 see where it says "Frankhouser"?
16    A.  Yes.
17    Q.  Do you know what Frankhouser is?
18    A.  No, I don't.
19    Q.  If I represent to you that Frankhouser is a
20 well site near Montrose, Pennsylvania, does that name
21 mean anything to you, Montrose?
22    A.  I know that it's a town in Pennsylvania,
23 so --
24    Q.  Do you know whether there's a well site, a
25 Frankhouser well site in Montrose?

234

1      A.  I do not.
2      Q.  If you look through the log, you'll see a
3  bunch of entries for Frankhouser.  Do you see that?
4      A.  Yes.
5      Q.  Now, do you also see there -- a few more
6  pages and I think you'll see where it says, "night
7  shift."
8      A.  Okay.
9      Q.  What's the date for the Frankhouser night
10  shift?  There are a few of them.
11      A.  2/12, 2/13.
12      Q.  And the year is 2013.  Correct?
13      A.  Yes.
14      Q.  All right.
15      A.  2/14, 2/15.  That seems to be all of them.
16      Q.  Would you agree with me, sir, that night
17  shifts are not performed at the shop?
18      A.  Correct.
19      Q.  All right.  So if it says "night shift," it
20  means he was -- it means Mr. Tvrdovsky was out at the
21  site?
22      A.  Yes.  Probably, yes.
23      Q.  Okay.  What you've said today is that one
24  could go from -- or should I say, you could then take a
25  look at the job orders and the field tickets

235

1  corresponding to those dates and, presumably, identify
2  the fact that Mr. Tvrdovsky was at a site?
3      A.  Yes.
4      Q.  All right.  And presumably, then, also
5  identify who else was on the crew?
6      A.  Yes.
7      Q.  Because, as you indicated to me when we were
8  looking through those documents, in the upper
9  right-hand corner of these field tickets like
10  Exhibit 13 it will identify the operator, who's the
11  engineer, and the riggers, who are the wireline
12  operators?
13      A.  Yes.  I probably wouldn't use that document
14  to identify who was on the site.  I would use the job
15  report document.
16      Q.  Okay.  All right.  You indicated -- you take
17  a look -- I'm done with those.
18      MR. CHIVERS:  And I'll get you the copies.
19  Okay?
20      MR. ANTKOWIAK:  That's fine.  Thank you.
21      Q.  You indicated, when you were looking at
22  Exhibit 14 -- could you look at Exhibit 14 for a
23  moment?
24      MR. CHIVERS:  And then John and I are going
25  to step outside, and I think we're just about

236

1  done.
2      A.  Okay.
3      Q.  Take a look at the second page, Bates number
4  14419.  Do you see that?
5      A.  Yes.
6      Q.  We talked about this briefly.  And you were
7  explaining that the bonus is calculated based on time?
8      A.  Correct.
9      Q.  Did you develop that -- did you develop the
10  formula?
11      In other words -- I'll be honest with you.
12  We were trying to figure this out.  We were doing some
13  kind of back-of-the-envelope calculations.
14      A.  Right.
15      Q.  We couldn't figure it out.
16      So if you would, let's just take -- I got it.
17  I got it.  Take a look at Mike Stratton.
18      A.  Okay.
19      Q.  Right?
20      You see where it says, "Mike Stratton, 54
21  total time."  Right?
22      A.  Yes.
23      Q.  $161.05?
24      A.  Okay.
25      Q.  Now, look.  If all I did was take 54 and

237

1  divide it into $161, I come up with like $3 an hour.
2      A.  All right.
3      Q.  Is that what you do?
4      A.  No.  We take the total number of hours that
5  were on the job and divide it into the -- take the
6  total number of hours, divide it into the 4 percent
7  that are going to get paid to the operators, and that's
8  going to give you the hourly rate that we pay.
9      Q.  It will give you the additional amount that
10  was paid?
11      A.  Yes.
12      Q.  So correct me if I'm wrong.  This is going to
13  vary -- it's going to go up and down -- depending upon
14  how much money is paid.  Right?
15      A.  Yes.
16      Q.  How much money is charged and paid and how
17  many hours, total hours, were devoted by a crew?
18      A.  By a crew member, yes.
19      Q.  By the one crew member or by all the crew
20  members?
21      A.  It's the total percentage that we're going to
22  pay to the riggers divided by the number of hours that
23  they were on location, by the total number of hours,
24  operating hours.
25      Q.  Yeah.  The total number of hours represented

**238**

1 by all the crew members?
2    A. Correct.
3      (Discussion off the record.)
4    Q. Take a look at the bottom of this page,
5 14419. See where it says, "total engineer hours"?
6    A. Yes.
7    Q. All right. Now, the engineer hours
8 correspond to your engineer slash — we'll just call
9 them engineers right now, because that seems to be the
10 term that we're using; the guy, basically, that's
11 running the crew. Correct?
12    A. Yes. Yes.
13    Q. So you take the 171 total engineer's hours,
14 and then what you've got to do is you've got to — I
15 guess, before you do anything with that number, you got
16 to figure out the total amount that's been paid.
17 Right?
18    A. Job paid.
19    Q. There we go. $25,350. Right?
20    A. Correct.
21    Q. $25,350.
22      All right. Now, do you take 4 percent of
23 that?
24    A. Yes.
25    Q. Okay. So that's — 1 percent would be $253

**239**

1 basically, and you'll take that by four. $1,012,
2 right?
3    A. Yes.
4    Q. About?
5    A. $1,014 is what it came out to.
6    Q. Thank you.
7      In fact, it even shows that, $1,014; doesn't
8 it?
9    A. Yes.
10    Q. And what do you do? You take the $1,014
11 divided by what?
12    A. By the total number of hours.
13    Q. Total number of engineer hours?
14    A. Yes.
15    Q. So it's $1,014 divided by 170, and that comes
16 out to like, what?
17      (Discussion off the record.)
18    Q. So if you take the $1,014 and you divide it
19 by 170 — Okay?
20    A. Yes.
21    Q. That's $5.96. All right? I'm just telling
22 you.
23    A. Okay.
24    Q. My calculator has always been right. So
25 that's $5.96.

**240**

1      Now, how in the heck — Wait a second. It's
2 a proportionate amount?
3    A. Yes.
4    Q. That's what it is. It's a proportionate
5 amount.
6      So if somebody — Dave Noel put in 91, and
7 the total number of hours are 170. Right?
8    A. Right. You take that $5.96 and multiply it
9 times 91, and you're going to come up with $542.
10    Q. Well, there's another way to do it, too.
11    A. Yeah.
12    Q. You could take 53 and a half percent .535,
13 times $1,014, and you probably come up — you do; I'm
14 sure — with the amount that he got. Okay?
15    A. Uh-huh.
16    Q. Yep. All right. Yep. $542.79. Okay?
17    A. Yes.
18    Q. All right. So they get a proportionate share
19 of the bonus that has been allocated, first, to the
20 engineers. Right?
21    A. Right.
22    Q. And then, 2 percent is allocated to the
23 wireline — to the operators?
24    A. Yes.
25    Q. Correct?

**241**

1    A. Yes.
2    Q. And so if 2 percent is allocated to the
3 wireline guys — I mean the operators —
4    A. It's actually 5 percent on this, on this
5 calculation. You have two operators at 2 percent, and
6 you have one operator at 1 percent. You had an SSE on
7 location. So the total number of bonus -- the total
8 amount of bonus was 5 percent.
9    Q. Well, all we've got to do is take $1,521 —
10 right — and calculate what percentage that is of
11 $25,350. Correct?
12    A. Yes.
13    Q. So if $1,521 is divided by $25,350 —
14 6 percent, that's what it says.
15    A. All right.
16    Q. All right. That's 6 percent. And then, the
17 6 percent, how is that divvied up?
18    A. By hours. The same way the engineers were
19 divvied up, proportions.
20    Q. Wait a second. Oh, I see. So the total
21 amount of money that's going to be distributed is
22 $1,521. Right?
23    A. Correct.
24    Q. And your share of that $1,521 is based upon
25 the total time that you spent on the job?

242

1   A. That you were on location. Correct.
2   Q. That you're on location. Okay.
3       Correct me if I'm wrong, sir, but how much
4   you get in the bonuses is independent of how much your
5   salary is?
6       You could have one wireline operator making
7   $3,000 a month, another one making $4,000 a month. The
8   amount they have in their bonus has nothing to do with
9   their salary. It's strictly a matter of how much time
10  they spend at the site and proportionate amount of the
11  hours they spent on the site compared to the total
12  number of hours on the site for that group of people
13  who are going to be getting the bonus?
14  A. Yes. The bonus is to compensate you for the
15  amount of time that you're on the site.
16  Q. I know. But you'll agree with me, sir, that
17  it has nothing to do with your -- let's say whether --
18  your salary or your hourly rate. It has nothing to do
19  with either one.
20  A. I'm sorry. I don't -- Explain it again. Say
21  it again.
22  Q. Yeah. I could be a guy that comes in; I'm
23  being paid $3,000 a month. Right?
24  A. Okay.
25  Q. Okay? Another guy could be getting $5,000 a

243

1   month because he's more senior than I am. Right?
2   A. Okay.
3   Q. I get a bigger chunk of the bonus, the amount
4   set aside for the riggers, let's say, based strictly on
5   how many hours I spent on that job.
6   A. Yes.
7   Q. Okay. It has nothing to do with what my
8   normal rate of pay is. Even though I'm making much
9   less per hour, if you calculate the salary according to
10  an hourly basis -- even though my hourly rate is much
11  lower, I'm still getting a bigger chunk of the bonus
12  than the guy who has a higher salary, who spent fewer
13  hours?
14  A. At this time we weren't paying hours.
15  Q. I understand. I do understand that. Okay?
16  A. So it doesn't have anything to do with hourly
17  rates.
18  Q. You'll agree with me that if you took $3,000
19  a month, it translates basically to $36,000 a year?
20  Understood?
21  A. Yes.
22  Q. Okay. And if you calculated that on an
23  hourly basis -- let's say you divide it by a normal
24  year of 2,080. That's what they normally do. That's
25  what Department of Labor does. Right?

244

1   A. I'll take your word on it.
2   Q. Fine. You could calculate that based on an
3   hourly rate, the salary?
4   A. Yeah, I guess you could --
5   Q. Yeah.
6   A. -- although the salary does have overtime
7   built into it also. So to get that hourly rate that we
8   were compensating for the salary, it's based on a
9   60-hour week. It's based on 20 hours of overtime.
10  Q. Let's do that. Okay?
11  A. Okay.
12  Q. Let's take 60 hours a week. You're going to
13  come up with -- if you do 60 hours a week for 52
14  weeks -- you have a certain number of weeks that you
15  worked in a year; haven't you?
16  A. Yes.
17  Q. And a certain number of hours that you
18  worked?
19  A. Yes.
20  Q. And that would calculate -- if you divided
21  all those hours up and you divided it into the total
22  amount that that person is being paid, you could derive
23  an hourly rate; couldn't you?
24  A. Yes.
25  Q. And what I'm saying to you -- you'll agree

245

1   that that hourly rate -- if you calculate the salary by
2   an hourly rate, right, based on 60 hours a week, the
3   amount the guy gets in bonus has nothing to do with
4   what that hourly rate is?
5   A. Correct.
6       MR. CHIVERS: John, why don't we take a
7   break. Okay?
8       We're almost done.
9       (Recess taken.)
10  Q. I have three questions and, hopefully, no
11  subquestions.
12      The charges that you use, the RDX, MDX -- is
13  that right?
14  A. RDX, PETN -- I forget what the other one
15  was -- RDX -- HMX.
16  Q. You get those supplies from where? Where do
17  you get those explosive supplies?
18  A. From a warehouse here in Pennsylvania, from
19  Owen Oil Tool Company and Titan Oil Tools, and there
20  may be a couple other manufacturers that I get them
21  from.
22  Q. Do you know where those manufacturers are, by
23  any chance?
24  A. Where they're actually manufactured or where
25  they're warehoused?

**NETWORK DEPOSITION SERVICES**
**Transcript of Randy Cassady**

63 (Pages 246 to 249)

246

1  Q.  Manufactured.
2  A.  Fort Worth, in Texas.
3  Q.  Gotcha.
4     And then, they're warehoused up here?
5  A.  Yes.
6  Q.  Where are the warehouses?
7  A.  And distributed.
8  Q.  Where are the warehouses, if you know?
9  A.  One is in Punxy.
10 Q.  Yeah.  Punxsutawney?
11 A.  Yeah.
12    And the other one is just north of it in --
13 Q.  Dubois?
14 A.  Yeah.  Exactly.
15 Q.  Just north of Punxsutawney?
16 A.  There's another manufacturer that's south of
17 here.  They also have warehouses in West Virginia.  And
18 so there's times that we actually get them from other
19 warehouses.
20 Q.  They store them in the warehouse, this
21 company out of Fort Worth?
22 A.  Yes.
23 Q.  One company?  Two companies?  Three
24 companies?  How many?
25 A.  There's about -- up in this area, there's two

247

1  major companies, and there's probably a couple more
2  minor --
3  Q.  Are you saying, now, the manufacturers are
4  only in Fort Worth, Texas, or are they elsewhere as
5  well?
6  A.  Probably -- the very highest percentage of
7  all perforating charges produced in the world are
8  produced out of various plants in Texas.
9  Q.  Various plants?
10 A.  Yes.
11 Q.  Various companies?
12 A.  Very few.  You could put them on one hand
13 probably.
14 Q.  Tell me what the companies are.
15 A.  Owen Oil & Tool.
16 Q.  How do you spell Owen?
17 A.  O-w-e-n.
18    Titan Industries.
19 Q.  Yeah.
20 A.  Shaped Charge Specialties.  That's just three
21 that I remember.
22 Q.  Are they out of Texas?
23 A.  Yes.
24 Q.  And do you order them from Texas, or do you
25 just order them from -- are they warehoused by those

248

1  companies up here in Pennsylvania or by -- or do they
2  ship them to somebody else?
3  A.  Combination.  They're warehoused here by the
4  companies.  The companies have distribution centers
5  here in Pennsylvania.
6  Q.  All right.  So I assume that, depending on
7  where you are, you get these charges.  Do you get them
8  delivered to your shops?
9  A.  Yes, sometimes.  Sometimes.
10 Q.  What else?
11 A.  Sometimes hotshots.  Sometimes we'll get them
12 from the warehouse directly.  Sometimes they'll send
13 them in the mail.  Sometimes we have them directly
14 shipped from the manufacturer in Texas.
15 Q.  So at least, when they're being used at the
16 well site -- I assume these charges aren't used
17 anyplace other than the well site?
18 A.  Correct.
19 Q.  You're not blowing up your shop?
20 A.  No.
21 Q.  You're not blowing up the warehouse?
22 A.  No.
23 Q.  Okay.  Everybody knows that, I assume?
24    I mean, from the manufacturer to the
25 distributors, everybody knows these things are intended

249

1  for the shaped charges at the well sites?
2  A.  Yes.
3  Q.  Okay.
4  A.  These manufacturers make explosive devices
5  for other industries also, so I mean --
6  Q.  Fair enough.
7     But when you place an order from your company
8  to one of these companies, you're only, obviously,
9  purchasing the things you need in your business?
10 A.  Yes.
11 Q.  Okay.
12 A.  We have a usage statement with the companies
13 on what we're going to do with the explosives.
14 Q.  That's what I was wondering.  So, in other
15 words, they know that you're going to be using these at
16 the well sites?
17 A.  Yes.
18 Q.  Okay.
19 A.  It's probably part of our explosive license
20 from the ATF also.
21 Q.  I wondered.  Yeah.  Yeah.  I mean, I just --
22 I accept what you say, because I don't know, but it
23 sure makes sense.
24    Have you had written job descriptions --
25 let's go back five years.  When you started this

250

1  business, your business, did you say: Hey, I'm going
2  to write down these job titles, and I'm going to
3  describe in writing what these jobs are?
4      A.  No.
5      Q.  Okay.  Have you ever come up with such
6  written job descriptions?
7      A.  Yes.  I think you've got copies of them.
8      Q.  All right.  My question is:  When did you
9  write those?
10     A.  Probably within the first couple years after
11 we were in business.
12     Q.  Oh, yeah.  And those written job
13 descriptions, is it fair to say -- you even said, at
14 the beginning of this thing, that people do whatever
15 they got to do to get the job done, words to that
16 effect?
17     A.  Yes.
18     Q.  All right.  If an engineer on the site
19 decides that he needs a rigger to do something that
20 isn't in the job description, I'd assume, just so long
21 as it's safe, it's okay for that rigger to do it?
22     A.  Yes.
23         (Discussion off the record.)
24     Q.  Do you have to have a license to purchase
25 explosives?

251

1      A.  Yes.
2      Q.  And is it on file with the suppliers?
3      A.  Yes.
4      Q.  You told me that the pretrip reports -- there
5  will be copies of those?
6      A.  Should be, yes.
7      Q.  You also testified we can get bonus sheets.
8      MR. CHIVERS:  Actually, I think, Christian,
9  you were saying those bonus sheets should be in
10 that production?
11     MR. ANTKOWIAK:  As far as I know, this
12 exhibit -- 14419 is a bonus sheet, so it's my
13 understanding, we have provided that.  But, again,
14 we're going to go back and confirm we provided all
15 of everything, you know, that we have.
16     THE WITNESS:  I don't know if we were
17 specifically asked for bonus sheets, so --
18     MR. CHIVERS:  Yeah, I don't know either.  I
19 will say this --
20     MR. ANTKOWIAK:  Why don't we say this for the
21 record:  Because there have been a number of
22 issues that have come up today, why don't you send
23 us a letter, at the conclusion of this, outlining
24 the items that you think are at issue or have been
25 requested, and then we'll take up each of them

252

1  separately.
2      MR. CHIVERS:  That's a fair position.
3      MR. ANTKOWIAK:  Yeah, because, I mean, to my
4  understanding, we have provided a bonus sheet.
5  We'll go back and confirm the scope of what we've
6  provided.  If there are any additional sheets -- I
7  don't believe that we've consciously withheld
8  something that's been responsive, you know,
9  subject to our objections.  But I think it's
10 easiest if you draft a letter, outlining the
11 items, and then we can respond to it.
12     MR. CHIVERS:  With that, we're done.  And I
13 thank you.
14     MR. ANTKOWIAK:  Nothing else from me.
15         - - -
16     (Deposition concluded at 3:59 p.m.)
17         - - -
18
19
20
21
22
23
24
25

253

1          CERTIFICATE
2  COMMONWEALTH OF PENNSYLVANIA )
3  COUNTY OF ALLEGHENY        )
4                             )
5      I, Rebecca L. Schnur, do hereby certify that
6  before me, a Notary Public in and for the Commonwealth
   aforesaid, personally appeared RANDY CASSADY, who then
7  was by me first duly cautioned and sworn to testify the
   truth, the whole truth, and nothing but the truth in
8  the taking of his oral deposition in the cause
   aforesaid; that the testimony then given by him as
9  above set forth was by me reduced to stenotype in the
   presence of said witness, and afterwards transcribed by
10 means of computer-aided transcription.
11     I do further certify that this deposition was
   taken at the time and place in the foregoing caption
12 specified, and was completed without adjournment.
13     I do further certify that I am not a relative,
   counsel or attorney of either party or otherwise
14 interested in the event of this action.
15     IN WITNESS WHEREOF, I have hereunto set my hand
16 and affixed my seal of office at Pittsburgh,
17 Pennsylvania, on this _____ of _____,
18 2014.
19
20 _____
   Rebecca L. Schnur, RDR, Notary Public
21 In and for the Commonwealth of Pennsylvania
22 My Commission expires June 16, 2017.
23
24
25

254

```
 1    COMMONWEALTH OF PENNSYLVANIA )
           ERRATA SHEET            )
 2    COUNTY OF ALLEGHENY          )
 3       I hereby make the following changes in my
      deposition transcript.
 4
      PAGE LINE CHANGE FROM        CHANGE TO
 5    ___ ___ _____           _____
 6    ___ ___ _____           _____
 7    ___ ___ _____           _____
 8    ___ ___ _____           _____
 9    ___ ___ _____           _____
10    ___ ___ _____           _____
11    ___ ___ _____           _____
12    ___ ___ _____           _____
13            CERTIFICATE OF READING
14       I, _____ hereby acknowledge that I
      have read the foregoing deposition transcript this
15    ____ day of _____ 2014. I further certify that
      the answers are true and correct as described unless
16    otherwise noted on the Errata Sheet.
17    Witness Name: _____
18
19    Subscribed and sworn to before me this _____ day
20    of _____ 2014.
21
22                    _____
23             Notary Public
24
25
```

255

```
 1         NETWORK DEPOSITION SERVICES
                SUITE 1101, GULF TOWER
 2         PITTSBURGH, PENNSYLVANIA  15219
                   412-281-7908
 3
                       - - -
 4
 5
 6    August 14, 2014
 7
 8    Christian C. Antkowiak, Esquire
      Buchanan Ingersoll & Rooney, P.C.
 9    One Oxford Centre
      301 Grant Street, 20th Floor
10    Pittsburgh, PA  15219
11    In re: Curtis Tvrdovsky vs. Renegade Wireline Services
12    Dear Mr. Antkowiak:
13    Enclosed please find the signature page and a copy of
      the deposition transcript of Randy Cassady, taken
14    before me on July 31, 2014.
15    Please have the witness read the transcript, make any
      corrections he may have on the errata sheet and sign
16    the original signature page.  Please send the original
      signed signature page and any corrections to Joseph
17    Chivers, Esquire.
18    If the witness does not sign the transcript within
      30 days of receipt, signature will be deemed waived.
19
20    Sincerely,
21
22    Rebecca Schnur
23    CC: Joseph Chivers, Esquire
24
25
```